**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------------x
OUSAMA KARAWIA AND INTERNATIONAL ........ :
SERVICES, INC. d/b/a ISI,

..................................................................... : ....... ECF CASE

............... Plaintiffs, ............................. :
..................................................................... :
.............. against ........ - ........................... : ....... 08 Civ. 5471 (HB)
..................................................................... :
UNITED STATES DEPARTMENT OF LABOR, ......... :
..................................................................... :
............... Defendant. ............................ :
..................................................................... :
------------------------------------------------------------------------------- x


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2734
Facsimile: (212) 637-2686
Email: li.yu@usdoj.gov


LI YU
Assistant United States Attorney
........ - Of Counsel -

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................3

I.   Statutory and Regulatory Framework for Debarment under the SCA ...........................4

    A.   Debarment is the Normal Consequence of Violations of the SCA ...........................4

    B.   To Qualify for Relief from Debarment, a Federal Contractor Must Meet the Three-Part, "Unusual Circumstances" Test under 29 C.F.R. § 4.188(b) ...............................5

    C.   Sanction of Debarment Applies to Individuals Who Are "Responsible Parties" ......6

II.   Plaintiffs' History of Non-Compliance with the SCA ...................................................7

    A.   In May 2001, ISI and Karawia Accepted a Consent Decree to Settle DOL Charges Based on, Among Other Things, Prior Violations of the SCA.....................................7

    B.   Notwithstanding the May 2001 Consent Decree, Widespread Violations of the SCA Continued at ISI ........................................................................................................9

    C.   Mr. Karawia Was Actively Involved with ISI's Employment Practices .................10

III.   The DOL Administrative Proceedings ........................................................................11

    A.   Proceedings Before the Administrative Law Judge .................................................11

    B.   Proceedings Before the ARB ...................................................................................12

IV.   Plaintiffs' Complaint and Preliminary Injunction Motion ...........................................14

ARGUMENT .............................................................................................................................14

I.   Applicable Legal Standards .........................................................................................14

    A.   To Obtain Preliminary Injunctive Relief, Plaintiffs Must Establish Both Substantial Likelihood of Success on the Merit and Risk of Irreparable Harm ...........................14

    B.   To Prevail on the Merits, Plaintiffs Must Show that the 2007 ARB Decision Is "Arbitrary or Capricious" or Not Supported by "Preponderance of Evidence" .........16

II.   Plaintiffs' Do Not Demonstrate a Substantial Likelihood of Success on the Merits......16

    A.   The ARB Correctly Determined that Plaintiffs Should Be Debarred ....................18

        i.   Undisputed Evidence Demonstrated That Plaintiffs Engaged in Pervasive Violations of the SCA ...................................................................................16

        ii.   Plaintiffs' Conduct Was Culpable and Willful ...............................................17

        iii.   The ARB Correctly that "Unusual Circumstances" Relief Was Unavailable in Light of Plaintiffs' Culpable and Willful Conduct .........................................19

iv.    The ARB Correctly Declined to Excuse Plaintiffs' Violations Based on Various Actual or Alleged Extenuating Circumstances ..................................20

B.  The ARB Correctly Concluded that ISI's Removal from a Pre-Qualified Vendor List Was Not Relevant to Whether Plaintiffs Should Be Debarred ....................................22

C.  The ARB Correctly Concluded that Karawia Was a "Responsible Party"  ................23

D.  The ARB Correctly Concluded that No Jurisdictional Defect Existed  .....................24

III.    Plaintiffs' Cannot Establish a Risk of Irreparable Harm  ................................25

A.  Bid Protest Cases Are Inapposite As Plaintiffs Have Not Alleged Any Direct Effect of Debarment ..............................................................................26

B.  Mr. Karawia's Conjectures about the "Roll Over Effect" of Debarment on ISI's Municipal Contracts and Bids Are Insufficient  ..........................................26

C.  Conclusory Allegation about Loss of Reputation Likewise Is Insufficient  ..............28

CONCLUSION  .........................................................................................................28

# TABLE OF AUTHORITIES

## CASES

*A to Z Maintenance Corp. v. Dole*, 710 F. Supp. 853 (D.D.C. 1989) ..........................4, 16

*Aim Int'l Trading, L.L.C. v. Valcuine S.P.A.*, 02 Civ. 1363 *(PKL)*, 2002 WL
1285557 (S.D.N.Y. Jun. 11, 2002) ......................................................15, 27

*Bither v. Martin, CV 91-3455 CBM*, 1992 WL 207912 (C.D. Cal. 1992)......................5, 6

*Canales v. Paulson*, No. 06-1330(GK), 2007 WL 2071709 (D.D.C. Jul. 16, 2007).........23

*Clark v. Astrue*, 06 Civ. 15521, 2007 WL 737489 (S.D.N.Y. Mar. 28, 2007)..............3, 15

*Colorado Sec. Agency, Inc. v. United States*, No. 91-1981 TFH/DAR, 1992 WL
415388 (D.D.C. Jul 13, 1992)......................................................5, 6, 18, 19

*County of Nassau v. Leavitt*, 524 F.3d 408 (2d Cir. 2008) ...............................15

*Dantran, Inc. v. U.S. Department of Labor*, 171 F.3d 58 (1st Cir. 1999)......3, 5, 16, 18, 19

*Elaine's Cleaning Serv., Inc. v. U.S. Department of Labor, C-3-92-332*, 1995 WL
1612534 (S.D. Ohio Sept. 29, 1995)........................................16, 18, 19, 21

*Federal Food Serv., Inc. v. Donovan*, 658 F.S2d 830 (D.C. Cir. 1981) ............................17

*Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007)...............15

*Hudson v. United States*, 522 U.S. 93 (1997) ...................................................23

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 826
(Fed. Cl. 2002) ........................................................................26

*In re United Pan-Europe Communications N.V.*, M-47, 2003 WL 221819
(S.D.N.Y. Jan. 30, 2003)...............................................................28

*Jayaraj v. Scappini*, 66 F.3d 36 (2d Cir. 1995)...................................................27

*Johnson v. U.S. Dep't. of Labor*, No. 2:04-CV-775, 2005 WL 197042 (S.D. Ohio
Aug. 16, 2005) .................................................................7, 16, 24

*M & G Electronics Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91
(E.D.N.Y. 2003)........................................................................28

*Mastercraft Flooring, Inc. v. Donovan*, 589 F. Supp. 258 (D.D.C. 1984) .......................17

*Munaf v. Geren*, --, U.S. -- 2008 WL 2369260 (June 12, 2008)........................................14

*Nat'l Football League Players Ass'n v. Nat'l Football League Properties, Inc.*, 90
Civ. *4244 (MJL)*, 1991 WL 79325 (S.D.N.Y. May 7, 1991)........................................27

*No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148 (2d Cir. 2001) ....................15

*Novicki v. Cook*, 946 F.2d 938 (D.C. Cir. 1991)................................................................23

*Proffitt v. F.D.I.C.*, 200 F.3d 855 (D.C. Cir. 2000) .........................................................23

*Seattle Sec. Serv., Inc. v. United States*, 45 Fed. Cl. 560 (Fed. Cl. 2000) .........................26

*Shapiro v. Cadman Towers*, 51 F.3d 332 (2d Cir. 1995).................................................3, 15

*Stapp Towing, Inc. v. United States*, 34 Fed. Cl. 300 (Fed. Cl. 1995).............................22

*Summit Investigative Serv., Inc. v. Herman*, 34 F. Supp. 2d 16 (D.D.C. 1998) ..4, 6, 16, 19

*Time Products v. J. Tiras Classic Handbags, Inc.*, 93 Civ. 7856 *(CSH)*, 1994 WL
    363930 (S.D.N.Y. Jul 13, 1994) ................................................................................25

*United States v. Halpers*, 490 U.S. 435 (1989)................................................................23

*Vigilantes, Inc. v. Admin. Of Wages and Hours Division*, 968 F.2d 1412 (1st Cir.
    1992) ...........................................................................................................1, 5, 6, 15

*Wali v. Coughlin*, 754 F.2d 1015 (2d Cir. 1985) ............................................................25

*Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000) ...........................................................14

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(A)..........................................................................................................3

41 U.S.C. § 351, *et seq.,* McNamara-O'Hara Service Contract Act ...................................1

41 U.S.C. § 351(a)(1)-(2)....................................................................................................4

41 U.S.C. § 353(a) ............................................................................................................16

41 U.S.C. § 354(a) .....................................................................................................1, 2, 4,17

41 U.S.C. § 39 ..................................................................................................................16

29 C.F.R. § 4.187(e)(4).............................................................................................7, 23, 24

29 C.F.R. § 4.188(a)...........................................................................................................4

29 C.F.R. § 4.188(b) ...............................................................................................2, 5, 6, 13, 19

Defendant the United States Department of Labor (the "Government" or "DOL"), by its attorney Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to the plaintiffs' motion for a preliminary injunction.

## PRELIMINARY STATEMENT

Plaintiffs bring this lawsuit to evade the legal consequences of their own conduct. On May 30, 2008 – at the conclusion of more than five years of administrative proceedings, DOL's Administrative Review Board (the "ARB") ordered that plaintiff International Services, Inc. ("ISI"), a security services firm, and its President and Chief Executive Officer, plaintiff Mr. Karawia, be debarred from obtaining federal contracts for a period of three years. Plaintiffs' motion seeking to enjoin DOL from placing them on a debarment list should be denied because they cannot establish either a clear likelihood of success on the merits or irreparable harm.

DOL's decision to debar plaintiffs is based on ISI's repeated violations of the labor standards established pursuant to the McNamara-O'Hara Service Contract Act (the "SCA"), 41 U.S.C. § 351, *et seq.* Specifically, in 2001 and 2002, ISI underpaid wages and fringe benefits for 1,943 employees, with underpayment totaling over $630,000. Furthermore, in engaging in those widespread SCA violations, plaintiffs were not operating on a blank slate. Instead, this pattern of abuse began, and continued, after ISI and Mr. Karawia had entered into a May 2001 consent decree with DOL, pursuant to which they undertook to comply fully with the SCA's mandates. Indeed, that consent decree was itself a settlement of alleged widespread SCA violations at ISI in the late 1990s.

Under the plain language of the SCA, ISI's 2001 and 2002 violations subjected plaintiffs to debarment. *See* 41 U.S.C. § 354(a) ("no contract of the United States shall be awarded to the persons or firms appearing on [a] list [of violators of the SCA]"); *see also Vigilantes, Inc. v.*

*Admin. Of Wages and Hours Div.*, 968 F.2d 1412, 1418 (1st Cir. 1992) ("debarment of contractors who violate [] the SCA should be the norm, not the exception"). Nor can plaintiffs qualify for discretionary relief from debarment, which relief is reserved, pursuant to express language in the SCA, to instances where "unusual circumstances" exist. 41 U.S.C. § 354(a). As set forth in the governing DOL regulations, to qualify for relief based on "unusual circumstances," contractors, like plaintiffs, must pass a three-part test. *See* 29 C.F.R. § 4.188(b)(3). Here, as the ARB correctly concluded, plaintiffs cannot meet even the first part of that test. ISI, under Mr. Karawia's active leadership, committed systemic SCA violations in 2001 and 2002 when it already was fully aware of the obligations to comply with the SCA and, indeed, specifically promised to honor such compliance obligations. Plaintiffs, accordingly, were disqualified from relief from debarment because their conduct was "willful [or] deliberate" or reflected "culpable neglect or culpable conduct." 29 C.F.R. § 4.188(b)(3)(i).

Plaintiffs are not entitled to the extraordinary, preliminary remedy they seek because they cannot demonstrate a clear likelihood of success on the merits. Indeed, in that regard, plaintiffs challenge none of the key factual or legal underpinnings of the ARB's decision. First, they do not dispute the fact that they were under a clear obligation to comply with the SCA and to pay minimum wages and fringe benefits to their employees. Second, they also do not, and cannot, contest either the validity of the May 2001 consent decree or that they engaged in pervasive SCA violations in 2001 and 2002, even though the consent decree provided clear guidance on plaintiffs' compliance obligations. Third, plaintiffs likewise do not challenge the validity of 29 C.F.R. § 4.188(b)(3), the DOL regulation governing whether "unusual circumstances" exist to permit relief from debarment. Finally, they do not seriously contest the finding that the extraordinary scope of SCA violations at ISI in 2001 and 2002, viewed in conjunction with the clear guidance set forth in the May 2001 consent decree, constituted culpable or willful conduct.

Instead, plaintiffs rehash a medley of excuses and conclusory assertions that had been rejected, correctly, by the ARB. As set forth more fully below, plaintiffs' various contentions offer no basis for concluding that the ARB's legal analysis was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," *see* 5 U.S.C. § 706(2)(A), or that the factual conclusions lack support by a "preponderance of the evidence," *see*, *e.g.*, *Dantran, Inc. v. U.S. Dep't. of Labor*, 171 F.3d 58, 69-70 (1st Cir. 1999). Because plaintiffs cannot establish *any* likelihood of overturning DOL's debarment decision on the merits, let alone a substantial likelihood of success, their request for a preliminary injunction should be denied on that basis alone. *See*, *e.g.*, *Clark v. Astrue*, 06 Civ. 15521, 2007 WL 737489 at, *8 n.4 (S.D.N.Y. Mar. 28, 2007) (analysis of irreparable harm is unnecessary when plaintiff fails to demonstrate likelihood of success).

Plaintiffs' request for preliminary injunctive relief also must be denied because they have not demonstrated the prospect of irreparable harm. Plaintiffs do not, and cannot, claim that DOL's debarment decision has any direct impact on either ISI or Mr. Karawia. Debarment only precludes ISI from obtaining federal contracts; but, as plaintiffs admit, ISI currently does not seek any contract with the federal government. Instead, plaintiffs' alleged fears are based solely on speculations regarding possible adverse consequences that debarment could have on ISI's local and municipal governments contracts. Even here, plaintiffs offer no evidence that debarment would have any "actual or imminent" effect. *See Shapiro v. Cadman Towers, Inc*., 51 F.3d 328, 332 (2d Cir. 1995). Instead, they rely on speculation and conclusory allegations that, as a matter of law, do not entitle them to the remedy of preliminary injunctive relief.

**BACKGROUND**

**I.    The Statutory and Regulatory Framework for Debarment under the SCA**

The SCA, originally enacted in 1965, represents Congress's effort to address a long-standing problem — that, historically, federal service contractors' employees "tended to be among the lowest paid people in the economy" because, in part, they lacked representation by labor organizations.  *See Summit Investigative Serv., Inc. v. Herman*, 34 F. Supp. 2d 16, 19 (D.D.C. 1998) (citing legislative history).  Specifically, the SCA "mandates that those who contract to provide services to the United States must remunerate their employees with minimum wages and fringe benefits" as determined by DOL.  *Id.* (citing 41 U.S.C. § 351(a)(1)-(2)).

A.    Debarment Is the Normal Consequence for Violating the SCA

In 1972, Congress amended the SCA and made the sanction of a three-year term of debarment "mandatory" for violations of the SCA, "unless the Secretary [of Labor] otherwise recommends because of unusual circumstances."  *See Summit Investigative Serv.*, 34 F. Supp. 2d at 19.  As amended, section 5(a) of the SCA directs the United States Comptroller General to:

> distribute a list to all [federal] agencies [] giving the names of persons or firms that [] the Secretary [of Labor] have found to have violated this chapter.  Unless the Secretary otherwise recommends because of unusual circumstances, no contract of the United States shall be awarded to the persons or firms appearing on this list . . . until three years have elapsed from the date of publication of the list containing the name of such persons or firms.

41 U.S.C. 354(a); *see also* 29 C.F.R. 4.188(a).

By restricting relief from debarment to only those contractors who can establish "unusual circumstances," the 1972 amendments to the SCA are designed to prevent "the unbounded exercise of bureaucratic benevolence."  *A to Z Maintenance Corp. v. Dole*, 710 F.Supp 853, 855 (D.D.C. 1989).  Thus, "unusual circumstances" has been analogized to a "safety valve" that prevents debarment only when the violations of the SCA "are insignificant or minor" or "inadvertent."  *Summit Investigative Serv.*, 34 F. Supp. 2d at 20.  Indeed, as the First Circuit has

explained, the 1972 amendment to the SCA clearly evinces Congress's intent that "debarment of contractors who violate[] the SCA should be the norm, not the exception." *Vigilantes*, 968 F.2d at 1418; *see also Bither v. Martin*, CV 91-3455 CBM, 1992 WL 207912 at, *4 (C.D. Cal. 1992) ("a review of the pertinent legislative history demonstrate that Congress mandated strict application of the debarment provision of the SCA").

> B. To Qualify for Relief from Debarment, a Federal Contractor Must Meet the Three-Part, "Unusual Circumstances" Test under 29 C.F.R. § 4.188(b)

DOL has promulgated 29 C.F.R. 4.188(b), a regulation setting forth the standards governing DOL's application of the SCA's "unusual circumstances" exception to debarment. Specifically, 29 C.F.R. 4.188(b) establishes a three-part test, which has been uniformly applied by federal courts, for examining a set of aggravating and mitigating factors to determine whether a federal services contractor is entitled to relief from debarment.[1] *See, e.g.*, *Dantran, Inc. v. U.S. Dep't. of Labor*, 171 F.3d at 60 (1st Cir. 1999) (reviewing DOL's application of the three-part test); *Vigilantes*, 968 F.2d at 1418; *Colorado Sec. Agency, Inc. v. United States*, No. 91-1981

---

[1]    The DOL regulation, in relevant parts, provides:

(i) … Thus, where the respondent's conduct in causing or permitting violations of the Service Contract Act provisions of the contract is willful, deliberate or of an aggravated nature or where the violations are a result of culpable conduct such as culpable neglect to ascertain whether practices are in violation, culpable disregard of whether they were in violation or not, or culpable failure to comply with recordkeeping requirements (such as falsification of records), relief from the debarment sanction cannot be in order.  Furthermore, relief from debarment cannot be in order where a contractor has a history of similar violations, where a contractor has repeatedly violated the provisions of the Act, or where previous violations were serious in nature.

(ii) A good compliance history, cooperation in the investigation, repayment of moneys due, and sufficient assurances of future compliance are generally prerequisites to relief.  Where these prerequisites are present and none of the aggravated circumstances in the preceding paragraph exist, a variety of factors must still be considered, including whether the contractor has previously been investigated for violations of the Act, whether the contractor has committed recordkeeping violations which impeded the investigation, whether liability was dependent upon resolution of a bona fide legal issue of doubtful certainty, the contractor's efforts to ensure compliance, the nature, extent, and seriousness of any past or present violations, including the impact of violations on unpaid employees, and whether the sums due were promptly paid.

29 C.F.R. 4.188(b)(3)(i) – (ii).

TFH/DAR, 1992 WL 415388, at *3 (D.D.C. Jul 13, 1992).  To be entitled to relief from debarment, a federal contractor, like ISI, must pass all three parts of the test — failing to meet its burden as to any part "forecloses [that] contractor from availing itself of the [unusual circumstances] exception" to debarment.  *Summit Investigative Serv.*, 34 F. Supp. 2d at 20.

The first part of the test precludes relief unless a contractor can show that <u>none</u> of the following aggravating factors is present: (1) the violations are not willful, deliberate, or aggravated; (2) the violations are not the result of culpable neglect or culpable conduct; (3) there is no history of similar violations or of repeatedly violating the Act; and (4) there are no previous serious violations.  29 C.F.R. 4.188(b)(3)(i); *see also* Bither, 1992 WL 415388, at *5.

If a contractor passes the first part of the test, the contractor then must establish that certain mitigating conditions have been met.  These conditions include good compliance history, cooperation in the investigation, repayment of monies due, and sufficient assurances of future compliance.  *See* 29 C.F.R. 4.188(b)(3)(ii); *see also Vigilantes*, 968 F.2d at 1418.

Finally, when a contractor that has met its burden on the first two parts of the test, it needs to establish that it should be granted relief from debarment based on consideration of "a variety of factors," including  (1) whether the contractor was previously investigated for SCA violations; (2) whether recordkeeping violations impeded the investigation; (3) whether liability depended upon resolution of a bona fide legal issue of doubtful certainty; (4) the contractor's efforts to ensure compliance; (5) the nature, extent, and seriousness of any past or present violations, including the impact of violations on unpaid employees; and (6) whether sums due were promptly paid.  *See* 29 C.F.R. 4.188(b)(3)(ii).

C.    <u>Sanction of Debarment Applies to Individuals Who Are "Responsible Parties"</u>

To effectuate the statutory purpose of the SCA, DOL has promulgated regulations that subject "individuals as well as corporate contracting parties" to the sanctions of being "liable for

underpayments [] and other penalties, including debarment for a period of years" for violations

of the SCA.  *Johnson v. U.S. Dep't. of Labor*, No. 2:04-CV-775, 2005 WL 197042, at *3 (S.D.

Ohio Aug. 16, 2005).  Under the applicable regulation, 29 C.F.R. § 4.187(e)(4), the responsible

parties who can be held accountable for SCA violations include not only "officers of a

contracting firm officers of [the] contracting firm or [] signatories to the [federal] contract," but

also "persons [] who exercise control, supervision, or management over the performance of the

contract, including the labor policy or employment conditions" and who "by action or inaction,

cause or permit a contract to be breached."  *Id*.; *see also Johnson*, 2005 WL 197042, at *3.

## II.    Plaintiffs' History of Non-Compliance with the SCA

### A.    In May 2001, ISI and Karawia Accepted a Consent Decree to Settle DOL Charges Based on, Among Other Things, Prior Violations of the SCA

ISI is the business name for International Protective Services, Inc.  *See* Complaint at ¶ 20.

It is undisputed that, ISI won three federal service contracts in the late 1990s – two with the

General Service Administration ("GSA") and one with the Department of Veteran Affairs.

Likewise undisputed is the fact that DOL charged plaintiffs, along with two other ISI officers

and an ISI affiliate, in an administrative proceeding in 1999 for having violated the SCA's

mandates (the "1999 SCA Complaint").  *See* Declaration of Barbara E. Racine dated July 2, 2008

(the "Racine Decl.") at ¶ 4.

On May 9, 2001, plaintiffs, along with three other parties charged in the 1999 SCA

Complaint, entered into a consent decree with DOL before an Administrative Law Judge (the

"May 2001 Consent Decree") to resolve the administrative proceedings brought by DOL.[2]  *See*

*id*. at 9 (attached as Ex. D to the Declaration of Li Yu dated July 2, 2008 (the "Yu Decl.")).  As

---

[2]    DOL also initiated two administrative proceedings against ISI in 2000, alleging violations of the Fair Labor Standards Act.  *See* May 2001 Consent Decree at ¶ 7.  Those proceedings also were resolved pursuant to the May 2001 Consent Decree.

set forth in the May 2001 Consent Decree, DOL charged plaintiffs with committing 42 violations

of the SCA or the Contract Work Hours and Safety Standards Act, which resulted in ISI

underpaying its employees more than $117,000 in wages and overtime and more than $39,000 in

fringe benefits.  *See id*. at ¶¶ 4-6.

Pursuant to the May 2001 Consent Decree, plaintiffs affirmed their good faith belief "that

they [already have come to be] in compliance" with the SCA's mandates and promised to remain

in compliance with the SCA.  *See id*. at ¶ 10.  They also agreed to reimburse ISI employees for

past underpayments, *see id*. at ¶ 8, and paid $7,700 in civil money penalties to DOL, *see id*. at ¶

13.  Finally, plaintiffs undertook to "establish [] a compliance program covering employees of

[ISI]."  *Id*. at ¶ 11.

The compliance program that plaintiffs undertook to implement included, among other

things, informational meetings and written materials designed to inform ISI employees of their

rights under the SCA and the appointment of an ombudsmen empowered to "investigate and

correct payroll problems promptly."  May 2001 Consent Decree at ¶ 11.  Further, as set forth in

the description attached to the consent decree, plaintiffs also accepted the responsibility to notify

ISI employees of the "availability, duties, and authority of the ombudsman" and to ensure that

the duly appointed ombudsman retained reports of employee complaints.  *See id*., Attachment A

at ¶ 3.

B.    Notwithstanding the May 2001 Consent Decree, Widespread Violations of the SCA Continued at ISI

In spite of the promises and undertakings they gave in connection with entering into the May 2001 Consent Decree, plaintiffs did not comply with the SCA's mandates or implement an adequate compliance program.  In that regard, ISI continued to provide security services to the federal government after May 2001, including pursuant to two contracts with the GSA, Nos. GS-02P-94-CID0141 and GS-02P-02-CIF-0001 (the "ISI GSA Contracts").  In mid-January 2002, however, barely seven months after the entry of the May 2001 Consent Decree, DOL sent a letter to ISI's then Chief Financial Officer to notify her that DOL had received numerous payroll complaints from ISI employees.  *See* January 16, 2002 letter from Catherine Quinn to Peggy Orlando (attached hereto as Ex. I to Yu Decl.).  It was necessary for DOL to contact Ms. Orlando, ISI's CFO, because DOL's three prior attempts to address those complaints with Hannibal Almodovar, the ombudsman designated by Mr. Karawia, had been met with complete silence.  *See id.*

Indeed, plaintiffs do not, and cannot, dispute that they paid little heed to complying with the SCA in 2001 and 2002, notwithstanding their promises or undertakings to contrary in the May 2001 Consent Decree.  For example, pursuant to the May 2001 Consent Decree, Mr. Karawia undertook to appoint an ombudsman and empower him or her "to investigate and correct payroll problems promptly." *See id.* at ¶ 11.  Yet, as Mr. Karawia admitted during the administrative proceedings, he in fact instructed ISI employees to report such problems to their supervisor or local manager, instead of the ombudsman directly.  *See* Transcript of Hearing before ALJ Romano on at 643 (hereafter, the "Hearing Tr.") (attached as Ex. F to Yu Decl.).

The result of plaintiffs' total disregard for their responsibility to comply with the SCA was both predictable and undisputed.  From May 2001 until October 18, 2002, when the GSA terminated its contracts with ISI, DOL was required to take 36 compliance actions against ISI for

9

SCA violations. The pervasiveness of those violations of the SCA, likewise, is not in dispute: plaintiffs' conduct affected 1,943 ISI employees; and the total underpayment of wages and benefits for the effected employees amounted to more than $630,000.

      C.    Mr. Karawia Was Actively Involved with ISI's Employment Practices

Finally, Mr. Karawia was actively involved in the key aspects of ISI's bids for and performance of federal service contracts, including ISI's employment practices. According to his own admissions before ALJ Romano, Mr. Karawia is the founder of ISI and, during all relevant times, retained 100 percent ownership of ISI through a holding company. *See* Hearing Tr. at 373, 628. He also was, at the relevant times, ISI's President and CEO. *See id*. at 628.

Mr. Karawia was not a hands-off chief executive. As his own testimony shows, Mr. Karawia participated in the negotiations of ISI's service contracts with the federal government and negotiated ISI's collective bargaining agreements with its employees. *See* Hearing Tr. at 633-635; *see also* Agreement between ISI and the United Federation of Security Officers, Inc. at 17 (Karawia's signature on behalf of ISI) (attached as Ex. F to Yu Decl.). Mr. Karawia also admitted that he personally signed payroll checks for ISI's employees and supervised the work of ISI's finance staff, including the chief financial officer. *See* Hearing Tr. at 634-638. Likewise, after he and ISI undertook to abide by the SCA's mandates pursuant to the May 2001 Consent Decree, Mr. Karawia ordered the ombudsman, Hannibal Almodovar, report to him. *See id*. at 645. Finally, it was Mr. Karawia, as he admitted, who set up "a process" at ISI that directed employees to sidestep the compliance program established pursuant to the May 2001 Consent Decree when they had complaints about violations of the SCA. *See id*. at 643.

### III.    DOL's Administrative Proceedings

A.    Proceedings Before the Administrative Law Judge

On May 28, 2003, DOL filed an administrative complaint (the "May 2003 DOL Complaint") against plaintiffs.[3]  *See* Racine Decl. at ¶¶ 8.  The May 2003 DOL Complaint alleges that plaintiffs violated the SCA by failing to pay minimum hourly wages and to make timely payments of minimum fringe benefits in connection with the ISI GSA Contracts.  *See id.* In response, plaintiffs raised many of the same arguments they advance here, including lack of personal jurisdiction as to ISI, entitlement to discretionary relief based on "unusual circumstances" because of alleged discrimination and GSA's late or withheld payments, *de facto* debarment, and, as to Mr. Karawia, lack of personal responsibility.  *See* July 6, 2005 Decision and Order (the "ALJ Decision") at 3 (attached at Ex. A to the Yu Decl., also Plaintiffs' Ex. 6).

After the matter was referred to him, DOL Administrative Law Judge Ralph A. Romano ("ALJ Romano") held hearings on November 22-23, 2004 and again on January 4-5, 2005.  *See* Racine Decl. at ¶ 10.  Nine witnesses testified before ALJ Romano, including Mr. Karawia, three DOL investigators, a district director at DOL's Wage and Hour Division, as well as three ISI employees.  *See id.*  In addition, the deposition testimony of Mr. Almodvoar, the ombudsman for ISI, also was introduced.  *See* ALJ Decision at 5-6.  After the hearings concluded, ALJ Romano gave DOL and plaintiffs a further opportunity to submit additional evidence and briefings.

On July 6, 2005, ALJ Romano issued a Decision and Order, holding that plaintiffs should "be debarred for a period of 3 years."  *See* ALJ Decision at 10.  In support of that decision, the ALJ found that plaintiffs' had admitted to having violated the SCA.  *See id.* at 2-3.  As to discretionary relief based on "unusual circumstances," ALJ Romano concluded that such relief

---

[3]    The May 2003 DOL Complaint also charged two other officers of ISI, .  Those charges were resolved pursuant to a settlement.  *See* Racine Decl. at ¶¶ 8-9.

was unavailable to plaintiffs because they had "acted with culpable neglect." *Id.* at 7- 8. Finally, ALJ Romano considered the excuses and contentions that plaintiffs had interposed, including *de facto* debarment, lack of personal jurisdiction over ISI, and lack of personal responsibility as to Mr. Karawia, and rejected them. *See id.* at 6-7, 9.

### B.    Proceedings Before the ARB

On administrative appeal to the ARB, plaintiffs advanced the same arguments against debarment that they had made to ALJ Romano. In reviewing the ALJ's decision to debar plaintiffs, the ARB did not simply rely on the ALJ's analysis; instead, the ARB independently considered the record evidence as to the circumstances of the alleged SCA violations. Based on that independent analysis, the ARB affirmed ALJ Romano's determination that plaintiffs should be debarred in a Final Decision and Order dated December 21, 2007 (the "2007 ARB Decision"). *See id.* at 2 (attached as Ex. B to the Yu Decl., also Plaintiffs' Ex. 7).

The ARB's decision rested on three conclusions:

- First, the ARB concluded that plaintiffs "are subject to debarment" because even though ALJ Romano erroneously deemed it unnecessary to address that issue, the administrative "record contains ample evidence that [plaintiffs had] violated the Act" in 2001 and 2002, including testimony and record evidence that ISI had underpaid 1,943 employees $631,081.07 in wages and fringe benefits.[4] 2007 ARB Decision at 6.

- Second, focusing on evidence of the pervasiveness of the SCA violations at ISI and of the fact that such violations occurred after the May 2001 Consent Decree had given plaintiffs specific guidance on appropriate compliance measures, the ARB found that plaintiffs' conduct was both "willful, intentional and deliberate" and reflected

---

[4]    The ARB found that the ALJ had made two mistakes: 1) it was error to conclude that plaintiffs had specifically admitted their 2001 and 2002 SCA violations; and 2) it was error to deem failures to comply with the May 2001 Consent Decree to be violations of the SCA. *See* December 2007 ARB Decision at 5.

12

"culpable neglect." *See id*. at 6-7.  Because plaintiffs could not "meet the first part of the three-part test" under 29 C.F.R. § 4.188(b)(3), the ARB concluded, relief from debarment was not warranted.  *Id*.

- Finally, the ARB considered plaintiffs' numerous contentions and found them to be unavailing.  Specifically, the ARB rejected plaintiffs' bid to use allegations of racism against a GSA officer and late or withheld payments by GSA as an excuse for their SCA violations because there was "no evidence that [the] alleged racism and sabotage caused ISI to underpay its employees" and also no legal or factual basis to allow a contractor to underpay employees due to late or withheld payments.  2007 ARB Decision at 9-10.  The ARB also rejected the bald assertion that plaintiffs deserved relief from debarment because they had been removed from the GSA's list of contractors pre-qualified to conduct business with the federal government – that position, the ARB held, conflicts with the clear mandate of SCA's statutory language. *See id*. at 10.  Finally, the ARB, like the ALJ, rejected plaintiffs' contentions that personal jurisdiction over ISI did not exist and that Mr. Karawia was not a responsible party, holding that ISI's active participation in the administrative proceedings and evidence of Mr. Karawia's extensive involvement in employment matters at ISI plainly belied those arguments.  *See id*. at 7-9.

Shortly after the issuance of the 2007 ARB Decision, plaintiff ISI sought reconsideration of that decision.  *See* ISI's Motion for Reconsideration (Plaintiff's Ex. 5).  On May 30, 2008, ARB denied ISI's request, finding that the motion for reconsideration failed to identify any new or overlooked issue of law or fact, but merely rehashed arguments that had been considered and rejected by the ALJ and the ARB.  *See* May 30, 2008 Order Denying Reconsideration at 3 (attached as Ex. C to Yu Decl.; also Plaintiffs' Ex. 27).

### IV.    Plaintiffs' Preliminary Injunction Motion

On June 17, 2008, plaintiffs filed the Complaint in this action and simultaneously moved, by order to show cause, for a preliminary injunction.  The Complaint and plaintiffs' moving papers identify no fact relevant to the merit of plaintiffs' debarment that they had not raised administratively; nor do they present any new legal issue that is of any moment.

It is worth noting at the outset that plaintiffs tacitly concede that they engaged in widespread underpayment of wages and benefits to their employees in 2001 and 2002.  *See* Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order/Preliminary Injunction ("Pl. Br.") at 9 (proffering excuses for why ISI did not timely pay its employees).  Nor do plaintiffs dispute either the existence or the validity of the May 2001 Consent Decree, an agreement that put them on explicit notice of their obligations under the SCA.  Thus, there is no dispute that plaintiffs have persisted in violating the SCA, thus subjecting ISI, along with any "responsible party," to debarment.  In short, plaintiffs do not deny violating the SCA; they claim they should be allowed to avoid debarment solely because of "unusual circumstances."  *See* Pl. Br. at 1 (defining the gravamen of the present motion as "whether plaintiffs' debarment should be vacated because unusual circumstances existed").

ARGUMENT

### I.    The Applicable Legal Standards

##### A.    To Obtain a Preliminary Injunction, Plaintiffs Must Demonstrate Both Substantial Likelihood of Success on the Merits and the Prospect of Irreparable Harm

"Preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, -- U.S. --, 2008 WL 2369260, at *11 (June 12, 2008) (internal quotation omitted).  A movant seeking that remedy has the burden to "demonstrate [] a likelihood of success on the merits," *see id*., as well as that "absent injunctive relief, it will suffer irreparable harm," *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000) (internal quotation omitted).  Further, to show that they are entitled

14

to a preliminary injunction, plaintiffs must prove establish each element "by a clear showing." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

First, the requirement that the party seeking the injunction must establish its likelihood of success is especially salient when the injunction sought "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme."[5]  *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008).  Here, because the injunctive relief that plaintiffs seek would delay the implementation of the clear Congressional directive for "debarment of contractors who violate[] the SCA [to] be the norm, not the exception," *see Vigilantes*, 968 F.2d 1412, 1418, the "more rigorous likelihood-of-success standard" applies.  *See No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001).

Second, to "satisfy the irreparable harm requirement" prong requires plaintiffs to "demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual[,] imminent, and [] cannot be remedied if a court waits until the end of trial to resolve the harm."  *Id.*; *see also Cadman Towers*, 51 F.3d 332 (2d Cir. 1995).  To meet this burden, plaintiffs cannot simply point to "a mere possibility of irreparable harm," but instead must show that they are "likely to suffer irreparable harm if equitable relief is denied." *Aim Int'l Trading, L.L.C. v. Valcunine S.P.A.,* 02 Civ. 1363 (PKL), 2002 WL 1285557, at *4 (S.D.N.Y. Jun. 11, 2002) (emphasis added).  In sum, to prevail on this motion, plaintiffs must establish, by a clear showing, *both* that they have a clear likelihood of success on the merits and a likelihood of irreparable harm can be discerned from objective evidence, and not merely speculation and conjectures.  *See, e.g., Clark*, 2007 WL 737489, at *4.

---

[5]  Where the relief requested does not affect ""government action taken in the public interest," a movant may be subject to the lesser standard as to the merits of its claim by showing that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Wright*, 230 F.3d at 547.  Here,

B.    To Prevail on the Merits, Plaintiffs Must Show that the 2007 ARB Decision Is "Arbitrary or Capricious" or Not Supported by "Preponderance of Evidence"

Judicial review of the ARB's debarment decision is not *de novo*. *See Summit Investigative Serv.*, 34 F. Supp. 2d at 20-21 (noting that courts should not "substitute its judgment for that of the [DOL]"); *see also Johnson*, 2005 WL 197042, at *6 ("the Court does not review the evidence *de novo*"). Instead, two distinct standards of review apply to the factual findings and the legal conclusions.

The ARB's conclusions of law are reviewed under the "arbitrary or capricious [] standard of 5 U.S.C. § 706" of the Administrative Procedure Act (the "APA"). *Elaine's Cleaning Serv., Inc. v. U.S. Dep't of Labor*, C-3-92-332, 1995 WL 1612534, at *2 (S.D. Ohio Sept. 29, 1995). Findings of fact,[6] on the other hand, must be upheld if they are "supported by the preponderance of the evidence." 41 U.S.C. § 353(a) (incorporating by reference 41 U.S.C. § 39); *see also A to Z Maintenance Corp. v. Dole*, 710 F.Supp. 853, 856 n.9 (D.D.C. 1989). In other words, to overturn a finding of fact in support of the administrative decisions to debar plaintiffs, this Court must conclude that that finding is, at least, clearly erroneous. *See Johnson*, 2005 WL 197042, at *6 (describing two alternative views on the preponderance of the evidence standard).

## II.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits

A.    The ARB Correctly Determined that Plaintiffs Should Be Debarred

i.    *Undisputed Evidence Demonstrated that Plaintiffs Engaged in Pervasive Violations of the SCA*

Here, there simply is no evidence to overturn the ARB's finding that plaintiffs violated the SCA. Indeed, evidence in the administrative record clearly establishes, and plaintiffs do not

---

[6]    There is disagreement as to whether deference is owed only to an ALJ's factual findings, or both the ALJ's and the ARB's findings. *Compare Dantran, Inc*., 171 F.3d at 71-72 (only ALJ's findings entitled to deference) with *Summit Investigative Serv.*, 34 F. Supp. 2d at 20 (suggesting that ARB's findings also are entitled to deference). Here, because plaintiffs do not challenge the ARB's finding that SCA violations occurred at ISI in 2001 and 2002, it is unnecessary for the Court to resolve this disagreement.

dispute, that, between May 2001 and October 2002, nearly 2,000 employees at ISI did not receive the minimum wages, basic fringe benefits, or both that were due them, in violation of the SCA. *See supra* at 8-9. The sheer scope of these SCA violations, as both the ALJ and the ARB found, was "astounding." *See* ALJ Decision at 8; 2007 ARB Decision at 6-7. Indeed, even plaintiffs tacitly concede that under the SCA, such pervasive violations subject ISI, as well as any other responsible parties, to debarment. *See supra* at 14; *see also* 41 U.S.C. § 354(a).

The pervasiveness of violations of the SCA at ISI following the May 2001 Consent Decree, involving over 1,900 employees and more than $600,000 in wages and benefits owed, marks a sharp contrast with many of the decisions upon which plaintiffs rely, *see* Pl. Br. at 27-28, in their effort to avoid debarment. Unlike *Federal Food Serv., Inc. v. Donovan*, 658 F.S2d 830 (D.C. Cir. 1981) and *Mastercraft Flooring, Inc. v. Donovan*, 589 F.Supp. 258 (D.D.C. 1984), for example, plaintiffs' failures to comply with the SCA clearly involve more than "*de minimis* underpayments" or "relatively significant" violations. *See Federal Food Serv.*, 658 F.S2d at 834; *Mastercraft Flooring*, 589 F.Supp. at 263.

### ii. Plaintiffs' Conduct Was Culpable and Willful

Similarly, there is no basis for overturning the ARB's determination that plaintiffs' conduct was culpable and willful, thus precluding them establishing the "unusual circumstances" necessary to avoid debarment. The evidence in the record makes clear that the violations of the SCA at ISI in 2001 and 2002 did not occur because plaintiffs were ignorant of their obligations to comply with the mandates of that statute. The May 2001 Consent Decree plainly establishes that, by May 2001, plaintiffs had been made well aware of three key facts: 1) the SCA's labor mandates, 2) their obligations to abide by those mandates, and 3) the specific steps to be taken to implement an effective compliance program. *See supra* at 7-8; *see also* ALJ Decision at 8; 2007 ARB Decision at 6-7.

Indeed, Mr. Almodovar testified that Mr. Karawia had personally selected him as the ombudsman under the May 2001 Consent Decree. *See* Transcript of Deposition of Hannibal Almodovar (the "Almodovar Tr.") at 30 (attached as Ex. I to Yu Decl.). However, Mr. Almodovar became a mere totem at ISI — Mr. Karawia, by his own admission, created a process to bypass the ombudsman whereby ISI employees were instructed to discuss their SCA complaints with their supervisors and managers, instead of directly with Mr. Almodovar. *See* Hearing Tr. at 643-44.

The irrefutable evidence of plaintiffs' awareness of the duty to comply with the SCA, combined with the scope of the violations that occurred at ISI in 2001 and 2002, clearly show that these violations did not result from mere negligence. *See Dantran, Inc.*, 171 F.3d at 69 (observing that "a contractor's disregard of legal requirements legitimately can be considered willful or grossly negligent, and thus manifest the species of culpability delineated by [29 C.F.R. § 4.188(b)(1)]"). As one court has observed, when a contractor continues to violate the SCA after having been "apprised of those violations and the consequences of continued non-compliance," such conduct can be deemed "willful and culpable." *Colorado Security Agency*, 1992 WL 415388, at *5.

Thus, unlike the contractor in *Elaine's Cleaning Serv.*, another case upon which plaintiffs rely, *see* Pl. Br. at 28-29, plaintiffs, in 2001 and 2002, lacked neither experience nor guidance about their compliance obligations. *See Elaine's Cleaning Serv.*, 1995 WL 1612534, at *6 (Elaine's "was relatively inexperienced in government contracting" and did not receive clear guidance about the SCA's fringe benefits requirements). Plaintiffs, likewise, cannot find refugee from ambiguous evidence on whether they had notice of the SCA's requirements, *cf. Dantran, Inc.*, 171 F.3d at 73 (culpable conduct not found because the contractor did not receive written notice of the relevant SCA requirements); to the contrary, the May 2001 Consent Decree is

unambiguous on both plaintiffs' obligations and the elements of an effective SCA compliance program.

### iii. The ARB Correctly Concluded that "Unusual Circumstances" Relief Was Unavailable in Light of Plaintiffs' Culpable and Willful Conduct

Plaintiffs' continuing failure to abide by the SCA's mandates after having received express notice of their compliance obligations reflects a level of disregard that is both culpable and willful. *See Colorado Security Agency*, 1992 WL 415388, at *4-5; *cf. Elaine's Cleaning Serv.*, 1995 WL 1612534, at *6 (defining culpable neglect under 29 C.F.R. §4.188(b)(3)(i) as "censurable or reprehensible" conduct) (internal citation omitted). A preponderance of evidence, therefore, clearly exists to support the ARB's conclusions that plaintiffs not only acted with "culpable neglect," but also engaged in "willful" misconduct. See 2007 ARB Decision at 6-7. Further, as the ARB correctly held, "culpable neglect" and "willful" misconduct both are aggravating factors under the first part of the three-part test under 29 C.F.R. 4.188(b)(3)(i). *See* 2007 ARB Decision at 6-7.

Under the applicable regulatory framework, once one or more aggravating factors obtains, "a government contractor cannot be saved from debarment." *Dantran, Inc.*, 171 F.3d at 68. The ARB and the ALJ, accordingly, acted in accordance with applicable law, and not arbitrarily or capriciously, when they declined to undertake the second and third steps in the three-part test.[7] *See Summit Investigative Serv.*, 34 F. Supp. 2d at 20 (the existence of aggravating circumstances under the first part of the three-part test "forecloses [that] contractor from availing itself of the [unusual circumstances] exception" to debarment). In sum, the ARB's

---

[7] In fact, even if the ARB were to have analyzed the evidence in light of the factors relevant to the second and third parts of the test, it would have found that plaintiffs would not qualify for relief from debarment. For example, plaintiffs cannot demonstrate that they satisfy the mitigating factors in the second part of the test — the administrative record is replete with evidence of their poor compliance history, *see, e.g.*, May 2001 Consent Decree, and lack of cooperation, *see, e.g.*, Hearings Tr. at 670-71.

19

decision that the SCA violations at ISI required plaintiffs' debarment is plainly supported by the preponderance of the evidence and clearly accords with applicable law.

>    iv.   *The ARB Correctly Declined to Excuse Plaintiffs' Violations Based on*
>          *Various Actual or Alleged Extenuating Circumstances*

Plaintiffs seek to overturn the ARB's determination that "unusual circumstances" did not obtain, arguing that their failure to comply with the SCA was not willful or culpable because their violations of the statute were attributable to 1) certain late payments by the GSA, 2) the GSA's decision to withhold payments in October 2002, and 3) alleged discrimination by a GSA employee. *See* Pl. Br. at 28-32. However, as the ARB and the ALJ correctly concluded, those contentions must be rejected because they simply are not supported by the evidence.

First, plaintiffs' own evidence belies the alleged nexus between late payments by the GSA and plaintiffs' SCA violations. *See* Aging Report of Amounts Owed from GSA to ISI ("Aging Report") (Plaintiff's Ex. 9).[8] Evidence was presented to ALJ Romano that during the period of May 31, 2001 to April 30, 2002, *i.e.*, the first year after the entry of the May 2001 Consent Decree, DOL undertook compliance actions against plaintiffs. *See* Racine Decl. at ¶ 7. For example, plaintiffs underpaid 17 employees in Anchorage, Alaska from March to July 2001, with underpayments totaling more than $3,400. *See id.*; *see also* Summary of Unpaid Wages dated August 27, 2001 (attached as Ex. G to Yu Decl.). Between March 2002 and May 2002, plaintiffs again underpaid the Anchorage ISI employees, with underpayments totaling more than

---

[8]    The aging report, which appears to be generated by ISI and does not bear a date, purports to show, at the end of each month from January 2001 to June 2003, the amounts billed by ISI on its GSA contracts, the amounts owed to ISI by the GSA, as well as the amounts that were more than 30, 60 and 90 days past due. It is far from clear that plaintiffs' aging report can be relied on as an accurate record of the history of GSA's payments to ISI; nor is it clear that this document would be admissible. Among other problems, the dates are not in exact chronological order, *e.g.*, 1/31/2002 appears between 3/31/2001 and 4/30/2001 on the first page; and the amounts in the "Total Owed" row, rather than increasing continuously, fluctuate inexplicably. For purposes of this opposition solely, the Government assumes the accuracy and admissibility that table.

$2,700.  *See* Summary of Unpaid Wages dated June 17, 2002 (attached as Ex. H to Yu Decl.).

But, according to plaintiffs' own aging report, GSA's payment to ISI was late in just three

months during that period.  *See* Aging Report at 1-2.  Further, none of these late payments

exceeded $100,000; and all were eventually made to ISI within 60 days of being due.  *See id.*

Thus, plaintiffs' reliance on *Elaine's Cleaning*, *see* Pl. Br. at 28-29, is misplaced.  In that

case, the district court concluded that the contractor "was financially unable to" comply with the

SCA and that the "sole cause of Elaine's financial inability" was the Air Force's failure to make

supplemental payments.  *Id.*, 1995 WL 1612534, at *6-7.  Here, in contrast, the late payments

from GSA could not have been the proximate cause for all of ISI's failure to pay its employees

during the May 1, 2001 to April 30, 2002 period.  In sum, the late payments by GSA are a red

herring and do not excuse plaintiffs' culpable non-compliance.[9]

Second, plaintiffs' attempt to blame the GSA's decision to withhold certain payments in

November and December 2002 for their SCA violations, *see* Pl. Br. at 30-31, is another red

herring.  Indeed, as the ARB correctly concluded, plaintiffs' contention defies logic — whether

ISI timely received payment from GSA in November 2002 is wholly irrelevant to whether

plaintiffs had the financial wherewithal to pay their employees between May 2001 and October

2002, when the SCA violations occurred.  *See* 2007 ARB Decision at 9-10.

Finally, plaintiffs' assertion that their non-compliance with the SCA should be excused

because they were victims of discrimination by a GSA employee, the "tabloid newspapers," and

possibly the then-New York Attorney General Elliot Spitzer, *see, e.g.*, Pl. Br. at 12-21, 31-32, is

meritless.  Once again, plaintiffs' own account and submissions illustrate the disconnect between

the alleged excuses and their violations of the SCA.  None of the news articles or e-mail

---

[9]    Although plaintiffs devote much attention to the period between November 2002 to June
2003, *ee* Pl. Br. at 30, that period has no relevance the debarment decision because that decision
is premised on SCA violations occurring before October 18, 2002.  *See* 2007 ARB Decision at 3.

messages submitted by plaintiffs is dated prior to June 2002.  By then, however, plaintiffs had

been subject to several compliance actions by DOL for, among other violations, underpaying

their Anchorage employees.  *See* Racine Decl. at ¶ 7.  Thus, plaintiffs' allegations concerning

discrimination, even if credited, cannot excuse their prior non-compliance with the SCA.

> **B.**    The ARB Correctly Concluded that ISI's Removal from a Pre-Qualified Vendor
> List Was Not Relevant to Whether Plaintiffs Should Be Debarred

Plaintiffs further argue that the ARB's debarment decision should be overturned because

the removal of ISI from the list of pre-qualified vendors to the federal government, the Federal

Supply Schedule, in 2003 by the GSA amounted to "*de facto* debarment."  In essence, plaintiffs

claim that GSA's 2003 decision regarding its pre-qualified vendor list somehow limited DOL's

authority to debar them.[10]  A contractor who claims "*de facto* debarment" may challenge agency

practices that, in the absence of formal debarment, nonetheless systematically exclude the

contractor.  *See Stapp Towing, Inc. v. United States*, 34 Fed. Cl. 300, 312 (Fed. Cl. 1995).  As a

threshold matter, here, however, nothing in the record suggests that plaintiffs ever pressed such a

claim against GSA in a court or an administrative proceeding, let alone obtaining a decision that

GSA's decision constituted "*de facto* debarment."

In any event, the ARB correctly recognized that nothing in the statutory language of the

SCA or the regulations promulgated to effectuate that statute authorized the ALJ to exempt

plaintiffs from debarment because of GSA's action.  *See* 2007 ARB Decision at 9.  Certainly, the

removal of ISI from the pre-qualified vendor list is not one of the factors that would allow either

the ARB or this Court to grant plaintiffs relief due to "unusual circumstances."  As set forth more

---

[10]    As a matter of fact, ISI's removal from the pre-qualified vendor list did not preclude it
from bidding on federal contracts.  Indeed, evidence presented to ALJ Romano includes
deposition testimony to this effect.  *See* Transcript of Deposition of Roger Pinnau at 5 (Q:  "If a
contractor is removed from the FSS [], can that contractor still bid on Federal Service contracts?"
A:  "Yes.") (attached as Exhibit K to the Yu Decl.).

fully above, *see supra* at 5-6, 29 C.F.R. § 4.188(b)(3) establishes a three-part test for determining whether the circumstances of a contractor's SCA violations amount to "unusual circumstances." A contractor's unsubstantiated allegations of having been excluded from obtaining contracts by an agency wholly separate from the DOL is not a ground for departing from that regulatory scheme.

Plaintiffs also argue that light of the ISI's removal from the pre-qualified vendor list, the ARB' debarment decision violates "double jeopardy." This contention, however, rests on authority that is no longer good law. The sole authority that plaintiffs cite in support of this argument is *United States v. Halpers*, 490 U.S. 435 (1989). *See* Pl. Br. at 41. But *Halpers* has been overruled on this specific point (*i.e.*, whether double jeopardy applies to civil sanctions) by *Hudson v. United States*, 522 U.S. 93 (1997). *See Hudson*, 522 U.S. at 100-02 (double jeopardy does not apply to civil sanctions); *see also Proffitt v. F.D.I.C.*, 200 F.3d 855, 860 n.5 (D.C. Cir. 2000) (noting that in *Hudson*, the Supreme Court, held that "the double jeopardy clause applies only to criminal cases," thereby "overturn[ing] its decision in *United States v. Halper"*). Thus, plaintiffs' double jeopardy argument also must be rejected.

C.    The ARB Correctly Concluded that Karawia Was a "Responsible Party"

Plaintiff Karawia does not challenge either the ARB's application of 29 C.F.R. § 4.187(e)(4) or the factual underpinnings of the ARB's decision to deem him a "responsible party." Instead, he argues that the ARB's conclusion should be overturned because, in his view, it does not comport with decisions applying the debarment standard for individuals under the Federal Acquisition Regulation ("FAR"). *See* Pl. Br.at 39-40; *see also Novicki v. Cook*, 946 F.2d 938, 941-43 (D.C. Cir. 1991) (applying FAR to debarment for fraud); *Canales v. Paulson*, No. 06-1330(GK), 2007 WL 2071709 (D.D.C. Jul. 16, 2007) (applying FAR to debarment based on false statements conviction). Mr. Karawai nowhere explains, however, why this Court's

23

analysis of the application of the "responsible party" concept in the SCA should be guided by precedents dealing with FAR, when those involve wholly distinct statutory schemes.

In any event, Mr. Karawia's own admissions make clear that the ARB was correct to conclude that he was a "responsible party" for ISI in connection with the ISI GSA Contracts. In addition to being the owner, president and the chief executive of ISI, Mr. Karawia also was responsible for negotiating ISI's federal contracts and for key aspects of employment practices, including oversight of Mr. Almodovar, in his role as the ombudsman. *See* Hearings Tr. at 634-35, 645.

Based on his extensive involvement with the federal contracts and employment practices, Mr. Karawia was among those "who cause[d] or permit[ted]" the SCA violations to occur. 29 C.F.R. § 4.188(e)(4). A preponderance of the evidence, therefore, clearly supports the ARB's conclusion that Mr. Karawia is a "responsible party" under the applicable legal law. *See Johnson*, 2005 WL 1970742, at *8-9.

D.    The ARB Correctly Concluded that No Jurisdictional Defect Existed

Plaintiffs conclusorily assert that "there is a fundamental weakness in this case" because DOL named ISI, instead of International Protective Services, Inc. – the official name of ISI, in the administrative proceedings. *See* Pl. Br. at 40-41. This argument is meritless.

Plaintiffs do not, and cannot, assert that the corporate entity called ISI is in any manner distinguished from International Protective Services, Inc. Indeed, Mr. Karawia affirmatively declared that ISI and International Protective Services, Inc. are two names for the same entity. *See* Karawia Decl. at ¶ 1 ("I [] am the President of International Protective Services, Inc. d/b/a International Services, Inc. ("IPSI"), or ("ISI")). Plaintiffs also cannot identify any prejudice resulting from DOL's naming ISI, instead of International Protective Services, Inc., in the administrative proceedings – for five years, ISI actively participated in the administrative

proceedings.  Absent prejudice, plaintiffs are not entitled to relief based on this purported naming

error.  *See*, *e.g.*, *Time Products v. J. Tiras Classic Handbags, Inc.*, 93 Civ. 7856 (CSH), 1994

WL 363930, at * 4 (S.D.N.Y. Jul 13, 1994) (denying motion to dismiss where error in service of

process is technical and does not result in prejudice).

              ****              ****              *****

In sum, none of plaintiffs' arguments challenging the conclusions of the ARB withstands

scrutiny.  Plaintiffs, accordingly, have not established any likelihood of success on the merits, let

alone the "better than 50 percent" standard they set for themselves.  *See* Pl. Br. at 22 (*quoting

Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).   The request for preliminary injunctive

relief should therefore be denied on this basis alone.

### III.    Plaintiffs Cannot Establish a Risk of Irreparable Harm

Plaintiffs also have failed to demonstrate any irreparable harm that would flow from their

placement on the debarment list.  Plaintiffs identify three types of harm that, they claim, will

result unless the Court enjoins the issuance of a formal debarment.  First, plaintiffs argue that a

line of bid protest cases involving federal contractors show that irreparable harm exists as a

matter of law.  Second, relying on Mr. Karawia's declaration, plaintiffs assert that debarment

will have "a rollover effect" on ISI's "ability to maintain municipal contracts and commercial

accounts."  Pl. Br. at 44.  That effect, they speculate, will sound "the death knell" for ISI.  *See id*.

at 44, 45-46.  Finally, plaintiffs also claim that formal debarment will cause ISI to "suffer a

significant loss of goodwill or reputation."  *See id*. at 44.

Each of those contentions lacks support from any concrete evidence.  Instead of

specifying how debarment will result in the harms alleged and defining the likelihood that these

harms will materialize, plaintiffs proffer only conclusory allegations and speculations.  They

therefore fail to make "a clear showing" that debarment creates a *likelihood* of irreparable harm.

A.    Bid Protest Cases Are Inapposite As Plaintiffs Have Not Alleged Any Direct Effect of Debarment

Plaintiffs cite to a line of bid protest cases in their brief, *see, e.g.*, *Seattle Sec. Serv., Inc. v. United States*, 45 Fed. Cl. 560, 563-65 (Fed. Cl. 2000) (post-award bid protest by losing security service contractor); *Impresa Construzioni Geom. Domenico Garufi* v. *United States*, 52 Fed. Cl. 826 (Fed. Cl. 2002) (post-award bid protest by losing janitorial service contractor), for the proposition that loss of a contract can be deemed irreparable harm. *See* Pl. Br. at 42-43. Those decisions, however, are clearly distinguishable from the situation at hand.

In contrast to the plaintiffs in the bid protests cases, plaintiffs do not base their allegations of irreparable harm on the direct effect of debarment, *i.e.*, losing specific federal contracts that ISI had bid on or plans to bid on.  Instead, plaintiffs claim that they will be harmed by the "rollover effect" of debarment.  *See* Pl. Br. at 44.  The bid protest decisions, thus, are inapposite; plaintiffs cannot rely on them to suggest that irreparable harm obtains here.

B.    Mr. Karawia's Conjectures about the "Roll Over Effect" of Debarment on ISI's Municipal Contracts and Bids Are Insufficient

Although plaintiffs largely stake their irreparable harm claim on debarment's "rollover effect" on both ISI's bids for municipal contracts and existing municipal contracts, *see* Karawia Decl. at ¶¶ 4-7, they have offered no objective evidence of this alleged effect.  They do not identify any official policies of ISI's clients or prospective clients stating that federal debarment precludes ISI from receiving municipal contracts.  They do not cite to any statements from municipal contracting officials asserting that formal debarment will, or at least is likely to, cause ISI to lose any of its municipal contracts or bids for such contracts.

Instead, plaintiffs only can point to a generic vendor questionnaire that ISI received from Sacramento County, which asks, among many other things, whether ISI has been debarred.  It is worth noting that irrespective of the outcome of this motion, plaintiffs must disclose to Sacramento County, in response to question no. 11, the existence of a DOL decision debarring

them on account of their violations of the SCA.  *See* Vendor Questionnaire at 3 (Plaintiffs' Ex. 23).  Thus, the relevant comparison for purposes of irreparable harm is not between a contractor with an unblemished compliance record and one that has been debarred; instead, it is between plaintiffs' current status, *i.e.*, already the subject of an order of debarment, and being formally debarred.  In this regard, plaintiffs have adduced no evidence that formal debarment, compared to their current status, is of any unique significance for Sacramento County or any other ISI's municipal clients.  Nor, for that matter, have plaintiffs provided a logical explanation of how Mr. Karawia's concerns about the Sacramento County bid translate into a risk that ISI would lose its current municipal contracts.

Simply put, plaintiffs have articulated concerns that formal debarment *could* cause certain significant adverse consequences to ISI's business, which, according to Mr. Karawia, could force ISI and him into bankruptcy.  *See* Karawia Decl. at ¶ 9.  But there is no evidence from which to conclude that the prospect of those consequences materializing is more than "a mere possibility," but rather meets the "higher standard" of having a distinct likelihood.  *See Aim Int'l Trading*, 2002 WL 1285557, at *4.  Without a coherent account of why they face a real prospect of losing municipal bids and existing contracts, plaintiffs can offer only vague and conclusory allegations. *See, e.g.*, Karawia Decl. at ¶ 8 (loss of municipal contracts will have "a serious dire detrimental economic impact on [ISI]").  But mere conjectures or attenuated fears cannot form the basis for granting the "extraordinary and drastic" remedy afforded by a preliminary injunction.  *See, e.g.*, *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995) (evidence of "speculative and attenuated injuries" insufficient for preliminary injunction); *Nat'l Football League Players Ass'n v. Nat'l Football League Properties, Inc.*, 90 Civ. 4244 (MJL), 1991 WL 79325, at *4 (S.D.N.Y. May 7, 1991) ("conclusory statements of [irreparable harm] will not make it so without more to support the claim").

C.    <u>Conclusory Allegation about Loss of Reputation Likewise Is Insufficient</u>

Finally, plaintiffs assert that formal debarment will irreparably harm their reputation and customer goodwill. *See* Pl. Br. at 44-45. While plaintiffs are correct that injuries to a business's reputation may suffice as irreparable harm, a party seeking a preliminary injunction nonetheless must offer more than a "conclusory allegation that 'reputational harm' will ensue" unless relief is granted. *In re United Pan-Europe Communications N.V.*, M-47(RWS), 2003 WL 221819, at *4 (S.D.N.Y. Jan. 30, 2003); *see also M & G Electronics Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 105 (E.D.N.Y. 2003) (conclusory statement, untethered to "evidence of a risk of loss of reputation," is insufficient to establish irreparable harm).

Here, plaintiffs do not offer any specifics about how the formalization of the ARB's debarment decision will affect ISI's reputation or relationship with its clients. Thus, their conclusory allegation of reputational loss does not amount to a "clear showing" of "actual or imminent" harm.

CONCLUSION

For the reasons set forth above, plaintiffs have failed to show either that they have a substantial likelihood of success on the merits or that they face the prospect of irreparable harm. Accordingly, plaintiffs' motion for a preliminary injunction should be denied.

Dated: New York, New York
      July 2, 2008

                        MICHAEL J. GARCIA
                        United States Attorney
                        *Attorney for the Government*

By:    /s/  Li Yu_____
        LI  YU
        Assistant United States Attorney
        Telephone: (212) 637-2734
        Facsimile:  (212) 637-2686
         Email:  li.yu@usdoj.gov

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------------------- x
OUSAMA KARAWIA and INTERNATIONAL          :
SERVICES, INC. d/b/a ISI,                 :        ECF CASE
                                          :
        Plaintiffs,                       :
                                          :
        against -                         :        08 Civ. 5471 (HB)
                                          :
UNITED STATES DEPARTMENT OF LABOR,        :
                                          :
        Defendant,                        :
                                          :
-------------------------------------------------------------------------------- x
```

### DECLARATION OF LI YU

I, Li Yu, pursuant to 28 U.S.C. § 1746, declare the following under the penalty of perjury:

1.      I am an Assistant United States Attorney in the office of Michael J. Garcia, United States Attorney for the Southern District of New York, attorney for defendant and third-party plaintiff the United States of America (the "Government"), in the above-captioned action.  I have been assigned to defend this matter, and am familiar with the proceedings herein.  I make this declaration in support of the Government's opposition to plaintiffs' motion for a preliminary injunction.

2.      Attached hereto as Exhibit A is a true and correct copy of a July 6, 2005 Decision and Order issued by Administrative Law Judge Ralph Romano ("ALJ Romano") of the United States Department of Labor (the "DOL") in the *Matter of International Services Incorporated and Ousama Karawia*, 2003-SCA-0018.

3.      Attached hereto as Exhibit B is a true and correct copy of a December 21, 2007 Final Decision and Order issued by the Administrative Review Board of the DOL (the "ARB")  in the *Matter of International Services Incorporated and Ousama Karawia*, ARB Case No. 05-136.

4.      Attached hereto as Exhibit C is a true and correct copy of a May 30, 2008 Order Denying Reconsideration issued by the ARB in the *Matter of International Services Incorporated and Ousama Karawia*, ARB Case No. 05-136.

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the transcript of the administrative hearings before ALJ Romano on November 22-23, 2004 and on January 4-5, 2005.

6.      Attached hereto as Exhibit E is a true and correct copy of an administrative Consent Findings and Order, entered by DOL Administrative Law Judge Richard A. Morgan on May 9, 2001, between DOL and International Services, Inc. ("ISI"), Ousama Karawia, International Security Services and Investigations, Inc., Richard E. DeLong and William Pedrick, which was introduced at the proceedings before ALJ Romano as Administrative Law Judge's Exhibit No. 11.

7.      Attached hereto as Exhibit F is a true and correct copy of the Agreement between ISI and the United Federation of Security Officers, Inc, signed by Ousama Karawia on August 31, 1999 on behalf of ISI, which was introduced at the proceedings before ALJ Romano as Administrator's Exhibit No. 34.

8.      Attached hereto as Exhibit G is a true and correct copy of a Summary of Unpaid Wages dated August 27, 2001, which was introduced at the proceedings before ALJ Romano as part of Administrator's Exhibit No. 40.

9.      Attached hereto as Exhibit H is a true and correct copy of a Summary of Unpaid Wages dated June 17, 2002, which was introduced at the proceedings before ALJ Romano as part of Administrator's Exhibit No. 50.

10.     Attached hereto as Exhibit I is a true and correct copy of excerpts from the transcript of transcript of Hannibal Almodovar's deposition taken on November 6, 2003, which was introduced at the proceedings before ALJ Romano as Administrator's Exhibit No. 110.

11.     Attached hereto as Exhibit J is a true and correct copy of a letter from Catherine Quinn, District Director in the Wage and Hour Division of DOL, to Peggy Orlando, the Chief Financial Officer

of ISI, dated January 16, 2002, which was introduced at the proceedings before ALJ Romano as

Administrator's Exhibit No. 114-A.

      12.    Attached hereto as Exhibit K is a true and correct copy of excerpts from the transcript of

transcript of Roger Pinnau's telephonic deposition taken on February 11, 2005, which was submitted to

ALJ Romano as Administrator's Exhibit No. 133.


Dated:  New York, NY
        July 2, 2008


                                                s/ Li Yu
                                              LI  YU
                                              Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------------- x

OUSAMA KARAWIA and INTERNATIONAL   :
SERVICES, INC. d/b/a ISI,   :
   :  ECF CASE
       Plaintiffs,   :
   :
      against -   :  08 Civ. 5471 (HB)
   :
UNITED STATES DEPARTMENT OF LABOR,   :
   :
       Defendant.   :
   :

-------------------------------------------------------------------------------- x

### DECLARATION OF BARBARA EBY RACINE

I, Barbara Eby Racine, pursuant to 28 U.S.C. § 1746, declares the following under the penalty of perjury:

1.     I am an attorney at the Officer of the Solicitor at the United States Department of Labor (the "Department of Labor" or "DOL"). I have been a member of the Officer of the Solicitor since 1988.

2.     As part of my official duties at the Office of the Solicitor at the Department of Labor, I am familiar with the McNamara-O'Hara Service Contract Act (the "SCA"), the DOL regulations promulgated to implement the SCA, and the policies and practices relating to the DOL's enforcement of the SCA. I also am familiar with the facts relating to the administrative proceedings brought by the staff of the Wage and Hour Division at DOL against plaintiffs Ousama Karawia and International Services, Inc. ("ISI," and, collectively with Karawia, the "Plaintiffs") seeking to debar them from obtaining federal contracts because they had violated the SCA (the "debarment proceeding").

3.      The statements contained in this declaration are based on my personal knowledge and upon information provided to me in my official capacity.

4.      In 1999, DOL filed an administrative complaint (the "1999 SCA Complaint") against the plaintiffs, two other ISI officers and an ISI corporate affiliate, charging them with having violated the SCA in connection with a federal service contract with the General Services Administration (the "GSA").

5.      On May 9, 2001, plaintiffs, along with the two ISI officers and ISI corporate affiliate who also were charged in the 1999 SCA Complaint, entered into a consent decree with the DOL before an Administrative Law Judge (the "May 2001 Consent Decree") to resolve the administrative proceedings brought by the DOL.

6.      Notwithstanding the May 2001 Consent Decree and plaintiffs' undertaking to ensure that ISI complied with the SCA's requirements, plaintiffs continued to violate the SCA. DOL's Wage and Hour Division undertook a total of 36 investigations of ISI between May 2001 and October 2002, when ISI's federal contract with the GSA was terminated due to ISI's failures to abide by the terms of that contract.

7.      For example, from March 2001 until July 2001, ISI violated the SCA by underpaying 17 employees in Anchorage, Alaska, with underpayments totaling over $3,400. Again, from March 2002 to May 2002, ISI again failed to make the requisite wage payments to employees in Anchorage, with underpayments totaling over $2,700.

8.      On May 28, 2003, DOL filed an administrative complaint against plaintiffs and two other employees of ISI, alleging that plaintiffs violated the SCA by failing to pay minimum hourly wages and timely fringe benefits in connection with ISI's contracts with the GSA.

9.      DOL subsequently resolved its administrative claims against the other ISI employees.  But, as to plaintiffs, DOL's debarment proceeding continued and the May 2003 administrative complaint was referred to DOL Administrative Law Judge Ralph A. Romano ("ALJ Romano").

10.     ALJ Romano held hearings on November 22-23, 2004 and again on January 4-5, 2005.  At those hearings, ALJ Romano took testimony from nine witnesses, including Mr. Karawia, three ISI employees, three Wages and Hours Division investigators, as well as Catherine Quinn, a district director at the Wages and Hours Division.  At the hearing, ALJ Romano also received the deposition testimony of Hannibal Almodovar, a former human resources manager at ISI, the "ombudsman" for SCA compliance.

11.     After the hearing, DOL also submitted deposition testimony of Roger Pinnau, an employee of the United States Department of Homeland Security, to clarify the effect of the GSA's removal of ISI from a list of pre-qualified vendors to the federal government.

12.     On July 6, 2005, ALJ Romano issued a Decision and Order, ruling that plaintiffs should be debarred for a period of three years.

13.     Plaintiffs filed an administrative appeal of ALJ Romano's decision with the DOL's Administrative Review Board (the "ARB").

14.     The ARB received submissions from plaintiffs and DOL staff.

15.     On December 21, 2007, the ARB issued a Final Decision and Order, affirming ALJ Romano's decision that plaintiffs should be debarred for a period of three years.

16.     On January 2, 2008, plaintiffs filed a Request for Reconsideration with the ARB, seeking review of the ARB's December 21, 2007 decision.

17.    On May 30, 2008, the ARB issued an order denying plaintiffs' Request for
Reconsideration and ordered that plaintiffs be debarred.

Dated:  Washington, DC
        July 2, 2008

*Barbara Eby Racine*

Barbara Eby Racine
Office of the Solicitor
United States Department of Labor

# EXHIBIT A

**U.S. Department of Labor**

Office of Administrative Law Judges
2 Executive Campus, Suite 450
Cherry Hill, NJ 08002

(856) 486-3800
(856) 486-3806 (FAX)

**Issue Date: 06 July 2005**

Case No.:     2003-SCA-00018

In the Matter of

**INTERNATIONAL SERVICES, INCORPORATED**
**and**
**OUSAMA KARAWIA**
          Respondents

## DECISION AND ORDER

This proceeding arises under the McNamara-O'Hara Service Contract Act, 41 U.S.C. § 351 ("the Service Contract Act" or "the Act"). The regulations issued pursuant thereto can be found at 29 C.F.R. Parts 4 and 6. The Act sanctions those who are awarded a federal contract and subsequently fail to (1) pay the required wage, (2) award minimum fringe benefits or (3) keep adequate records, by barring them from receiving federal contracts for a period of 3 years.

Background and Procedural History

On March 15, 1999, the Secretary of Labor ("Secretary") filed a complaint against Respondents, alleging they had violated the Act by failing to timely pay the minimum hourly rate and minimum fringe benefits between March, 1996 and February, 1999. (Complaint ¶ VI). The Secretary and Respondents reached an accord to resolve those issues, which was approved by Administrative Law Judge Richard A. Morgan on May 9, 2001. (Complaint ¶ VII). The Consent Findings and Order ("CF&O")[1] specifically relate to Contract No. GS-02P-94-CID-0141, a General Services Administration ("GSA") contract lasting from March of 1996 until March of 1998; Contract No. V463P-0051-96, a Veteran's Affairs contract covering the period of October, 1997 until January, 1998; and Contract No. GS-11P-96-MPC-0513, another GSA contract beginning in January of 1996 and ending December 31, 1997. (CF&O at 2).

---

[1] Respondents objected to the admission of evidence relating to the time period before the approval of this document. Respondents also cited case law supporting their position that this agreement cannot be counted against them as having a history of prior violations of the Act. However, this document specifically states, "The Consent Findings and Order are without prejudice to (a) plaintiff's future exercise of all investigative enforcement authority under the SCA…or (b) respondent's future assertion and exercise of all defenses available to them under law." In addition, the document states, "The parties stipulate that this Consent Findings and Order may be entered into evidence in any future proceeding, provided that the parties will be free to argue, and the Judge shall be free to decide, the weight thereof." Although this document does not itself establish any previous violations of the Act, it is not only relevant to this matter but crucial to the issue of whether Respondent's actions occurring after entering into this agreement constitute culpable neglect.

Within the Consent Findings and Order, it is alleged that 42 investigative files had been opened and Respondents were found to have owed at least $157,000 to their employees. (CF&O at 3). Respondents did in fact pay $157,789. (CF&O at 5). However, they did so without admitting any violations of the Act. (CF&O at 6).

The Consent Findings and Order also state that Respondents agreed to establish a compliance program which required them, *inter alia,* to employ an ombudsman and to obtain legal counsel experienced in wage/hour matters. The ombudsman was to be a full-time employee, reporting directly to Respondent Karawia, charged with the duty of handling all future payroll complaints. The ombudsman was also to keep quarterly records. (CF&O at 11-12). "Working with counsel as necessary, respondents [agreed] to use information and experience gained from the compliance program to develop procedures and an institutional knowledge base to help assure wage/hour compliance on a permanent basis." (CF&O at 12).

The complaint in the instant matter, alleging that Respondents have failed to fulfill the obligations imposed under the Consent Findings and Order, was filed on May 28, 2003. The complaint was filed in relation to Contract No. GS-02P-94-CID-0141 and No. GS-02P-02-CIF-0001. Both are GSA contracts and together they cover the period beginning March 1, 1996 and ending March 31, 2003. (Complaint ¶ VIII). This complaint again alleges that Respondents have failed to timely pay the minimum hourly rate due to employees under these federal contracts and have failed to timely pay the minimum fringe benefits. (Complaint ¶¶ IX & X). It is alleged that as a result, Respondents at various times owed in excess of $600,000 (Complaint ¶ XI). Although the Administrator concedes that no further payments are due, debarment is sought. (Complaint ¶ XII). Respondents answered the complaint on June 19, 2003.

This matter was transferred to the Office of Administrative Law Judges and was assigned to me on June 1, 2004. The formal hearing was held on November 22 and 23, 2004 in New York, New York and on January 4 and 5, 2005 in Philadelphia, Pennsylvania, during which time both parties presented testimony[2] and other evidence.[3] Following the hearing, the record was left open for the submission of additional evidence and closing briefs. After requests for extensions, which I granted for good cause shown, I ordered that all evidence and post hearing briefs be filed by May 20, 2005 and reply briefs by June 7, 2005.

<u>Issue</u>

The only issue presented for my resolution is whether Respondents shall be debarred pursuant to § 354(a) of the Act. Furthermore, in reaching an outcome, I need not address whether Respondents actually violated the Act, since they have admitted doing so, although they

---

[2] The transcript of the hearing consists of 681 pages and will be cited as "Tr. at --."
[3] The Administrator's exhibits will be cited as "Adm. X" and Respondents' exhibits will be cited as "RX."

- 2 -

argue these violations were inadvertent.[4]  I thus need only determine whether Respondents have established that they are entitled to relief from debarment.

### The Arguments of the Parties

The Administrator argues that ISI and its president, Mr. Karawia, should be debarred for a period of three years because their conduct amounts to culpable neglect, and they are therefore not entitled to relief by proving the existence of unusual circumstances.  The Administrator also argues that Respondents are precluded from establishing unusual circumstances which would relieve them from the sanction of debarment because they have a history of violating the Act.  In the alternative, the Administrator argues that Respondents have failed to prove unusual circumstances.

As a preliminary matter, Respondents argue that I have no jurisdiction over this matter since International Protective Services, the legal entity which does business as ISI, was never served.[5]  Next, Respondents argue they have proven the existence of unusual circumstances, including racial discrimination and GSA's failure to pay money due on the contract, sufficient to warrant relief from the ordinary sanction of debarment.  Respondents also argue that even if ISI is debarred, Mr. Karawia should not be debarred.  Finally, Respondents ask that I find that they have been de facto debarred since October 18, 2002, and that I thus not sanction Respondents further.

### Statement of Facts[6]

Respondent Karawia started his security guard business in 1982 when he was 17 years old.  (Tr. at 373).  Mr. Karawia testified that he "built [his] company on integrity, not doing anything illegal."  (Tr. at 567).  He presently owns 100 percent of Karawia Industries, the holding company of International Protective Services which does business as ISI.  (Tr. at 628).  In addition, he serves as the chief executive officer and president of both Karawia Industries and International Protective Services.  (Tr. at 628).  As president of International Protective Services, he exercised significant control of ISI.  For example, Mr. Karawia negotiated the collective bargaining agreements, signed both payroll and non-payroll checks, supervised the work of others, including the chief financial officer, and set the rate of pay for ISI executives (Tr. at 634-38).  The ombudsman, who was hired pursuant to the Consent Findings and Order, also reported directly to Mr. Karawia.

---

[4]  Respondents also argue that some violations were due to the fact that the government was withholding money due to ISI under the contract, leaving ISI with a cash flow problem.

[5]  I note that ISI submitted the bid for the contract and the contract was awarded to ISI.  (Tr. at 634).

[6]  The record in this matter is voluminous.  Although I have carefully considered all of the evidence and testimony, based on my analysis of the issue presented, the pertinent facts in this case relate to Respondents' disregard of its obligations pursuant to the Consent Findings and Order and only evidence relevant thereto will be discussed.

The first federal contract awarded to ISI in 1996 was a GSA contract, and more specifically was the predecessor to the contract involved herein. (Tr. at 375-76).

Adm. X-110 is a chart showing 36 compliance actions with regard to ISI that took place after the Consent Findings and Order were issued on May 9, 2001. These compliance actions were a result of Respondent ISI's failure to pay the prevailing wage or required fringe benefits. The total back wages owing was determined to be $630,081.07, owed to 1,943 employees. (Tr. at 131).

Perhaps one of the most relevant violations of the Act alleged by the Administrator in this matter relates to Mr. Karawia requesting and receiving a refund of money paid to a third-party benefits administrator under the GSA contract. According to Mr. Karawia, due to the mistake of ISI's chief financial officer, ISI was paying its employees twice for each sick day taken. (Tr. at 559-60).    Upon realizing this, Mr. Karawia asked Contractor's Employee Benefits Administration ("CEBA"), the third-party benefits administrator, for a refund of the amount paid for sick time. (Tr. at 561).

Although Mr. Karawia testified that he did not know this was in violation of the Act, he admitted that before writing the letter requesting the reimbursement (Adm. X-13), he did not consult anyone from the Department of Labor ("DOL") and did not seek legal advice. (Tr. at 646).  Only after DOL contacted ISI regarding the illegality of this action did Mr. Karawia consult with an attorney, and the attorney, Mr. Baker, advised Mr. Karawia to repay the money.[7] (Tr. at 562-63).  Mr. Baker subsequently advised Mr. Karawia that he was not permitted to recoup the money from CEBA even if ISI had paid the same benefit twice. (Tr. at 560).

The next part of the compliance agreement which the Administrator alleges ISI has failed to comply with is that which requires ISI to employ an ombudsman, to make his identity and location known to all employees, and requires the ombudsman to keep records.

Adm. X-114A is a letter to Ms. Orlando, ISI's chief financial officer, dated January 16, 2002, from Ms. Quinn, the Assistant District Director of Wage and Hour.  The letter is regarding numerous payroll complaints and states, "Calls to your firm's Ombudsman, Mr. Hannibal Almodovar, on 01/02/2002, 01/03/2002, and 01/09/2002 regarding these issues have gone unreturned." (Adm. X.-114A).

Adm. X-114B is an additional letter from Ms. Quinn to Ms. Orlando, dated January 30, 2002, outlining more individual payroll complaints. (Tr. at 116).  Again, this letter indicates that calls to the ombudsman went unreturned. (Tr. at 117).

Mr. Weeks has been employed by the U.S. Department of Labor for over seven years as an investigator, working out of the Syracuse and Albany area offices. (Tr. at 42).  Mr. Weeks

---

[7] Mr. Baker is a labor and employment attorney who was hired pursuant to the Consent Findings and Order for the purpose of assisting ISI in preparing compliance materials. (Tr. at 512).

testified that employees regularly told him that they were unsuccessful reaching the ombudsman. (Tr. at 154).

Mr. Martin is employed by DOL, Wage and Hour Division in Albany, New York, as the District Director. (Tr. at 333). He has held that title since April of 1999. (Tr. at 334). The building in which Mr. Martin works was at one time guarded by ISI employees, and those guards regularly reported that they were unable to reach the ombudsman. (Tr. at 342). Mr. Martin did not personally try to contact him. (Tr. at 343-44).

Mr. Karawia admitted during cross-examination that employees were not to take complaints directly to the ombudsman. Instead, there was "a process" or "a program that they follow." As part of that process, an employee was to first go to his supervisor and the manager of the local office. (Tr. at 643). In addition, Mr. Karawia admitted that when Maggie Melogiza replaced Mr. Almodovar as ombudsman, the employees of ISI were not notified for three weeks. (Tr. at 644).

The Consent Findings and Order requires that ISI's ombudsman "retain documentation that includes report forms for employees lodging complaints with the ombudsman, and quarterly spreadsheet reports reviewed and signed by both the ombudsman and Mr. Karawia listing all the complaints received by the ombudsman, investigative findings, and any corrective actions taken during the quarter covered by the report." (Tr. at 134-35). These records were requested from Ms. Orlando, who responded that no such records exist. (Tr. at 135).

Roderick McNeil, who began working for ISI in 1999, testified that he called ISI in California on one occasion to speak with a gentleman by the name of Hannibal in payroll. (Tr. at 38-39). He left a message for him but never received a response, although Mr. McNeil did testify to his belief that the problem he was calling about was later resolved. (Tr. at 39).

Harry Nopper worked for ISI as a security guard beginning July 1, 1996 and worked in that capacity until October 17, 2002. (Tr. at 297). Mr. Nopper testified to having periodic problems with his payroll and fringe benefits while being employed by ISI. (Tr. at 297-98). He testified that he did not ever attempt to contact the ombudsman although he did call ISI's California office because of a payroll issue that he did not feel was resolved in a reasonable time. Mr. Nopper testified that he was disciplined and suspended as a result of making that call and later reinstated and reimbursed for the lost time after filing a union complaint. (Tr. at 300).

James Costanzo began working for ISI in June, 1996 and worked there until sometime in 2002. (Tr. at 302). While employed by ISI, he constantly had problems with wages or fringe benefits, according to his testimony. (Tr. at 302). According to Mr. Costanzo, it sometimes took months for ISI to resolve payroll issues after the appropriate form was filed. (Tr. at 305). He never called ISI in California and was told not to by the company. (Tr. at 306).

Mr. Almodovar testified by deposition regarding his position as ombudsman. (Adm. X.-110). According to his testimony, Mr. Karawia informed him a few months after he was hired as the human resources director that he would be taking on this new role and gave him some documents to read, which were going to be distributed to ISI's employees. (Adm. X.-110 at 29-

30). These documents, as Mr. Almodovar recalled, instructed employees to call him with problems and gave his business address and telephone number. (Adm. X.-110 at 30).

When asked if he ever performed any duties as ombudsman, Mr. Almodovar replied:

> I remember one lady calling in. She called in or sent me a letter. I actually had a letter from her and we spoke on the phone. I don't remember in what order. But we spoke on the phone and she sent me a letter. And then I remember contacting the branch and spoke to someone at the branch. It was a lady. I don't remember who it was. And she told me that she had spoken to the employee and explained the situation to the employee and the person didn't understand.
>
> So what I did was I requested from her something in writing explaining it all in writing. And so she sent it to me, and then I sent the letter with the documents to the employee. That's as far as I remember. What happened after that, I don't remember.

(Adm. X.-110 at 32-33).

When asked if he had received other complaints in his role of ombudsman, Mr. Almodovar responded that he received a large volume of calls while employed by ISI and was unable to recall what specifically the calls related to. (Adm. X.-110 at 50). Mr. Almodovar also testified that he submitted monthly reports, but they did not relate to matters that arose in his position as ombudsman. (Adm. X.-110 at 47).

## Analysis

I.    The issue of personal jurisdiction has been waived.

Mr. Karawia testified that ISI is a part of International Protective Services; International Protective Services does business as ISI. (Tr. at 632). However, Respondents now argue that there is no personal jurisdiction because International Protective Services, which is the legal entity, has not been named as a party to this case and has not been served. The issue of personal jurisdiction has been waived, as Respondents answered the complaint, filed motions and fully defended the claim at trial.

II.   If ISI is debarred, Respondent Karawia, the President and Principal Stockholder, can also be debarred.

It is well settled that an individual who serves as president and principal stockholder, who is responsible for the performance of the contract or who has overall control of the business operations, is personally responsible for violations of the Act and can be debarred. *See Nantom Services, Inc.*, 1997-SCA-35 (ALJ, Dec. 22, 1998); *Rasputin, Inc.*, ARB Case No. 03-059, 1997-SCA-32 (ARB, May 28, 2004); *Stephen W. Yates*, ARB Case No. 02-119, 2001-SCA-21; *SuperVan, Inc.*, ARB Case No. 00-0008, Case No. 1994-SCA-47 (ARB, Sept. 30, 2002); *Hugo*

*Reforestation, Inc.*, ARB Case No. 99-0003, 1997-SCA-20 (ARB, Apr. 30, 2001); *Melton Sales and Services, Inc.*, 1982 SCA-127 (ALJ, Nov. 18, 1985).

Because Mr. Karawia is the president and chief executive officer of both the holding company that owns International Protective Services and of International Protective Services itself, and because he exercises significant control over the business operations of ISI, he is subject to debarment.

Further, I find that Mr. Karawia is personally responsible for at least one violation of the Act. Mr. Karawia admitted requesting the partial refund of fringe benefit payments from CEBA. This refund was sought in violation of the Act and without consulting counsel as required by the Consent Findings and Order.

III.    Respondents are not entitled to an opportunity to prove the existence of unusual circumstances because their conduct amounts to culpable neglect.

The Act provides:

The Comptroller General is directed to distribute a list to all agencies of the Government giving the name of persons or firms that the Federal agencies or the Secretary have found to have violated this chapter. Unless the Secretary otherwise recommends because of unusual circumstances, no contract of the United States shall be awarded to the persons of firms appearing on this list or to any firm, corporation, partnership, or association in which such persons or firms have a substantial interest until three years have elapsed from the date of publication of the list containing the name of such persons or firms.    Where the Secretary does not otherwise recommend because of unusual circumstances, he shall, not later than ninety days after a hearing examiner has made a finding of a violation of this chapter, forward to the Comptroller General the name of the individual or firm found to have violated the provisions of this chapter.

41 U.S.C. § 354(a).

The regulations provide this additional insight:

The Department of Labor has developed criteria for determining when there are unusual circumstances within the meaning of the Act. (Citations omitted). Thus, where the respondent's conduct in causing or permitting violations of the Service Contract Act provisions of the contract is willful, deliberate or of an aggravated nature or where the violations are a result of culpable conduct such as culpable neglect to ascertain whether practices are in violation, culpable disregard of whether they were in violation or not, or culpable failure to comply with recordkeeping requirements (such as falsification of records), relief from the debarment sanction cannot be in order.  Furthermore, relief from debarment cannot be in order where a

contractor has a history of similar violations, where a contractor has repeatedly violated the provisions of the Act, or where previous violations were serious in nature.

29 C.F.R. § 4.188 (b)(3)(i).

Therefore, if I find that ISI's conduct which violated the Act amounts to culpable neglect, relief from debarment is not warranted despite whether ISI can prove the existence of unusual circumstances. I do find that ISI and Mr. Karawia acted with culpable neglect.

In discussing debarment, the regulations speak of "a contractor's plea of ignorance of the Act's requirements where the obligation to comply with the Act is plain from the contract." 29 C.F.R. § 4.188(b)(1). I find that just as the contract language imposes a higher standard of compliance, so does the language of the Consent Findings and Order because it created a duty which Respondents were completely and fully aware of, as opposed to a duty imposed by the Act of which Respondents were unaware.

Respondents' duties, which were imposed in order to ensure future compliance, were clearly set out in the Consent Findings and Order. They undertook an affirmative duty to establish a compliance program, which included an obligation to employ an ombudsman and to make his identity and function known to all employees, as well as employing an experienced labor and employment attorney who would be consulted when compliance issues arose. Because Respondents failed to comply with these explicit instructions, and as a result violated the Act, their actions undoubtedly amount to culpable neglect.

Although ISI and Mr. Karawia did take affirmative steps to educate the employees regarding the compliance program, they failed in clearly conveying the existence, identity and role of the ombudsman. Despite Mr. Almodovar's equivocal testimony, it is clear from the testimony of Wage and Hour employees and ISI employees that he was contacted several times in his role of ombudsman, and usually did not respond. Further, I find that Respondents failed to execute their duty with respect to the ombudsman because at least some employees were told not to contact the California office, where Mr. Almodovar was located, with complaints. In addition, both Mr. Almodovar, at his deposition, and Ms. Orlando in a letter to Wage and Hour admitted that the ombudsman did not keep the required records.

Respondents also acted in disregard of the Consent Findings and Order by failing to consult with their attorney before taking actions which violated the Act, namely requesting a refund of money paid to a third-party benefits administrator for fringe benefits. I find that this is precisely the type of question that the Consent Findings and Order anticipated, when it stated, "Respondents commit to obtaining and acting upon advice from legal counsel experienced in wage/hour matters in addressing issues that arise through the ombudsman *or in overall wage/hour compliance.*" (Emphasis added). (CF&O at 12).

In addition, I find that Respondents' history of violations precludes Respondents from seeking relief from debarment. After the Consent Findings and Order were issued, Respondents were found to be in violation of the Act an astounding number of times. It was clear from Mr.

- 8 -

Karawia's testimony that the violations of the Act were not purposeful and Respondents promptly rectified most issues after being made aware of them by DOL. However, Respondents never took adequate steps to ensure future compliance and continued violating the Act until GSA finally canceled the contract. I find that the number of compliance actions initiated against ISI alone indicates extreme irresponsibility amounting to culpable neglect.[8]

Based on the foregoing, Respondents must be debarred for a period of three years regardless of whether unusual circumstances existed.

IV.    Respondents are not entitled to a credit for the period of time during which they claim they have faced de facto debarment.

The Board of Service Contract Appeals has held that a contractor is not entitled to a credit against the 3-year debarment period, because the Act specifically mandates when the debarment period begins. *The Swanson Group, Inc.*, 1995 WL 843407 (L.B.S.C.A. 1995). The Act does in fact state that the Comptroller General is to distribute a list of the firms found to have violated the Act and such firms shall be debarred for a period of 3 years from the date of publication of such list. 41 U.S.C. § 354(a).

Despite Respondents' compelling argument to the contrary,[9] I must agree with the Board of Service Contract Appeals. The legislature has clearly indicated its intent that the 3 year period begin running upon publication of the above described list and I am therefore without authority to give Respondents credit for the time during which they were unable to contract with the federal government based on the fact that they were removed from the Federal Supply Schedule ("FSS").

---

[8] During the hearing, Ms. Quinn indicated that had DOL's investigation not taken place, she is confident that ISI would never have paid the backwages due to its employees in many instances, although she admitted that some would have eventually been paid. (Tr. at 327-28).

[9] Respondents argue they have been de facto debarred. Following cancellation of the GSA contract, ISI was eliminated from the FSS and was therefore unable to do any work with the Federal Government. (Tr. at 457). The other federal contracts that ISI had concurrently with the GSA contract were all lost following the cancellation of the GSA contract and the removal of ISI from the FSS. The Veteran's Administration in Alaska, for example, would not allow ISI to rebid on that contract because ISI was no longer listed on the FSS. ISI also lost its contract with the National Park Service. (Tr. at 458). According to Mr. Karawia, ISI was then unable to contract with the federal government between October 18, 2002 and the date of the hearing, which represents a period of over 2 years. (Tr. at 500). Presumably, ISI has not been able to contract with the federal government through the present, representing a period of almost 3 years.

## ORDER

It is hereby ORDERED that Respondents, International Services, Inc. and Ousama Karawia, shall be debarred for a period of 3 years.

A

RALPH A. ROMANO
Administrative Law Judge

Cherry Hill, New Jersey

**NOTICE OF APPEAL RIGHTS**: To appeal, you must file a written petition for review with the Administrative Review Board ("ARB") within 40 days after the date of this Decision and Order (or such additional time that the ARB may grant). *See* 29 C.F.R. § 6.20. The Board's address is

Administrative Review Board
United States Department of Labor
Room S-4309, FPB
200 Constitution Avenue, NW
Washington, DC 20210

A copy of any such petition must also be provided to the Chief Administrative Law Judge, Office of Administrative Law Judges, 800 K Street, NW, Washington, DC 20001-8002. Your petition must refer to the specific findings of fact, conclusions of law, or order at issue. A petition concerning the decision on the ineligibility list shall also state the unusual circumstances or lack thereof under the Service Contract Act, and/or the aggravated or willful violations of the Contract Work Hours and Safety Standards Act or lack thereof, as appropriate.

The ARB's Rules of Practice further require that the petitioner provide to the ARB an original and four copies of the petition and any other papers submitted to the ARB. 29 C.F.R. § 8.10(b). Service is to be in person or by mail. 29 C.F.R. § 8.10(c). Service by mail is complete on mailing, and the petition is considered filed upon the day of service by mail. 29 C.F.R. § 8.10(c). The petition must contain an acknowledgement of service by the person served or proof of service in the form of a statement of the date and the manner of service and the names of the person or persons served, certified by the person who made service. 29 C.F.R. § 8.10(d).

A copy of the petition is also required to be served upon the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210; the Administrator, Wage and Hour Division, U.S. Department of Labor, Washington, DC 20210; the Federal contracting agency involved; and all other interested parties. 29 C.F.R. § 8.10(e).

- 10 -

# EXHIBIT B

**U.S. Department of Labor**    Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

INTERNATIONAL SERVICES,    ARB CASE NO. 05-136
INCORPORATED AND OUSAMA
KARAWIA,    ALJ CASE NO. 2003-SCA-018

RESPONDENTS.    DATE: December 21, 2007

In re Contract Nos. GS-02P-94-CID-0141
and GS-02P-94-CID-0001 with the U. S. General
Services Administration, covering upstate New York

BEFORE: THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Administrator, Wage and Hour Division*:
     **Barbara Eby Racine, Esq., Ford F. Newman, Esq., William C. Lesser, Esq.,
     Steven J. Mandel, Esq., Howard M. Radzely, Esq., Solicitor,** *U.S. Department of
     Labor, Washington, District of Columbia*

*For the Respondents:*
     **Sam Zalman Gdanski, Esq.,** *Suffern, New York*

### FINAL DECISION AND ORDER

     Federal service contractors who violate the McNamara-O'Hara Service Contract
Act (SCA or the Act)[1] shall not be awarded federal contracts for three years unless they
can prove "unusual circumstances."[2]    A United States Department of Labor

---

[1]     41 U.S.C.A. §§ 351-358 (West 1994).

[2]     *Id.* at § 354(a).

Administrative Law Judge (ALJ) found that International Services, Inc. (ISI) and its President, Ousama Karawia, violated the Act and did not prove "unusual circumstances." Since a preponderance of the evidence supports the ALJ's findings, we order ISI and Karawia debarred.

BACKGROUND

ISI is a corporation with its principal place of business in Torrance, California. It provides security guard services and has six thousand employees. Karawia is the President and Chief Executive Officer of ISI and is responsible for the company's employment practices and management policies. Karawia's authority includes negotiating government contracts, third-party contracts and collective bargaining agreements, signing payroll and non-payroll checks, interviewing and hiring job applicants, firing employees, supervising employees, and assigning work and job responsibilities.

The U.S. General Services Administration (GSA) awarded ISI Contract No. GS-02P-94-CID-0141 for security guard services covering GSA-controlled facilities in upstate New York from March 1, 1996, to March 31, 2002. The contract was subject to the SCA, which requires federal contractors to pay prevailing wages and fringe benefits that the Secretary of Labor predetermines or that a collective bargaining agreement specifies.[3] Contractors who violate the wage provisions of the statute are liable for any underpayments owed their employees.[4] During the course of this contract, the Wage and Hour Division, United States Department of Labor, received numerous complaints from ISI employees alleging that ISI had underpaid wages and fringe benefits on this and other federal contracts. The Wage and Hour Division investigated these complaints.

Thereafter, on March 15, 1999, Wage and Hour filed a complaint with the Labor Department against ISI and certain corporate officers, including Karawia, alleging violations of the SCA's wage and fringe benefits provisions in connection with the 1996 GSA contract and other federal service contracts. The parties settled the matter and entered into a Consent Findings and Order (consent decree) on May 9, 2001. ISI, Karawia, and the other corporate officers agreed to the consent decree without admitting any violation of the SCA.

The consent decree required that ISI establish a wage and hour compliance program. The compliance program required (1) that Karawia meet with all contract employees and inform them of their rights under, inter alia, the SCA; (2) that ISI provide relevant written materials and a description of the compliance program to contract employees; (3) that ISI employ a full-time manager to serve as "ombudsman," having the responsibility for receiving, investigating, documenting, and resolving wage and fringe

---

[3]    41 U.S.C.A. § 351(a).

[4]    *Id.* at § 352(a).

benefits complaints; and (4) that ISI obtain and act upon the advice of legal counsel in wage and hour matters.

Despite the compliance program, contract employees continued to complain to Wage and Hour that ISI did not pay them their prevailing wages and fringe benefits. Even so, ISI successfully rebid the contract with GSA when the 1996 contract expired on March 31, 2002. GSA awarded ISI Contract No. GS-02P-94-CID-0001, covering April 1, 2002, to March 31, 2003.

Wage and Hour investigated the complaints that had arisen since the May 9, 2001 consent decree. These investigations involved underpayments totaling $630,081.07 affecting 1,943 contract employees employed under both the 1996 and the 2002 contracts. After notice to ISI, GSA cancelled the contract, and October 18, 2002, was the last workday thereunder. About a month later, on November 14, Wage and Hour requested that GSA withhold funds due ISI. GSA withheld a total of $136,967.00 in contract payments due ISI.[5]

From October 2002 through January 2003, ISI paid the overdue wages and fringe benefits it owed to the employees. On January 31, 2003, after determining that ISI had paid the employees, Wage and Hour directed GSA to release all withheld funds to ISI.

Nevertheless, though ISI paid the back wages and fringe benefits, Wage and Hour filed another complaint against ISI, Karawia, and other corporate officers. This complaint, the subject of this case, requested an order debarring ISI, Karawia, and the others because of numerous and repeated violations of the SCA.[6]

ISI responded to the complaint and requested a hearing. The ALJ held a hearing on November 22 and 23, 2004, and January 4 and 5, 2005. The ALJ found that ISI and Karawia (hereinafter "the Respondents") had violated the Act and ordered that they be debarred. The Respondents filed a Petition for Review with the Administrative Review Board (ARB or the Board).[7]

---

[5]    *See* 41 U.S.C.A. § 352(a); 29 C.F.R. § 4.187 (Labor Department may request that contracting agency withhold payment due service contractor in amount equal to compensation owed to employees).

[6]    The complaint named three corporate officers in addition to Karawia: Richard E. Long, Vice President of Operations; William Pedrick, contract manager for New York; and Peggy Orlando, Chief Financial Officer. All three settled their cases prior to the hearing. The ALJ dismissed them from the case.

[7]    *See* 29 C.F.R. § 6.20.

The Board has jurisdiction to decide this case.[8]  In rendering its decisions, "the Board shall act as the authorized representative of the Secretary of Labor and shall act as fully and finally as might the Secretary of Labor concerning such matters."[9]

The Board's review of an ALJ's decision is an appellate proceeding.[10]  The Board shall modify or set aside an ALJ's findings of fact only when it determines that those findings are not supported by a preponderance of the evidence.[11]  But conclusions of law are reviewed de novo.[12]

## DISCUSSION

### 1. The Legal Standard

Under Section 5(a) of the SCA, persons or firms that violate the Act are subject to debarment, that is, ineligible to receive federal contracts for a period of three years "[u]nless the Secretary otherwise recommends because of unusual circumstances."[13] Debarment is presumed once violations of the Act have been found, unless the violator is able to show that "unusual circumstances" exist.[14]  "Section 5(a) is a particularly unforgiving provision of a demanding statute.  A contractor seeking an 'unusual circumstances' exemption from debarment, must, therefore, run a narrow gauntlet."[15]

---

[8]    *See* 29 C.F.R. § 8.1(b).

[9]    29 C.F.R. § 8.1(c).

[10]    29 C.F.R. § 8.1(d).

[11]    29 C.F.R. § 8.9(b).  *See Dantran, Inc. v. U.S. Dep't of Labor,* 171 F.3d 58, 71 (1st. Cir 1999).

[12]    *SuperVan, Inc.,* ARB No. 00-008, ALJ No. 1994-SCA-014, slip op. at 3 (ARB Sept. 30, 2002); *United Kleenist Org. Corp. & Young Park,* ARB No. 00-042, ALJ No. 1999-SCA-018, slip op. at 5 (ARB Jan. 25, 2002).

[13]    41 U.S.C.A. § 354(a); 29 C.F.R. § 4.188(a), (b).

[14]    *Hugo Reforestation, Inc.,* ARB No. 99-003, ALJ No. 1997-SCA-020, slip op. at 9 (ARB Apr. 30, 2001).

[15]    *Sharipoff dba BSA Co.,* No. 1988-SCA-032, slip op. at 6 (Sec'y Sept. 20, 1991). *Accord Colorado Sec. Agency,* No. 1985-SCA-053, slip op. at 2-3 (Sec'y July 5, 1991); *Able Bldg. Maint. & Serv. Co.,* No. 1985-SCA-004 (Dep. Sec'y Feb. 27, 1991); *A to Z Maint. Corp. v. Dole,* 710 F.Supp. 853, 855-856 (D.D.C. 1989). *See also Vigilantes Inc. v. Adm'r of*

The SCA does not define "unusual circumstances." Relevant regulations, however, establish a three-part test that states the criteria for determining when relief from debarment is appropriate. The contractor has the burden of proving "unusual circumstances" and must meet all three parts of the test to be relieved from the debarment sanction.[16] Under the first part of this test, the contractor must establish that the conduct giving rise to the SCA violations was not willful, deliberate, aggravated, or the result of culpable conduct. Moreover, the contractor must demonstrate the absence of a history of similar violations, an absence of repeat violations of the SCA, and that any previous violations were not serious.[17]

If the contractor succeeds on the first part, the second part of the test requires that it demonstrate a good compliance history, cooperation in the investigation, repayment of the moneys due, and sufficient assurances of future compliance. If successful, the third part lists other factors that must be considered, including whether the contractor has previously been investigated for violations, whether the contractor has committed recordkeeping violations which impeded Wage and Hour's investigation, and whether the determination of liability was dependent upon the resolution of bona fide legal issues of doubtful certainty.[18]

### 2. Karawia and ISI Violated the Act

At the outset, we note two errors in the ALJ's Decision and Order (D. & O.). First, the ALJ found that the Respondents admitted violating the Act.[19] The record contains no such admission. Secondly, the ALJ also erred in concluding that the Respondents violated the Act when they failed to fulfill their obligations under the May 2001 consent decree.[20] But the SCA's debarment sanction does not apply to those who violate consent decrees. It applies only to persons or firms "found to have violated this chapter."[21]

---

*Wage & Hour Div., U.S. Dep't of Labor*, 968 F.2d 1412, 1418 (1st Cir. 1992) ("The legislative history of the SCA makes clear that debarment of a contractor who violated the SCA should be the norm, not the exception, and only the most compelling of justifications should relieve a violating contractor from that sanction.").

[16]    29 C.F.R. § 4.188(b)(1); *Hugo Reforestation,* slip op. at 12-13.

[17]    29 C.F.R. § 4.188(b)(3)(i).

[18]    *See* 29 C.F.R. § 4.188(b)(3)(ii).

[19]    D. & O. at 2-3.

[20]    *Id.* at 4, 5, 7, 8.

[21]    41 U.S.C.A. § 354(a).

Nevertheless, the record contains ample evidence that the Respondents violated the Act. Several contract employees and Wage and Hour investigators and their supervisors testified that ISI had not paid the proper wages and fringe benefits.[22] The record establishes that at one point after the May 2001 consent decree, ISI had underpaid $631,081.07 in wages and fringe benefits to 1,943 contract employees. We find that a preponderance of the evidence demonstrates that ISI violated the SCA when it underpaid contract employees the wages and fringe benefits due them. Therefore, ISI and Karawia are subject to debarment.

### 3. Karawia and ISI Do Not Pass Part 1 of the Debarment Test

As already noted, unless the Respondents can meet the first part of the three-part test, they must be debarred. Therefore, they must prove that their conduct in causing or permitting violations of the Act was not willful, deliberate, aggravated, or the result of culpable conduct.

"Culpable conduct" includes "culpable neglect to ascertain whether practices" violate the Act.[23] Culpable neglect is conduct "beyond negligence, but short of specific intent."[24] The ALJ used slightly different terminology in describing ISI's conduct. He concluded that the "astounding number" of violations after the May 2001 consent decree evidenced "extreme irresponsibility amounting to culpable neglect."[25] The Respondents argue that underpaying the employees was not intentional and does not amount to culpable neglect.[26] But like the ALJ, we cannot ignore the fact that underpaying 1,943 employees is "astounding." Also astounding is $631,081.07 in underpayments. Therefore, we too conclude that ISI's conduct, whether described as beyond negligent or extremely irresponsible, amounts to culpable neglect.

Moreover, the record plainly demonstrates that the Respondents repeatedly violated the Act after Wage and Hour had provided specific guidance on how to comply with the Act. In the consent decree that the Respondents entered into with Wage and

---

[22]  Hearing Transcript (T.) at 43-46, 65, 72-73, 75, 83-84, 92-101, 114, 128-132, 138, 139, 141-142, 157, 670 (Weeks); 188-199, 207-208, 212-224, 242-245, 248-251 (LaCroix); 267, 272-276, 279, 290-293, 325, 329 (Quinn); 333-341 (Martin); Administrator's Exhibits 5, 26-29, 32, 33, 38-42, 44A, 44B, 46, 71, 72, 79, 82, 88, 91, 109, 110, 111, 114A, 114B, 114C, 114D.

[23]  29 C.F.R. § 4.188(b)(3)(i).

[24]  *J & J Merrick's Enters., Inc.,* BSCA No. 94-09, slip op. at 5 (Oct. 27, 1994).

[25]  D. & O. at 8-9.

[26]  Respondents' Brief at 1.

Hour in May 2001, they agreed to "establish a comprehensive, ongoing wage/hour compliance program for a four year period ending on August 31, 2005."[27]   The Respondents agreed to "use information and experience gained from the compliance program to develop procedures and an institutional knowledge base to help assure wage/hour compliance on a permanent basis."[28]   The Respondents' numerous and repeated underpayment of wages and fringe benefits, especially after agreeing with Wage and Hour to establish a compliance program to prevent such underpayments, constitutes not only culpable neglect, but willful, intentional, and deliberate conduct as well.[29]

Therefore, like the ALJ, we find that the Respondents did not satisfy the first part of the three-part test for determining whether "unusual circumstances" exist to warrant relief from debarment.  Accordingly, we need not examine whether the Respondents met the second and third parts of the test.[30]

### 4. The Respondents' Additional Arguments

*Personal Jurisdiction*

ISI contends that the Labor Department lacks personal jurisdiction because International Protective Services, the corporate entity doing business as ISI, was never a party to the litigation and was never served. The company therefore argues that we should dismiss the complaint against ISI.[31]  The ALJ found that the issue of personal jurisdiction had been waived because ISI answered the complaint, filed motions, and fully defended against the complaint at the hearing.[32]

---

[27]     Administrative Law Judge's Exhibit 1 (Consent Findings and Order, Attachment A at 10).

[28]     *Id.* at 12.

[29]     *See Nationwide Bldg. Maint., Inc. & William W. Johnson*, BSCA No. 92-04, slip op. at 12 (Oct. 30, 1992) ("Violations which are committed more than once - after proper notice - can also be seen as intentional, deliberate and willful."); *see also A to Z Maint. Corp.*, 710 F.Supp 853, 857-859 (D.D.C. 1989) (contractor's repeated violations of SCA even after receiving advice from Labor Department Compliance Officer is one of the aggravating factors which preclude a finding of "unusual circumstances" under 29 C.F.R. § 4.188(b)(3)(i)).

[30]     *See Integrated Res. Mgmt., Inc. of Or.*, ARB No 99-119, ALJ No. 1997-SCA-014, slip op. at 6 (ARB June 27, 2002).

[31]     Respondents' Brief at 8-9.

[32]     D. & O. at 6.

The preponderance of the evidence supports the ALJ's findings. Karawia testified that International Protective Services is the corporate entity doing business as ISI.[33] ISI answered the complaint without raising this issue.[34] ISI appeared at the hearing and actively defended itself against the Administrator's request for debarment. Therefore, ISI cannot now object to the Labor Department's jurisdiction.[35]

### *Karawia not a "party responsible"*

Karawia maintains that he is not personally responsible for the SCA violations and therefore should not be subject to debarment.[36] The ALJ found that Karawia is subject to debarment because he is President and Chief Executive Officer of the holding company that owns both International Protective Services and ISI and because he exercises significant control over ISI's business operations. ISI argues that Peggy Orlando and William Pedrick, who settled their respective cases with the Labor Department before the hearing and agreed to be debarred, are responsible.[37]

Section 3(a) imposes liability on "the party responsible" for violations of the Act.[38] Liability is not limited to the officers of a contracting firm or to signatories to the service contract. Rather, "party responsible" includes "all persons, irrespective of propriety interest, who exercise control, supervision, or management over the performance of the contract, including the labor policy or employment conditions regarding the employees engaged in contract performance, and who, by action or inaction, cause or permit a contract to be breached."[39]

Karawia testified that he negotiated government contracts, third-party contracts, and collective bargaining agreements, ensured that contract procedures were being followed, assigned job responsibilities, managed subordinate employees, hired specialized lawyers, hired a public relations firm, represented ISI in the press, and

---

[33]     T. at 631-32.

[34]     Administrative Law Judge's Exhibit 19.

[35]     *See Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (personal jurisdiction defense waived where defendants participated in litigation); *see also McDonald v. Mabee*, 243 U.S. 90 (1917) (court has jurisdiction when party appears regardless of the power of the State to serve process).

[36]     Respondents' Brief at 8-9.

[37]     *Id.* at 9.

[38]     41 U.S.C.A. § 352(a).

[39]     29 C.F.R. § 4.187(e)(4).

arranged contract financing.[40]   Therefore, Karawia is a party responsible within the meaning of the regulations and is subject to the debarment sanction.   Furthermore, Karawia and ISI cannot avoid debarment by arguing that Orlando or Pedrick are responsible.[41]

### Discrimination

The Respondents claim that Robert Soden, the GSA contracting officer's technical representative, used racial epithets against Karawia during the course of contract performance.   They argue that Soden "sabotaged [the contract] and did all he could to have [it] terminated."   This discrimination, contend the Respondents, constitutes "unusual circumstances," thus precluding debarment.[42]   But though Soden was in a position to affect the timeliness of GSA payments to ISI, the Respondents adduced no evidence that his alleged racism and sabotage caused ISI to underpay its employees. Therefore, the alleged racism and sabotage do not constitute "unusual circumstance" here.

### GSA's Late Payments and Withholding Contract Funds

GSA admitted that it was in arrears on payments due to ISI.[43]   And, as noted, GSA withheld some contract payments after the Labor Department requested it to do so. The Respondents argue that these "unusual circumstances" warrant relief from debarment because GSA's actions created a cash flow problem, preventing ISI from paying wages and fringe benefits.[44]

We reject ISI's argument about the withheld funds because the evidence contradicts it.   The last workday on ISI's contract with GSA was October 18, 2002.   GSA did not withhold contract funds until after November 14, 2002, when Wage and Hour first requested that GSA do so.[45]   Thus, these withheld funds could not have affected

---

[40]    T. at 375, 402, 403, 405, 413, 421, 424, 427, 428-429, 432-433, 437, 441, 442-443, 445-446, 531-532, 633-635, 636-638.

[41]    *See* 29 C.F.R. § 4.188(b)(5) (attempting to shift responsibility to subordinate employees does not relieve contractor from debarment).

[42]    Respondents' Brief at 2, 18, 21.

[43]    Respondents' Exhibits 33, 34.   These exhibits, dated November 2002, are GSA's responses to ISI's request that GSA pay invoices still outstanding after the contract ended.

[44]    Respondents' Brief at 3, 4-6, 11-13, 18-21, 27.

[45]    Administrator's Exhibits 26, 28, 29, 32.

ISI's ability to pay wages and fringe benefits that were owed before, on, or shortly after October 18, the last workday on the contract.

We also reject the late payments argument. Addressing this issue in *Kleen-Rite Corp.*, the Board of Service Contract Appeals (BSCA) wrote, "The purpose of the Act is to protect the rightful wages of service employees. There is no provision in the statute or the regulations which permits an employer to wait until being reimbursed by another party before fulfilling its obligations to its employees."[46]

### De Facto Debarment

The Respondents argue that ISI has been, in effect, debarred since GSA cancelled the contract and then removed ISI from the Federal Supply Schedule, a list of contractors pre-qualified to do business with the United States Government. They assert that adding a formal debarment to this de facto debarment "will spell the death knell of the company" and will cause it to lose contracts that it currently has. Therefore, they argue, the de facto debarment preempts our authority to order debarment or should at least operate as a mitigating circumstance.[47]

This argument lacks merit because contractors cannot receive credit against the three-year debarment period.[48] The statute prescribes that the three-year debarment period begins to run from the date that the list distributed by the Comptroller General of those persons or firms found to have violated the SCA is published.[49] Further, the ARB has held that '[d]ebarment is the statutorily required sanction for SCA violators and its adverse effects [on the contractor's business] should not be considered a reason to excuse a contractor for its wrongdoing."[50]

### CONCLUSION

The preponderance of evidence demonstrates that ISI and Karawia, who is a "party responsible," violated the Act when they underpaid employees SCA wages and fringe benefits due under the GSA contracts. The record also proves that this conduct

---

[46] BSCA No. 92-09, slip op. at 3 (Oct. 13, 1992).

[47] Respondents' Brief at 5, 25.

[48] *The Swanson Group, Inc.*, BSCA No. 94-05, slip op. at 3 (May 31, 1995).

[49] 41 U.S.C.A. § 354(a).

[50] *Integrated Res. Mgmt., Inc. of Or.*, slip op. at 7 n.2.

was willful, intentional, deliberate, and culpable.  Therefore, "unusual circumstances" do not exist.  As a result, we **AFFIRM** the ALJ's decision and order that ISI and Karawia be debarred.

      **SO ORDERED**.

                                          **OLIVER M. TRANSUE**
                                          **Administrative Appeals Judge**

                                          **M. CYNTHIA DOUGLASS**
                                          **Chief Administrative Appeals Judge**

# EXHIBIT C

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

**INTERNATIONAL SERVICES,
INCORPORATED AND OUSAMA
KARAWIA,**

**ARB CASE NO. 05-136**

**ALJ CASE NO. 2003-SCA-018**

**RESPONDENTS,**

**DATE:    MAY 3 0 2008**

In re Contract Nos. GS-02P-94-CID-0141
And GS-02P-94-CID-0001 with the U.S. General
Services Administration, covering upstate New York.

**BEFORE:    THE ADMINISTRATIVE REVIEW BOARD**

Appearances:

*For the Respondents:*
  Sam Zalman Gdanski, Esq., Suffern, New York

## ORDER DENYING RECONSIDERATION

On December 21, 2007, the Administrative Review Board (ARB or Board) issued a Final Decision and Order in this case arising under the McNamara-O'Hara Service Contract Act (SCA or the Act).[1]  The Board concluded that the preponderance of the evidence demonstrates that International Services, Incorporated (ISI) and Ousama Karawia (Karawia) violated the Act when they underpaid employees SCA wages and fringe benefits due under the United States General Services Administration contracts listed above.  The ARB also determined that the underpayment of wages and fringe benefits was willful, intentional, deliberate, and culpable conduct.  The ARB thus affirmed the Administrative Law Judge's decision that the Respondents did not prove "unusual circumstances" warranting relief from the debarment sanction, and ordered that ISI and Karawia be debarred.

---

[1]    41 U.S.C.A. §§ 351-358 (West 1994).

2

On January 9, 2008, the Respondents filed a Motion for Reconsideration And Or [sic] Reconsideration By the Entire Panel of the ARB and for a Stay of the Order of Debarment Pending Reconsideration.[2]

The ARB is authorized to reconsider a decision upon the filing of a motion for reconsideration within a reasonable time of the date on which the decision was issued.[3] Moving for reconsideration of a final administrative decision is analogous to petitioning for panel rehearing under Rule 40 of the Federal Rules of Appellate Procedure.[4] Rule 40 expressly requires that any petition for rehearing "state with particularity each point of law or fact that the petitioner believes the court has overlooked or misapprehended . . . ."[5] A petition for rehearing should not reargue unsuccessful positions or assert an inconsistent position that may prove more successful.[6] Likewise, issues not presented in initial briefs or during oral argument are not appropriate subjects for rehearing.[7] But raising new issues on rehearing may be appropriate if supervening judicial decisions or legislation, not reasonably foreseen during initial argument, would alter the outcome.[8] In considering a motion for reconsideration, the Board has applied a four-part test to determine whether the movant has demonstrated:

> (i) material differences in fact or law from that presented to a court of which the moving party could not have known through reasonable diligence, (ii) new material facts that occurred after the court's decision, (iii) a change in the law

---

[2]     ISI and Karawia have requested that the entire Board review their Motion. But ISI and Karawia have presented no authority requiring the full Board to decide their Motion.

[3]     *Macktal v. Chao*, 286 F.3d 822, 826 (5th Cir. 2002), *aff'g Macktal v. Brown & Root, Inc.*, ARB Nos. 98-112/122A, ALJ No. 1986-ERA-023, slip op. at 2-6 (ARB Nov. 20, 1998); *Powers v. Pinnacle Airlines, Inc.*, ARB No. 04-102, ALJ No. 2004-AIR-006, slip op. at 1 (ARB Feb. 17, 2005). *Accord Thomas & Sons Bldg. Contractors*, ARB No. 98-164, ALJ No. 1996-DBA-033, slip op. at 2-4 (ARB June 8, 2001). *See also Henrich v. Ecolab, Inc.*, ARB No. 05-030, ALJ No. 2004-SOX-051, slip op. at 11 (ARB May 30, 2007).

[4]     *Powers v. Pinnacle Airlines, Inc.*, ARB No. 06-078, ALJ Nos. 2006-AIR-004, 2006-AIR-005, slip op. at 3 (ARB Jan. 30, 2008).

[5]     Fed. R. App. P. 40(a)(2).

[6]     *United States v. Smith*, 781 F.2d 184 (10th Cir. 1986).

[7]     *Utahns for Better Transp. v. United States Dep't of Transp.*, 319 F.3d 1207, 1210 (10th Cir. 2003); *FDIC v. Massingill*, 30 F.3d 601, 605 (5th Cir. 1994); *American Policyholders Ins. Co. v. Nyacol Prods.*, 989 F.2d 1256, 1264 (1st Cir. 1993).

[8]     *Lowry v. Bankers Life & Cas. Ret. Plan*, 871 F.2d 522, 523 n.1, 525-526 (5th Cir. 1989).

3

after the court's decision, and (iv) failure to consider material facts presented to the court before its decision.[9]

Upon review of the Respondents' Motion, we conclude that the Respondents have failed to meet any of the provisions of the Board's four-part test for reconsideration. Instead, the Respondents' Motion rehashes arguments the Board has already considered and rejected. Accordingly, we **DENY** the Respondents' Motion in its entirety.

**SO ORDERED.**

OLIVER M. TRANSUE
Administrative Appeals Judge

M. CYNTHIA DOUGLASS
Chief Administrative Appeals Judge

---

9    *Powers, supra*; *Chelladurai v. Infinite Solutions, Inc.*, ARB No. 03-072, ALJ No. 2003-LCA-004, slip op. at 2 (ARB July 24, 2006); *Rockefeller v. U.S. Dep't of Energy*, ARB Nos. 03-048, 03-184; ALJ Nos. 2002-CAA-005, 2003-ERA-010, slip op. at 2 (ARB May 17, 2006); *Saban v. Morrison-Knudsen*, ARB No. 03-143, ALJ No. 2003-PSI-001, slip op. at 2 (ARB May 17, 2006); *Halpern v. XL Capital, Ltd.*, ARB No 04-120, ALJ No. 2004-SOX-054, slip op. at 2 (ARB Apr. 4, 2006); *Getman v. Southwest Secs.*, ARB No. 04-059, ALJ No. 2003-SOX-008, slip op. at 1-2 (ARB Mar. 7, 2006); *Knox v. Dep't of the Interior*, ARB No. 03-040, ALJ No. 2001-LCA-003, slip op. at 3 (ARB Oct. 24, 2005).

## ADMINISTRATIVE REVIEW BOARD
## CERTIFICATE OF SERVICE

**CASE NAME** : *International Services, Incorporated and Ousama Karawia*

**ARB CASE NO** : 05-136

**ALJ CASE NO.:** 2003-SCA-18

**DOCUMENT** : ORDER DENYING RECONSIDERATION

A copy of the above-referenced document was sent to the following persons on

**MAY 3 0 2008**

*L. Wilson*

## PARTIES AND INTERVENING INTERESTED PERSONS
## (CERTIFIED OR INTEROFFICE):

Sam Z. Gdanski, Esq.
Gdanski and Gdanski, LLP
25 Sherwood Ridge Road
Pomona, NY 10970

Steven J. Mandel, Esq.
Associate Solicitor
Division of Fair Labor Standards
U.S. Department of Labor
Room N-2716, FPB
200 Constitution Avenue, NW
Washington, DC 20210

Alfred Robinson
Acting Administrator
Wage and Hour Division, ESA
U.S. Department of Labor
Room S-3502, FPB
200 Constitution Avenue, NW
Washington, DC 20210

2

**REGULAR OR INTEROFFICE MAIL:**

Gregory Jacobs
Solicitor of Labor
U.S. Department of Labor
200 Constitution Ave., NW
Room S-2002
Washington, DC  20210

Harold Le Mar
Office of the Solicitor
U.S. Department of Labor
201 Varick Street
New York, NY  10014-4811

Hon. John M. Vittone
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, NW, Suite 400
Washington, DC  20001-8002

Hon. Ralph A. Romano
Administrative Law Judge
Office of Administrative Law Judges
2 Executive Campus, Suite 450
Cherry Hill, NJ  08002

SOL:BS
42268, 42404, 42405

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES
------------------------------------------
In the Matter of:                      :    CASE NO.
                                       :
INTERNATIONAL SERVICES, INC., and      :    99-SCA-12
INTERNATIONAL SECURITY SERVICES &      :
INVESTIGATIONS, INC., and              :
Ousama Karawia, Individually and as    :
President; Richard E. DeLong,          :
Individually and as Vice President of  :
Operations; and, William Pedrick,      :
Individually and as Contract Manager,  :
                                       :
            Respondents.               :
------------------------------------------

                     AND

UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
- - - - - - - - - - - - - - - - - - - - -
ELAINE L. CHAO, Secretary of Labor,    :
United States Department of Labor,     :
                                       :
            Plaintiff,                 :
                                       :
        v.                             :
                                       :    No.  2000-FLS-15
                                       :          AND
INTERNATIONAL SERVICES, INC. and Ousama :   NO.  2000-FLS-16
Karawia, Individually and as President, :
                                       :
            Respondents.               :
- - - - - - - - - - - - - - - - - - - - -

                CONSENT FINDINGS AND ORDER

        The parties represent that they have reached an accord to

resolve these cases without the burden, expenses and delays of

further litigation and to this end stipulate and agree as follows:

        1.  Respondents,  International  Services,  Inc.  and

International Security Services & Investigations, Inc. were at all

ISI00010

times hereinafter mentioned, corporations doing business at 3771 242nd Street, Suite 205, Torrance, California, and they were engaged in providing guard services at, among others, federal buildings and facilities in Virginia, Alaska, and throughout upper New York State, all under contract with the General Services Administration (GSA).

2. Respondents Ousama Karawia, Richard E. DeLong, and William Pedrick occupied the positions set forth in the captions above and exercised control and supervision of the operations of the corporate respondents and were responsible individually for the employment practices and management policies of the corporate respondents.

3. Respondents were awarded the following contracts, among others:

| Contract No. | Agency | Period Covered | Locations |
|---|---|---|---|
| GS-02P-94-CID-0141 | GSA | 3/1/96-3/1/98 & extensions through 2/1/99 | Up-state NY: Albany, Buffalo, Utica, Syracuse, |
| V463P-0051-96 | VA | 10/97-1/13/98 | Anchorage, AK |
| GS-11P-96-MPC-0513 | GSA | 1/1/96-12/31/97 | Arlington, VA. |

4. Plaintiff charged that during the periods required for the performance of the listed contracts above, respondents violated the provisions of the McNamara-O'Hara Service Contract Act, as amended, 79 Stat. 1034, 86 Stat. 789, 41 U.S.C. 351 et seq.(the SCA), and the Contract Work Hours and Safety Standards

2

ISI00011

Act, as amended, 40 U.S.C. § 327 et seq. ("CWHSSA"), in the following ways: (a) respondents failed to timely pay several of their service employees employed in the performance of the aforesaid contracts the minimum hourly rate required by § 2(a)(1) of the SCA, and by 29 C.F.R. §§ 4.3 and 4.6(b); (b) respondents failed to timely pay several of their service employees employed in the performance of the aforesaid contracts the minimum fringe benefits required by § 2(a)(2) of the SCA and by 29 C.F.R. §§ 4.3 and 4.6(b); and, (c) respondents failed to timely pay several of their service employees employed in the performance of the aforesaid contracts at a rate not less than one and one-half times their regular rate of pay for all hours worked by such employees in excess of forty (40) hours in a workweek, as required by § 102(a) of the CWHSSA and by 29 C.F.R. § 4.181(b).

5.    Plaintiff alleged that by reason of a number of breaches of contract and violations of the SCA, CWHSSA, and the Regulations issued thereunder, respondents became liable for a sum equal to the amount of minimum hourly rate, overtime, and fringe benefit underpayments of compensation due to employees engaged in the performance of such contracts in a sum of at least $157,000.

6.    Wage/Hour opened forty-two investigation files and alleged underpayments for minimum wages, fringe benefits or overtime as set forth on this chart, and respondents agreed to and in fact did pay these amounts due:

3

IS100012

| Wage/Hour case # | Minimum wages | Fringe benefits | Overtime wages | Back wages |
|---|---|---|---|---|
| 96-206-92933 | | 414 | | 414 |
| 96-206-97411 | 62510 | 16529 | | 79039 |
| 97-309-07433 | | | 4851 | 4851 |
| 97-206-92901 | 36 | 289 | | 325 |
| 97-206-92906 | | 96 | | 96 |
| 97-206-92912 | 2527 | | | 2527 |
| 97-206-92925 | 2048 | | 29 | 2077 |
| 97-206-93322 | 461 | 36 | | 497 |
| 97-206-97401 | 36 | 192 | | 228 |
| 97-206-97416 | | 1557 | | 1557 |
| 97-206-97417 | 251 | | | 251 |
| 97-206-97420 | | 712 | | 712 |
| 97-206-98406 | 1017 | 67 | 75 | 1159 |
| 98-206-01070 | 553 | 29 | | 582 |
| 98-206-01098 | 208 | | | 208 |
| 98-206-01099 | 34 | | | 34 |
| 98-206-01108 | | 670 | | 670 |
| 98-206-01129 | 63 | | | 63 |
| 98-206-01131 | 96 | | | 96 |
| 98-206-01133 | 1105 | 150 | 306 | 1561 |
| 98-206-01151 | | 68 | | 68 |
| 98-206-01153 | | 248 | | 248 |
| 98-206-01154 | 1750 | | | 1750 |
| 98-206-01173 | 447 | | | 447 |
| 98-206-01174 | 0 | 0 | 0 | 0 |
| 98-206-01204 | | 20 | | 20 |
| 98-206-02063 | 1387 | | 451 | 1838 |

4

ISJ00013

| | | | | |
|---|---|---|---|---|
| 98-206-06090 | 7754 | | | 7754 |
| 98-206-06104 | | 12727 | | 12727 |
| 98-206-06111 | 112 | 213 | | 325 |
| 98-206-06112 | 1134 | 564 | | 1698 |
| 98-206-06127 | 540 | | | 540 |
| 98-206-06171 | | | 72 | 72 |
| 98-206-06178 | 8427 | | | 8427 |
| 98-206-95718 | 170 | | | 170 |
| 98-206-95720 | 60 | | | 60 |
| 98-260-95721 | 361 | | | 361 |
| 98-206-97312 | | 192 | | 192 |
| 98-206-97402 | 82 | 187 | | 269 |
| 98-206-97403 | 706 | 2362 | 5520 | 8588 |
| 98-206-97403 | 12745 | 2490 | | 15235 |
| 99-101-00091 | | 53 | | 53 |
| Subtotals | $106,620 | $39,865 | $11,304 | |
| Grand total | | | | $157,789 |

7.    Pursuant to section 16(e) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. ("FLSA"), and in accordance with 29 C.F.R. Part 578, plaintiff assessed civil money penalties in the amounts of $7,200 and $500 against the respondents, INTERNATIONAL SERVICES, INC. and Ousama Karawia, individually and as president, for alleged repeated and willful violations of the minimum wage and overtime provisions of sections 6 and 7 of the FLSA.

ISI00014

8.  Respondents paid the FLSA monies that plaintiff told respondents were due to respondents' employees.

9.  Respondents hereby agree to withdraw their Answer and Exceptions to the Complaint and Orders of Reference of the plaintiff.  Respondents further agree, without admitting any violations of the SCA, CWHSSA, or the FLSA, that the facts as set forth herein are incorporated into and made a part of the Consent Findings.

10.  Respondents have undertaken efforts to understand the labor standards provisions of the SCA and the CWHSSA and the regulations associated thereto.  Respondents affirm that they believe in good faith that they are in compliance and promise to continue to work in good faith to comply with the terms of those Acts and their applicable regulations.

11.  Respondents, as is set forth in Attachment A which is incorporated herein, will establish, no later than September 1, 2001, a compliance program covering employees of the corporate respondents and their successors, if any, that will include, among others: Respondent Karawia conducting informational meetings with all employees; giving all employees a written summary of their rights under the SCA, the CWHSSA, and the FLSA; and, employing a full-time employee who will serve as an ombudsman with the authority to investigate and correct payroll problems promptly.

ISI00015

12.   The Consent Findings and Order are without prejudice to (a) plaintiff's future exercise of all investigative enforcement authority under the SCA, the CWHSSA, the FLSA, and other applicable laws; or (b) respondents' future assertion and exercise of all defenses available to them under law.

13.   Respondents will pay $500 and $7,200 in civil money penalties to plaintiff in two separate checks for those amounts made payable to "U.S. Department of Labor" and mailed to the United States Department of Labor, Northeast Regional Office, Wage and Hour Division, Curtis Center - Suite 850 West, 170 South Independence Mall West, Philadelphia, PA 19106-3317, on or before April 20, 2001.   Respondent will, on both checks, write its Tax Identification Number and "Civil Money Penalty Payment".   In addition, on the $500 check, respondent will write "Case Number 2000-FLS-16" and on the $7,200 check respondent will write "Case Number 2000-FLS-15".

14.   The parties agree that an Order disposing of these proceedings in accordance with the Consent Findings and Order shall have the same force and effect as Orders entered after full hearings pursuant to 29 C.F.R. 4.189 (29 C.F.R. § 18.9(b)(1)).

15.   The entire record on which this Final Order is based consists solely of the Complaint, Orders of Reference, and these Consent Findings and Order (29 C.F.R. § 18.9(b)(2)).

7

16. The parties through agreement hereby waive any further procedural steps before the Administrative Law Judge regarding these matters (29 C.F.R. § 18.9(b)(3)).

17. Respondents hereby waive any right to challenge or contest the validity of these Consent Findings and Order (29 C.F.R. § 18.9(b)(4)).

18. The parties stipulate that this Consent Findings and Order may be entered into evidence in any future proceeding, provided that the parties will be free to argue, and the Judge shall be free to decide, the weight thereof. Respondents do not waive any affirmative or other defenses available to them under law in any future proceeding.

19. Each party hereby agrees to bear its own costs, attorney charges, fees, and other expenses incurred by such party in connection with any stage of these proceedings.

Approved as to Form and Content:

For Respondents:

International Services, Inc.

CORP.
SEAL
BY: _____

International Security Services & Investigations, Inc.

CORP.
SEAL
BY: _____

For the Plaintiff:

STEVEN J. MANDEL
Associate Solicitor
of Labor for
Fair Labor Standards

PATRICIA M. RODENHAUSEN
Regional Solicitor

_____ 4/27/01
BARNETT SILVERSTEIN
Attorney

8

ISI00017

OUSAMA KARAWIA, as President of
International Services, Inc. and
as President of International Security
Services & Investigations, Inc.

OUSAMA KARAWIA,
Individually

RICHARD E. DELONG, as Vice President
of International Services, Inc. and
as Vice President of International
Security Services & Investigations, Inc.

RICHARD E. DELONG,
Individually

WILLIAM PEDRICK, as Contract
Manager of International Services,
Inc. and as Contract Manager of
International Security Services &
Investigations, Inc.

WILLIAM PEDRICK,
Individually

Mark E. Baker, Esq.
McGuiness, Norris & Williams, LLP
Counsel to Respondents

SO ORDERED

HONORABLE RICHARD A. MORGAN
Administrative Law Judge

9 MAY 2001 ,2001
Date

9

ATTACHMENT A - COMPLIANCE PROGRAM

No later than September 1, 2001, the corporate respondents and the individual respondents for the duration of their employment by or affiliation with the corporate respondents agree to establish a comprehensive, ongoing wage/hour compliance program for a four-year period ending on August 31, 2005, consisting of the following components:

1)   All employees will participate in an informational program at which they will be told of their rights under the SCA, the CWHSSA, and the FLSA.  This program will include (a) providing each employee with a written summary of employees' rights under the SCA, the CWHSSA, and the FLSA, including the right to contact Department of Labor enforcement personnel at any time, and employees will be informed of their legal protections against retaliation for asserting their rights under the SCA, the CWHSSA, and the FLSA, and respondents will assure employees that no such retaliation will occur; and (b) meetings (of at least one hour) with all employees nationwide at which respondent Sam Karawia states respondents' commitment to compliance with the SCA, the CWHSSA, and the FLSA.  Employees will be told at these meetings of their legal protections against retaliation for asserting their rights under the SCA, the CWHSSA, and the FLSA, and respondents will assure employees that no such retaliation will occur.  At these meetings, employees will be provided a review of pertinent

10

ISI00019

SCA, CWHSSA, and FLSA principles by respondents' counsel, or representatives of respondents, with a question/answer session during the meetings. Such meetings will be held on or before September 1, 2001 for such employees as are employed by the corporate respondents on the dates of the meetings.

2) All employees hired after the employee meetings described above will be provided with the written summary described above and a description of the other components of the compliance program.

3) Respondents will employ a full-time manager to serve as an "ombudsman" who will have responsibility for receiving and investigating complaints pertaining to wages due and authority to take appropriate corrective payroll actions. The position will report directly to Mr. Karawia. The availability, duties, and authority of the ombudsman will be publicized in the meetings and informational packets and on employee bulletin boards at respondents' work locations. These publications will include a reminder to employees that, while plaintiff encourages use of the ombudsman, employees are free to contact appropriate plaintiff/DOL enforcement personnel at any time. Respondents commit, absent unusual circumstances, to resolve all complaints submitted to the ombudsman within 10 days of completion of the ombudsman's investigation, with no complaint to remain unresolved for more than 30 days after the complaint is filed; provided that resolution shall not necessarily in every case require payment of the amount

11

IS100020

asserted to be due in the complaint. The ombudsman will retain documentation including report forms for employees lodging complaints with the ombudsman, and quarterly spreadsheet reports, reviewed and signed by both the ombudsman and Mr. Karawia, listing all complaints received by the ombudsman, the investigative findings, and any corrective actions taken during the quarter covered by the report.

4)  Respondents commit to obtaining and acting upon advice from legal counsel experienced in wage/hour matters in addressing issues that arise through the ombudsman or in overall wage/hour compliance. Working with counsel as necessary, respondents will use information and experience gained from the compliance program to develop procedures and an institutional knowledge base to help assure wage/hour compliance on a permanent basis.

12

ISI00021

Issue date: 09May2001

## SERVICE SHEET

Case Name:      ADMIN., WAGE & HOUR DIV. vs. INTERNATIONAL SERVICES,
                INC., AND OUSAMA KARAWIA, Individually and as President;
                U.S. DEPT. OF LABOR vs. INTERNATIONAL SERVICES, INC., ET AL
Case No.:       2000-FLS-15, 2000-FLS-16; 1999-SCA-12
Title of Document:  DECISION AND ORDER - CONSENT FINDINGS

I certify that on a copy of the above-entitled document was mailed to the following parties:

REGULAR MAIL                        REGULAR MAIL

Barnet Silverstein, Esq.            Samuel L. Weitman
Office of the Solicitor             District Director
201 Varick Street                   Employment Standards Admin.
New York NY 10014                   Wage & Hour Div.
                                    O'Brien Federal Bldg. Room 822
Mark E. Baker, Esq.                 Albany NY 12207
McGuiness Norris & Williams, LLP
1015 Fifteenth St., N.W. Suite 1200
Washington DC 20005                 Administrator, Wage and Hour Div.
                                    U.S. Dept. of Labor
                                    Employment Standards Admin.
Patricia Rodenhausen                Room S-3502, FPB
Regional Solicitor                  200 Constitution Ave., N.W.
201 Varick Street                   Washington DC 20210
New York, NY 10014

                                    Associate Solicitor
International Services Inc., and     U.S. Dept. of Labor
  Ousama Karawia, Individually and  Office of the Solicitor
  as President                      Room N-2716, FPB
3771 242nd Street                   200 Constitution Avenue, N.W.
Suite 205                           Washington DC 20210
Torrance CA 90505

                                    Counsel for Trial Litigation
Mr. Ousama Karawia, President       Division of Fair Labor Standards
International Services, Inc.         Office of the Solicitor
3771 West 242nd Street, Suite 205   Room N-2716, FPB
Torrance, CA 90505                  200 Constitution Ave., N.W.
                                    Washington DC 20210
Corlis Sellers
Reg. Admin. Wage & Hour Div.        International Security
U.S. Dept. of Labor                 Services & Investigations, Inc.
Office of the Solicitor             3771 242nd St., Suite 205
201 Varick St., Room 707            Torrance, CA 90505
New York, NY 10014

ISI00022

<u>REGULAR MAIL</u>

Richard E. Delong
Vice President of Operations
International Services, Inc.
3771 242nd St., Suite 205
Torrance, CA 90505

William Pedrick
Contract Mngr. for NYS
  International Services, inc.
1 Steuben Place, M. level, #6
Albany, NY 12207


*Darlene M Rothert*
DARLENE M. ROTHERT
Legal Technician

ISI00023

# EXHIBIT D

BEFORE THE
U.S. DEPARTMENT OF LABOR
NORTHEAST REGION

```
------------------------------X
In the Matter of:                    :

INTERNATIONAL SERVICES, INC., and    :
Ousama Karawia, Individually and     :
as President; Richard E. DeLong,     :     Case No.:   2003-SCA-18
Individually and as Vice President   :
of Operations; and William           :
Pedrick, Individually and as         :
Contract Manager; Peggy Orlando,     :
Individually and as Chief            :
Financial Officer,                   :
                                     :
              Respondents.           :
------------------------------X
```

U.S. Tax Court
Jacob K. Javits Federal Building
26 Federal Plaza
Room 238
New York, NY 10278

Monday,
November 22, 2004

The above-entitled matter came on for a hearing,

pursuant to notice, at 1:00 p.m.

BEFORE:    RALPH A. ROMANO
           Administrative Law Judge

Free State Reporting, Inc.

BEFORE THE
U.S. DEPARTMENT OF LABOR
NORTHEAST REGION

```
-------------------------------X
In the Matter of:                :
                                 :
INTERNATIONAL SERVICES, INC., and :
Ousama Karawia, Individually and  :
as President; Richard E. DeLong,  :    Case No.:   2003-SCA-18
Individually and as Vice President:
of Operations; and William        :
Pedrick, Individually and as      :
Contract Manager; Peggy Orlando,  :
Individually and as Chief         :
Financial Officer,                :
                                  :
            Respondents.          :
-------------------------------X
```

U.S. Tax Court
Jacob K. Javits Federal Building
26 Federal Plaza
Room 238
New York, NY 10278

Tuesday,
November 23, 2004

The above-entitled matter came on for hearing,

pursuant to notice, at 9:00 a.m.

BEFORE:    RALPH A. ROMANO
           Administrative Law Judge

Free State Reporting, Inc.

1                          Exhibit No. 37 was marked and

2                          received into evidence.)

3          MR. LeMAR:  The Administrator rests, Your Honor.

4          JUDGE ROMANO:  All right.  So the Administrator has

5    rested.  Mr. Gdanski, you may call your first witness.

6          MR. GDANSKI:  I'd like to call Ousama Karawia.

7          JUDGE ROMANO:  Good morning, sir.  If you would

8    raise your right hand to be sworn.

9    (Whereupon,

10                        OUSAMA KARAWIA

11   was called as a witness by and on behalf of the Respondents,

12   and having been first duly sworn, was examined and testified

13   as follows:)

14         JUDGE ROMANO:  Please be seated.  Mr. Gdanski, y

15   witness.

16                      DIRECT EXAMINATION

17        BY MR. GDANSKI:

18     Q    Mr. Karawia, who are you employed by?

19     A    International Services.

20     Q    Is that a company you started?

21     A    Yes.

22     Q    Why don't you give us a brief history of when the

23   company was started?

24     A    I started the company in 1982.  I started it when I

25   was 17 1/2 years old.

364

BEFORE THE
U.S. DEPARTMENT OF LABOR
NORTHEAST REGION

```
---------------------------------X
In the Matter of:                :
                                 :
INTERNATIONAL SERVICES, INC., and :
Ousama Karawia, Individually and  :
as President;  Richard E. DeLong,  :  Case No.:  2003-SCA-18
Individually and as Vice President:
of Operations; and William        :
Pedrick, Individually and as      :
Contract Manager; Peggy Orlando,  :
Individually and as Chief         :
Financial Officer,                :
                                 :
         Respondents.             :
---------------------------------X
```

U.S. Tax Court
U.S. Customs House
200 Chestnut Street
Suite 300
Philadelphia, Pennsylvania

Tuesday,
January 4, 2005

The above-entitled matter came on for a hearing,

pursuant to notice, at 10:00 a.m.

BEFORE:    RALPH A. ROMANO
           Administrative Law Judge

Free State Reporting, Inc.

BEFORE THE
U.S. DEPARTMENT OF LABOR
NORTHEAST REGION

```
--------------------------------X
In the Matter of:              :
                               :
INTERNATIONAL SERVICES, INC., and :
Ousama Karawia, Individually and :
as President; Richard E. DeLong, :   Case No.:   2003-SCA-18
Individually and as Vice President:
of Operations; and William     :
Pedrick, Individually and as   :
Contract Manager; Peggy Orlando, :
Individually and as Chief      :
Financial Officer,             :
                               :
                 Respondents.  :
--------------------------------X
```

U.S. Tax Court
U.S. Customs House
200 Chestnut Street
Suite 300
Philadelphia, Pennsylvania

Wednesday,
January 5, 2005

The above-entitled matter came on for a hearing,

pursuant to notice, at 10:00 a.m.

BEFORE:    RALPH A. ROMANO
           Administrative Law Judge

```
 1       A      Yes.

 2       Q      What kind of business are you engaged in?

 3       A      We provide guard service, security guards and also

 4  facility services.

 5       Q      What would be involved in the facility services?

 6       A      Janitorial services.

 7       Q      Are you an officer of any corporations?

 8       A      Yes.

 9       Q      And what corporations?

10       A      The holding company, Karawia Industries,

11  International Protective Services, DeKar Industries, and

12  International Armored Services.

13       Q      And what titles do you hold in Karawia Industries?

14       A      I am the CEO and president.

15       Q      And International Protective Service, what offices?

16       A      Same position.

17       Q      And DeKar?

18       A      Same position.

19       Q      And International Armored?

20       A      Same position.

21       Q      Do you own any corporations?

22       A      I own 100 percent of the holding company.

23       Q      Karawia Industries?

24       A      Correct.

25       Q      Do you own any unincorporated businesses?
```

1    Q    And what was his title?

2    A    He was the project manager **who started** the contract.

3    Q    And was he **ever** fired?

4    A    No, he was actually relieved of his duties and

5    reassigned.

6    Q    Okay.  Where was he reassigned to?

7    A    To a security guard.

8    Q    And who relieved him of his duties?

9    A    Richard DeLong.

10    Q    And do you know why?

11    A    Performance, and the request of GSA.

12    Q    Now you maintained an office in Albany to collect

13    payroll information.  Is that correct?  On the GSA contract.

14    A    Correct.

15    Q    And that office collected the payroll information,

16    input that into your payroll system, and then the main office

17    in California actually cut the checks.  Is that correct?

18    A    Correct.

19    Q    William Pedrick was your regional manager for the

20    GSA contract up until -- **what was it?  The end of** --

21    A    April of 2002.

22    Q    April of 2002.  Were you aware that there was a

23    significant turnover in the persons who performed the job of

24    payroll clerk in the **Albany** office for the GSA contract?

25    A    If I was aware of significant turnover?  At the end,

1    yes.

2        Q    And when you say the end?

3        A    At the end of the contract.

4        Q    October of --

5        A    Somewhere in October, November.

6        Q    And were you aware that there was a transfer of that

7    function, of the payroll function in September of 2002 to the

8    California main office?

9        A    I was not aware of that.

10       Q    Besides Hannibal Almodovar, who else held the

11   position of ombudsman?

12       A    Maggie Melogiza.

13       Q    Could we get a spelling of Maggie's last name?

14       A    God, I don't even know.

15       Q    Phonetically.

16       A    M E L O G I Z A, something like that.

17       Q    Was Maggie employed as an ombudsman after

18   Mr. Almodovar?

19       A    Yes.

20       Q    How long was Maggie in that position?

21       A    Two weeks after Hannibal left --

22       Q    That's when she started?

23       A    -- until presently, yes.

24       Q    I'm sorry.

25       A    Until presently.

1    Q    What's Maggie's title?

2    A    Maggie's HR director -- HR manager.

3    Q    And is that the title that she had two weeks after

4    Hannibal left?

5    A    Yes.

6    Q    What were her duties when she first started?

7    A    **She** was an assistant to Hannibal.

8    Q    And **then** when Hannibal left, what were her duties?

9    A    She became the manager taking over his position.

10   Q    And what did she do?

11   A    She managed **the** HR.

12   Q    What specifically?

13   A    Everything to do with human resources.

14   Q    Was her responsibilities as far as taking care of

15   payroll complaints from the GSA employees -- from the guards

16   on the GSA contract just one of her duties?

17   A    Actually it went through the process, yes.  There

18   was a process that they had to go through.  They just don't go

19   directly to her.

20   Q    They don't go directly to her?

21   A    They don't.  There's a process.  There's a **program**

22   that they follow.  They've got to go to their supervisor and

23   the manager of the local office, and then if that doesn't get

24   resolved, then they go straight to Maggie.

25   Q    Is that the same policy that you had when Hannibal

**Free State Reporting, Inc.**

1  was there?

2      A    Yes.

3      Q    So if a particular employee called up Hannibal,

4  Hannibal wouldn't necessarily return the phone call.  The

5  employee was supposed to go through the chain of command?

6      A    No, he would.  He would tell them, did you talk to

7  your manager and go through the steps, and he would refer them

8  to the manager and make sure the manager took care of it.

9      Q    And Hannibal wouldn't take the complaint.  He would

10  refer the person to the, to the --

11      A    He would talk to the employee and refer them back to

12  the manager.

13      Q    When Hannibal left, was the fact that Maggie was now

14  the **ombudsman**, was that communicated to employees?

15      A    It was about three weeks after.  We made an error of

16  Maggie didn't know the responsibility for about two weeks, and

17  after that, we got wind of it and then we took care of it to

18  all the employees.

19      Q    How was that communicated?

20      A    I think **it was done**, a letter inside their paycheck.

21      Q    **Did any of your** -- was there any **ombudsman** before

22  Hannibal?

23      A    No.  The program was created only for that specific

24  reason.

25      Q    Did either Maggie or Hannibal visit any of the

1    various sites on the GSA contract?

2        A    They never did.

3        Q    Why not?

4        A    They're not operation.  They don't need to go to the

5    site.

6        Q    Who did Maggie report to?

7        A    Maggie reported to Richard DeLong, I believe, at

8    that time.  And then after that she reported to our in-house

9    counsel.

10        Q    Mr. Trope?

11        A    Yes.

12        Q    And who did Hannibal report to?

13        A    Hannibal reported to again our Vice President,

14    Richard DeLong, and he reported to the in-house counsel, but

15    when it came to the **ombudsman**, the program, **well**, he would

16    report directly to me.

17        Q    What is CEBA?

18        A    CEBA is a health provider, health plan provider.

19        Q    Who selected CEBA?

20        A    I did.

21        Q    Was there a service provider before CEBA?

22        A    Yes, there was a company in Virginia, but I don't

23    know the name.  It was only for a short period of time.

24        Q    And who selected that company?

25        A    I did.

1    Q    Have you ever submitted a bid on a federal contract?

2    A    Ever submitted?  Yes, we have.

3    **Q    Okay.**

4    **A**    That's how we got awarded these contracts.

5    Q    Okay.  I take it you've submitted bids on contracts

6    that were not awarded to you?

7    A    Correct.

8    Q    Okay.

9         MR. GDANSKI:  May I just ask, by the term you, you

10    mean Mr. Karawia individually, do you mean the corporate

11    entity, **which** of the corporate entities?

12         BY MR. LeMAR:

13    Q    You or any of your companies.

14    A    Actually my companies have submitted.  I don't

15    personally submit them.  The company does.

16    Q    Do you have any input into the bid procedure?

17    A    I have maybe about 25 percent input.

18    Q    Okay.  Who handles the -- who specifically handles

19    the bulk of the **bid** proposal?

20    A    Bunce Pierce.

21    Q    Bunce Pierce.  And what is his title?

22    A    He's Vice President of the corporation.

23    Q    And which corporation?

24    A    International Protective Services.

25         JUDGE ROMANO:  Again, I don't mean to get **picayune**

634

1    about this, but obviously **you're passed** this line of

2    questioning.  The Respondent here is International Services,

3    Inc., not International Protective Services, Inc., doing

4    business as.  You don't want to read it that way.  Is that

5    correct?

6          MR. LeMAR:  **Well**, let me make a suggestion.  Did you

7    want to consider a stipulation that we amend the caption?

8          MR. GDANSKI:  No.

9          MR. LeMAR:  Okay.  I'm comfortable leaving it as

10   International Services, Inc.

11         JUDGE ROMANO:  Okay.

12         BY MR. LeMAR:

13   Q    Who did the -- as far as the GSA contract, who did

14   GSA award the contract for the security guard services that

15   **are** at issue in this case?

16   A    I believe International Services.  They used that

17   name.  They didn't use the main corporation.

18   Q    Okay.  When you say they, who is they?

19   A    GSA.

20   Q    Okay.  Who actually submitted the bid?  ISI or

21   International Protective Services.

22   A    I think ISI at that time.

23   Q    Okay.  Who within your businesses negotiates

24   collective bargaining agreements?

25   A    Bunce Pierce, myself, Bill Pedrick.

1    Q    And who within the organization has the authority to

2    sign checks?

3    A    To sign checks, I do.

4    Q    And that's both payroll and non-payroll?

5    A    Correct, and the CFO, Peggy Orlando.

6    Q    Who hired Bill Pedrick?

7    A    Richard DeLong.

8    Q    And he was the Vice President of ISI?

9    A    At that time, yes.

10    Q    And who hired Ray Postawa?

11    A    Bill Pedrick.

12    Q    And who -- did Mr. Postawa replace Mr. Pedrick?

13    A    As the contract manager, yes.

14    Q    And who made that decision to replace Mr. Pedrick?

15    A    GSA.  GSA requested it.

16    Q    And who made the decision to actually do it?

17    A    GSA made that request.

18    Q    Okay.  GSA made the request.

19    A    To do it.

20    Q    To do it, and, and who actually did it?

21    A    We did.

22    Q    You?

23    A    Yeah, but GSA requested it.

24    Q    Okay.  Why did they request it?

25    A    That's what they wanted.  On the new contract,

1   **that's what** they wanted.

2       Q    Did they tell you the reason?

3       A    No.

4       Q    Did you ever learn of a reason?

5       A    We weren't in a position to argue the point what

6   they want for a new contract.

7       Q    Did you bid on any FAA contracts?

8       A    Yes, I did.

9       Q    And did you testify earlier that you were denied the

10  contract because of being taken off of the FSS?

11      A    Yes.

12      Q    Okay.  Are you aware that there's a decision that

13  ISI did not provide specific information to FAA as far as th

14  particular contract?

15      A    That's not true.

16      Q    But are you aware that there's a published decision

17  about that?

18      A    About what?  We did not provide information?

19      Q    Yes.

20      A    No, I am not aware of that.

21      Q    You're not aware of that.  Did you interview Peggy

22  Orlando before she was hired?

23      A    Yes.

24      Q    Anybody else interview her?

25      A    Ilona Foyer is the one actually who originally hi

1  her as a consultant and interviewed her originally.

2      Q    Can you spell that person's name?

3      A    F O Y E R, Ilona, I L O N A.

4      Q    And what was the title?

5      A    She was a consultant.

6      Q    And how did it come about that Peggy Orlando was

7  recruited -- I'm sorry.  Was Peggy Orlando recruited for the

8  job?

9      A    From a consultant to a permanent position, yes.

10     Q    Was she recruited to become a consultant?

11     A    She came in as a consultant through Ilona Foyer.

12     Q    Okay.  Did Peggy Orlando apply for employment?

13     A    She knew that we had the position open, and we just

14  thought it was a good thing.

15     Q    Did you assign Peggy Orlando work?

16     A    I assigned her responsibility, but not the day-to-

17  day stuff.

18     Q    Did anybody assign her day-to-day things?

19     A    No.

20     Q    Okay.  What duties did she have with respect to the

21  GSA contract?

22     A    She was responsible for all financial

23  responsibilities for the contract, making sure everybody gets

24  paid, make sure that the invoices were billed, make sure she

25  collects the money, make sure she deals with the banks, what a

1    CFO does, everything that has to do with financial.

2        Q    Who supervised her work?

3        A    I did.

4        Q    And who did she report to?

5        A    She reported to me.

6        Q    Who set her pay?

7        A    Who set her pay?  I did.

8        Q    And what was her starting pay?

9        A    I can't remember.  I know what her ending pay was.

10       Q    Okay.  I believe there's something in one of the

11   exhibits that indicates she got a 30 percent raise in

12   approximately her last year of employment.  Do you know what

13   type of raise she got when she was employed?

14       A    Honestly I don't know.

15       Q    Now you indicated in discovery responses **that** Peggy

16   Orlando was responsible for the violations.  When did you

17   discover that?

18       A    When did I discover she was responsible?

19       Q    Yes.

20       A    The last year or so.

21       Q    The last year or so.

22       A    Or two years.  I don't have an exact date.

23       Q    Sometime, **let's say**, within the last two years of

24   the contract?

25       A    When you say responsibilities, she's been

1      Q      And to the right of that section, is there another

2  section called earnings?

3      A      There is.

4      Q      And what categories are in that section?

5      A      It includes regular, vacation, sick, overtime,

6  holiday, special, and then one I can't make out -- oh, **uniform**

7  **allowance.**

8      Q      Now you were present in the courtroom when

9  Mr. Karawia testified that as ISI was advised of

10  underpayments, ISI paid the back wages pretty quickly, were

11  you not?

12      A      I was.

13      Q      Okay.  Is that true for all the violations found in

14  all of these cases?

15      A      No, it's not.

16      Q      Can you explain?

17      A      Often resolution would take multiple correspondence

18  with the firm, multiple telephone calls, and weeks, sometimes

19  days, often weeks, sometimes months, to resolve.

20      Q      You were also present in the courtroom when

21  Mr. Karawia testified that ISI cooperated with Wage and Hour.

22  Is that correct?

23      A      Yes.

24      Q      And is that true in all cases?

25      A      In all cases, no.  Often our correspondence would

1    be -- the response would be delayed.  Occasionally near the

2    end, when we were requesting the payments for sick leave, et

3    cetera, those requests -- when we would get the response, the

4    response may be timely but would skip over complete portions

5    of our requests.  If we asked about vacation pay, the response

6    may not even address it.  It may go onto some other things.

7    So in that respect, not always.

8            MR. LeMAR:  No further questions.

9            JUDGE ROMANO:  Cross.

10                        CROSS-EXAMINATION

11        BY MR. GDANSKI:

12    Q    You said that one question was, although you

13    demanded a withholding of $500,000, it's your understanding

14    that less was actually withheld.

15    A    That's correct.

16    Q    You've been in the courtroom the entire time we've

17    had proceedings, right?

18    A    Yes, **I have.**

19    Q    And you've heard testimony that GSA officials

20    couldn't tell you how much they owed ISI at any given time

21    during the latter part of 2002.

22    A    That's correct.

23    Q    And you know that there were periods of time in

24    which payments had not been **made** for 30 to 60 to 90 days.

25    A    That's correct.

**Free State Reporting, Inc.**

# EXHIBIT E

SOL:BS
42268, 42404, 42405

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES
-------------------------------------------------

In the Matter of:                             :      CASE NO.
                                              :
INTERNATIONAL SERVICES, INC., and             :      99-SCA-12
INTERNATIONAL SECURITY SERVICES &             :
INVESTIGATIONS, INC., and                     :
Ousama Karawia, Individually and as           :
President; Richard E. DeLong,                  :
Individually and as Vice President of          :
Operations; and, William Pedrick,             :
Individually and as Contract Manager,         :
                                              :
                        Respondents.          :
-------------------------------------------------

                          AND

UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
- - - - - - - - - - - - - - - - - - - - - -
ELAINE L. CHAO, Secretary of Labor,           :
United States Department of Labor,            :
                                              :
                  Plaintiff,                  :
                                              :
              v.                              :
                                              :      No.  2000-FLS-15
                                              :              AND
INTERNATIONAL SERVICES, INC. and Ousama       :      NO.  2000-FLS-16
Karawia, Individually and as President,       :
                                              :
                  Respondents.                :
- - - - - - - - - - - - - - - - - - - - - -

                CONSENT FINDINGS AND ORDER

        The parties represent that they have reached an accord to

resolve these cases without the burden, expenses and delays of

further litigation and to this end stipulate and agree as follows:

      1.    Respondents,    International    Services,    Inc.   and

International Security Services & Investigations, Inc. were at all

ISI00010

times hereinafter mentioned, corporations doing business at 3771 242nd Street, Suite 205, Torrance, California, and they were engaged in providing guard services at, among others, federal buildings and facilities in Virginia, Alaska, and throughout upper New York State, all under contract with the General Services Administration (GSA).

2. Respondents Ousama Karawia, Richard E. DeLong, and William Pedrick occupied the positions set forth in the captions above and exercised control and supervision of the operations of the corporate respondents and were responsible individually for the employment practices and management policies of the corporate respondents.

3. Respondents were awarded the following contracts, among others:

| Contract No. | Agency | Period Covered | Locations |
|---|---|---|---|
| GS-02P-94-CID-0141 | GSA | 3/1/96-3/1/98 & extensions through 2/1/99 | Up-state NY: Albany, Buffalo, Utica, Syracuse, |
| V463P-0051-96 | VA | 10/97-1/13/98 | Anchorage, AK |
| GS-11P-96-MPC-0513 | GSA | 1/1/96-12/31/97 | Arlington, VA. |

4. Plaintiff charged that during the periods required for the performance of the listed contracts above, respondents violated the provisions of the McNamara-O'Hara Service Contract Act, as amended, 79 Stat. 1034, 86 Stat. 789, 41 U.S.C. 351 _et seq._(the SCA), and the Contract Work Hours and Safety Standards

2

ISI00011

Act, as amended, 40 U.S.C. § 327 et seq. ("CWHSSA"), in the following ways: (a) respondents failed to timely pay several of their service employees employed in the performance of the aforesaid contracts the minimum hourly rate required by § 2(a)(1) of the SCA, and by 29 C.F.R. §§ 4.3 and 4.6(b); (b) respondents failed to timely pay several of their service employees employed in the performance of the aforesaid contracts the minimum fringe benefits required by § 2(a)(2) of the SCA and by 29 C.F.R. §§ 4.3 and 4.6(b); and, (c) respondents failed to timely pay several of their service employees employed in the performance of the aforesaid contracts at a rate not less than one and one-half times their regular rate of pay for all hours worked by such employees in excess of forty (40) hours in a workweek, as required by § 102(a) of the CWHSSA and by 29 C.F.R. § 4.181(b).

5.    Plaintiff alleged that by reason of a number of breaches of contract and violations of the SCA, CWHSSA, and the Regulations issued thereunder, respondents became liable for a sum equal to the amount of minimum hourly rate, overtime, and fringe benefit underpayments of compensation due to employees engaged in the performance of such contracts in a sum of at least $157,000.

6.    Wage/Hour opened forty-two investigation files and alleged underpayments for minimum wages, fringe benefits or overtime as set forth on this chart, and respondents agreed to and in fact did pay these amounts due:

ISI00012

| Wage/Hour case # | Minimum wages | Fringe benefits | Overtime wages | Back wages |
|---|---|---|---|---|
| 96-206-92933 | | 414 | | 414 |
| 96-206-97411 | 62510 | 16529 | | 79039 |
| 97-309-07433 | | | 4851 | 4851 |
| 97-206-92901 | 36 | 289 | | 325 |
| 97-206-92906 | | 96 | | 96 |
| 97-206-92912 | 2527 | | | 2527 |
| 97-206-92925 | 2048 | | 29 | 2077 |
| 97-206-93322 | 461 | 36 | | 497 |
| 97-206-97401 | 36 | 192 | | 228 |
| 97-206-97416 | | 1557 | | 1557 |
| 97-206-97417 | 251 | | | 251 |
| 97-206-97420 | | 712 | | 712 |
| 97-206-98406 | 1017 | 67 | 75 | 1159 |
| 98-206-01070 | 553 | 29 | | 582 |
| 98-206-01098 | 208 | | | 208 |
| 98-206-01099 | 34 | | | 34 |
| 98-206-01108 | | 670 | | 670 |
| 98-206-01129 | 63 | | | 63 |
| 98-206-01131 | 96 | | | 96 |
| 98-206-01133 | 1105 | 150 | 306 | 1561 |
| 98-206-01151 | | 68 | | 68 |
| 98-206-01153 | | 248 | | 248 |
| 98-206-01154 | 1750 | | | 1750 |
| 98-206-01173 | 447 | | | 447 |
| 98-206-01174 | 0 | 0 | 0 | 0 |
| 98-206-01204 | | 20 | | 20 |
| 98-206-02063 | 1387 | | 451 | 1838 |

4

ISJ00013

| | | | | |
|---|---|---|---|---|
| 98-206-06090 | 7754 | | | 7754 |
| 98-206-06104 | | 12727 | | 12727 |
| 98-206-06111 | 112 | 213 | | 325 |
| 98-206-06112 | 1134 | 564 | | 1698 |
| 98-206-06127 | 540 | | | 540 |
| 98-206-06171 | | | 72 | 72 |
| 98-206-06178 | 8427 | | | 8427 |
| 98-206-95718 | 170 | | | 170 |
| 98-206-95720 | 60 | | | 60 |
| 98-260-95721 | 361 | | | 361 |
| 98-206-97312 | | 192 | | 192 |
| 98-206-97402 | 82 | 187 | | 269 |
| 98-206-97403 | 706 | 2362 | 5520 | 8588 |
| 98-206-97403 | 12745 | 2490 | | 15235 |
| 99-101-00091 | | 53 | | 53 |
| Subtotals | $106,620 | $39,865 | $11,304 | |
| Grand total | | | | $157,789 |

7.    Pursuant to section 16(e) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. ("FLSA"), and in accordance with 29 C.F.R. Part 578, plaintiff assessed civil money penalties in the amounts of $7,200 and $500 against the respondents, INTERNATIONAL SERVICES, INC. and Ousama Karawia, individually and as president, for alleged repeated and willful violations of the minimum wage and overtime provisions of sections 6 and 7 of the FLSA.

5

ISI00014

8. Respondents paid the FLSA monies that plaintiff told respondents were due to respondents' employees.

9. Respondents hereby agree to withdraw their Answer and Exceptions to the Complaint and Orders of Reference of the plaintiff. Respondents further agree, without admitting any violations of the SCA, CWHSSA, or the FLSA, that the facts as set forth herein are incorporated into and made a part of the Consent Findings.

10. Respondents have undertaken efforts to understand the labor standards provisions of the SCA and the CWHSSA and the regulations associated thereto. Respondents affirm that they believe in good faith that they are in compliance and promise to continue to work in good faith to comply with the terms of those Acts and their applicable regulations.

11. Respondents, as is set forth in Attachment A which is incorporated herein, will establish, no later than September 1, 2001, a compliance program covering employees of the corporate respondents and their successors, if any, that will include, among others: Respondent Karawia conducting informational meetings with all employees; giving all employees a written summary of their rights under the SCA, the CWHSSA, and the FLSA; and, employing a full-time employee who will serve as an ombudsman with the authority to investigate and correct payroll problems promptly.

ISI00015

12.  The Consent Findings and Order are without prejudice to (a) plaintiff's future exercise of all investigative enforcement authority under the SCA, the CWHSSA, the FLSA, and other applicable laws; or (b) respondents' future assertion and exercise of all defenses available to them under law.

13.  Respondents will pay $500 and $7,200 in civil money penalties to plaintiff in two separate checks for those amounts made payable to "U.S. Department of Labor" and mailed to the United States Department of Labor, Northeast Regional Office, Wage and Hour Division, Curtis Center - Suite 850 West, 170 South Independence Mall West, Philadelphia, PA 19106-3317, on or before April 20, 2001.  Respondent will, on both checks, write its Tax Identification Number and "Civil Money Penalty Payment".  In addition, on the $500 check, respondent will write "Case Number 2000-FLS-16" and on the $7,200 check respondent will write "Case Number 2000-FLS-15".

14.  The parties agree that an Order disposing of these proceedings in accordance with the Consent Findings and Order shall have the same force and effect as Orders entered after full hearings pursuant to 29 C.F.R. 4.189 (29 C.F.R. § 18.9(b)(1)).

15.  The entire record on which this Final Order is based consists solely of the Complaint, Orders of Reference, and these Consent Findings and Order (29 C.F.R. § 18.9(b)(2)).

ISI00016

16. The parties through agreement hereby waive any further procedural steps before the Administrative Law Judge regarding these matters (29 C.F.R. § 18.9(b)(3)).

17. Respondents hereby waive any right to challenge or contest the validity of these Consent Findings and Order (29 C.F.R. § 18.9(b)(4)).

18. The parties stipulate that this Consent Findings and Order may be entered into evidence in any future proceeding, provided that the parties will be free to argue, and the Judge shall be free to decide, the weight thereof. Respondents do not waive any affirmative or other defenses available to them under law in any future proceeding.

19. Each party hereby agrees to bear its own costs, attorney charges, fees, and other expenses incurred by such party in connection with any stage of these proceedings.

Approved as to Form and Content:

For Respondents:

International Services, Inc.

CORP.
SEAL
BY: _____

International Security Services
& Investigations, Inc.

CORP.
SEAL
BY: _____

For the Plaintiff:

STEVEN J. MANDEL
Associate Solicitor
of Labor for
Fair Labor Standards

PATRICIA M. RODENHAUSEN
Regional Solicitor

_____ 4/27/01
BARNETT SILVERSTEIN
Attorney

8

ISI00017

OUSAMA KARAWIA, as President of
International Services, Inc. and
as President of International Security
Services & Investigations, Inc.

OUSAMA KARAWIA,
Individually

RICHARD E. DELONG, as Vice President
of International Services, Inc. and
as Vice President of International
Security Services & Investigations, Inc.

RICHARD E. DELONG,
Individually

WILLIAM PEDRICK, as Contract
Manager of International Services,
Inc. and as Contract Manager of
International Security Services &
Investigations, Inc.

WILLIAM PEDRICK,
Individually

Mark E. Baker, Esq.
McGuiness, Norris & Williams, LLP
Counsel to Respondents

SO ORDERED

HONORABLE RICHARD A. MORGAN        9 MAY 2001        , 2001
Administrative Law Judge                    Date

9

ISI00018

ATTACHMENT A - COMPLIANCE PROGRAM

No later than September 1, 2001, the corporate respondents and the individual respondents for the duration of their employment by or affiliation with the corporate respondents agree to establish a comprehensive, ongoing wage/hour compliance program for a four-year period ending on August 31, 2005, consisting of the following components:

1) All employees will participate in an informational program at which they will be told of their rights under the SCA, the CWHSSA, and the FLSA. This program will include (a) providing each employee with a written summary of employees' rights under the SCA, the CWHSSA, and the FLSA, including the right to contact Department of Labor enforcement personnel at any time, and employees will be informed of their legal protections against retaliation for asserting their rights under the SCA, the CWHSSA, and the FLSA, and respondents will assure employees that no such retaliation will occur; and (b) meetings (of at least one hour) with all employees nationwide at which respondent Sam Karawia states respondents' commitment to compliance with the SCA, the CWHSSA, and the FLSA. Employees will be told at these meetings of their legal protections against retaliation for asserting their rights under the SCA, the CWHSSA, and the FLSA, and respondents will assure employees that no such retaliation will occur. At these meetings, employees will be provided a review of pertinent

10

ISI00019

SCA, CWHSSA, and FLSA principles by respondents' counsel, or representatives of respondents, with a question/answer session during the meetings. Such meetings will be held on or before September 1, 2001 for such employees as are employed by the corporate respondents on the dates of the meetings.

2) All employees hired after the employee meetings described above will be provided with the written summary described above and a description of the other components of the compliance program.

3) Respondents will employ a full-time manager to serve as an "ombudsman" who will have responsibility for receiving and investigating complaints pertaining to wages due and authority to take appropriate corrective payroll actions. The position will report directly to Mr. Karawia. The availability, duties, and authority of the ombudsman will be publicized in the meetings and informational packets and on employee bulletin boards at respondents' work locations. These publications will include a reminder to employees that, while plaintiff encourages use of the ombudsman, employees are free to contact appropriate plaintiff/DOL enforcement personnel at any time. Respondents commit, absent unusual circumstances, to resolve all complaints submitted to the ombudsman within 10 days of completion of the ombudsman's investigation, with no complaint to remain unresolved for more than 30 days after the complaint is filed; provided that resolution shall not necessarily in every case require payment of the amount

11

IS100020

asserted to be due in the complaint. The ombudsman will retain documentation including report forms for employees lodging complaints with the ombudsman, and quarterly spreadsheet reports, reviewed and signed by both the ombudsman and Mr. Karawia, listing all complaints received by the ombudsman, the investigative findings, and any corrective actions taken during the quarter covered by the report.

4) Respondents commit to obtaining and acting upon advice from legal counsel experienced in wage/hour matters in addressing issues that arise through the ombudsman or in overall wage/hour compliance. Working with counsel as necessary, respondents will use information and experience gained from the compliance program to develop procedures and an institutional knowledge base to help assure wage/hour compliance on a permanent basis.

12

ISI00021

Issue date: 09May2001

## SERVICE SHEET

Case Name:        ADMIN., WAGE & HOUR DIV. vs. INTERNATIONAL SERVICES,
                  INC., AND OUSAMA KARAWIA, Individually and as President;
                  U.S. DEPT. OF LABOR vs. INTERNATIONAL SERVICES, INC., ET AL
Case No.:         2000-FLS-15, 2000-FLS-16; 1999-SCA-12
Title of Document: DECISION AND ORDER - CONSENT FINDINGS

I certify that on a copy of the above-entitled document was mailed to the following parties:

REGULAR MAIL                        REGULAR MAIL

Barnet Silverstein, Esq.            Samuel L. Weitman
Office of the Solicitor             District Director
201 Varick Street                   Employment Standards Admin.
New York NY 10014                   Wage & Hour Div.
                                    O'Brien Federal Bldg. Room 822
Mark E. Baker, Esq.                 Albany NY 12207
McGuiness Norris & Williams, LLP
1015 Fifteenth St., N.W. Suite 1200
Washington DC 20005                 Administrator, Wage and Hour Div.
                                    U.S. Dept. of Labor
                                    Employment Standards Admin.
Patricia Rodenhausen                Room S-3502, FPB
Regional Solicitor                  200 Constitution Ave., N.W.
201 Varick Street                   Washington DC 20210
New York, NY 10014

International Services Inc., and    Associate Solicitor
 Ousama Karawia, Individually and   U.S. Dept. of Labor
 as President                       Office of the Solicitor
3771 242nd Street                   Room N-2716, FPB
Suite 205                           200 Constitution Avenue, N.W.
Torrance CA 90505                   Washington DC 20210

                                    Counsel for Trial Litigation
Mr. Ousama Karawia, President       Division of Fair Labor Standards
International Services, Inc.         Office of the Solicitor
3771 West 242nd Street, Suite 205   Room N-2716, FPB
Torrance, CA 90505                  200 Constitution Ave., N.W.
                                    Washington DC 20210
Corlis Sellers
Reg. Admin. Wage & Hour Div.        International Security
U.S. Dept. of Labor                 Services & Investigations, Inc.
Office of the Solicitor             3771 242nd St., Suite 205
201 Varick St., Room 707            Torrance, CA 90505
New York, NY 10014

ISI00022

<u>REGULAR MAIL</u>

Richard E. Delong
Vice President of Operations
International Services, Inc.
3771 242nd St., Suite 205
Torrance, CA 90505

William Pedrick
Contract Mngr. for NYS
 International Services, inc.
1 Steuben Place, M. level, #6
Albany, NY 12207


DARLENE M. ROTHERT
Legal Technician

ISI00023

# EXHIBIT F

AGREEMENT

Between

INTERNATIONAL SERVICES, INC.
SECURITY DIVISION

And The

UNITED FEDERATION OF SECURITY OFFICERS, INC.

On Behalf Of

ITS AFFILIATED LOCAL 618

At All Federal Sites In The State Of New York

October 1, 1999 Through September 30, 2004

1

ORIGINAL

ISI00455

C-2-a

## Table of Contents

| | | Page |
|---|---|---|
| Preamble | . . . . . . . . . . . . . . . . | 3 |
| Article 1 | — Scope and Purpose of Agreement . . . . . . . | 3 |
| Article 2 | — Management Rights . . . . . . . . . . . | 3 |
| Article 3 | — Strikes and Lockouts . . . . . . . . . . . | 3 |
| Article 4 | — Union Membership . . . . . . . . . . . | 4 |
| Article 5 | — Grievance and Arbitration Procedure . . . . . | 5 |
| Article 6 | — Seniority . . . . . . . . . . . . . | 7 |
| Article 7 | — Report and Call-in Pay . . . . . . . . . | 9 |
| Article 8 | — Pay Days . . . . . . . . . . . . . . | 10 |
| Article 9 | — Holidays . . . . . . . . . . . . . | 10 |
| Article 10 | — Vacation . . . . . . . . . . . . . | 11 |
| Article 11 | — Bereavement and Other Leaves . . . . . . . | 12 |
| Article 12 | — Hours of Work and Overtime . . . . . . . . | 13 |
| Article 13 | — Equal Opportunity . . . . . . . . . . . | 13 |
| Article 14 | — Wages . . . . . . . . . . . . . . . | 14 |
| Article 15 | — Occupational Illness or Injury . . . . . . . | 14 |
| Article 16 | — Health and Welfare Benefits and 401K Plan . . | 15 |
| Article 17 | — Uniforms and Equipment for Inclement Weather . . | 16 |
| Article 18 | — Union Business . . . . . . . . . . . . | 16 |
| Article 19 | — Separability of the Contract . . . . . . . . | 17 |
| Article 20 | — Disciplinary Procedures . . . . . . . . . | 17 |
| Article 22 | — Duration . . . . . . . . . . . . . . | 17 |

2

ISI00456

C. 2. b

PREAMBLE

This Agreement is entered into this       day of            , 1999, by
and between INTERNATIONAL SERVICES, INC., SECURITY DIVISION, here-
inafter referred to as the "COMPANY" or the "EMPLOYER", at their
operations at all federal sites, as such sites existed on June 16,
1997 and thereafter, in the state of New York under government con-
tract for protective services, and the UNITED FEDERATION OF SECURITY
OFFICERS, INC. and its affiliated LOCAL 618, hereinafter referred to
as the "UNION", as sole and exclusive representative for collective
bargaining for the employees covered by this Agreement.

ARTICLE 1 - SCOPE AND PURPOSE OF AGREEMENT

Section 1.1 - It is the intent and purpose of the parties hereto that
this Agreement shall serve to establish and maintain harmonious labor
relations between the COMPANY and the UNION and to set the rates of
pay, wages, hours of work and the other terms and conditions of em-
ployment of Employees as stated by this Agreement.

Section 1.2 - The COMPANY recognizes the UNION as the collective
bargaining representative for all hourly regular full-time and regular
part-time security officers performing guard duties as defined in
Section 9(b)(3) of the National Labor Relations Act, employed at
Federal sites located in New York State, excluding office clerical
employees, professional employees and supervisors as defined in the
Act and all other employees at all Federal sites in the State of New
York as such sites existed on June 27, 1997 and thereafter.

ARTICLE 2 - MANAGEMENT RIGHTS

Section 2.1 - Except as specifically limited, abridged or modified by
a specific provision of this Agreement, the EMPLOYER retains all
rights, powers and authority exercised or held by it in the normal
course of conducting its day-to-day business.

Section 2.2 - It is understood that supervisory employees may perform
bargaining unit work for the purposes of training, instruction, per-
sonal hygiene relief or in emergency.

Section 2.3 - The parties agree that there are security officers who
are part-time supervisors and that those employees may perform bar-
gaining unit work which was historically performed prior to the cur-
rent collective bargaining Agreement. It is further understood that
these security officers who perform supervisory duties do not have the
independent authority to discipline bargaining unit members.

ARTICLE 3 - STRIKES AND LOCKOUTS

    Since the COMPANY is responsible for continuous, uninterrupted
and efficient twenty-four (24) hour per day security service and in
accordance with the no-strike no-lockout pledge requested by Presiden-

3

ISI00457

C-2.C

tial Executive Ord ... 10946 concerning Federal Government sites, the UNION and the Employees agree to perform loyal and efficient work and service on a continuous, uninterrupted basis and shall use their best efforts to achieve the objectives of the government contract. Accordingly, UNION and EMPLOYER agree that there shall be no strikes, boycotts, sympathy strikes, lockouts or any interference whatsoever during the life of this Agreement and that in the event differences or disputes shall arise between the COMPANY and the UNION or its members as to the meaning and application of this Agreement or should any trouble of any kind arise, there shall be no suspension of work in any manner whatsoever by the Employees on account of any such differences. Any Employee or Employees who violate the provisions of this Article may be subject to termination. All disputes under this Article shall be subject to expedited arbitration and said arbitration shall be final and binding on the parties.

ARTICLE 4 - UNION MEMBERSHIP

Section 4.1 - All Employees on the active payroll as of the date of execution of this Agreement, may become members of the UNION, and shall maintain their membership in the UNION in good standing, as long as they have a UNION dues deduction authorization form on file with the EMPLOYER.

Section 4.2 - Neither the EMPLOYER nor the UNION shall exert any pressure on, or discriminate against, any Employee(s) regarding any decision to join, maintain or drop UNION membership. The UNION, under this Agreement, is required to represent all of the Employees in the bargaining unit fairly and equally without regard to whether or not an Employee is a member of the UNION. The terms of this Agreement have been made for all Employees in the bargaining unit, and not just for UNION members. Accordingly, it is fair and just that each Employee(s) in the bargaining unit is to pay a fair and equal share of the obligations along with the grant of equal benefits contained in this Agreement.

Accordingly, all Employees on the active payroll as of the date of execution of this Agreement, who elect to not become members of the UNION, shall have payroll deducted each payroll period a maintenance fee, which is defined as an amount of money equal to that paid by other Employees in the bargaining unit who are members of the UNION, which shall be limited to an amount of money equal to the UNION's regular and usual dues.

Section 4.3 - All Employees hired after the date of execution of this Agreement, may become members of the UNION no later than the thirtieth (30th) day following the beginning of such employment by providing the EMPLOYER with a completed UNION dues deduction authorization form. Such newly hired Employees who elect to not join the UNION shall have payroll deducted the maintenance fee as provided for in Section 4.2 of this Agreement.

Section 4.4 - For the purposes of this Article, an Employee shall be considered in good standing with the UNION if he/she tenders his/her

4

ISI00458

C - 2 - d

periodic payroll ‿ ʤucted dues uniformly requ_ed as a condition of
membership, or has payroll deducted a maintenance fee as provided for
in Section 4.2 of this Agreement.

Section 4.5 - An Employee who has failed to maintain good standing
with the UNION as required by this Article, shall be discharged if the
required dues and initiation fee (for members), or maintenance fee
(for non-members), have not been tendered.

Section 4.6 - The EMPLOYER shall deduct from the wages due each Em-
ployee each pay period, starting not earlier than the first pay period
following the completion of the Employee's first thirty (30) days of
employment, and remit to the UNION regular semi-monthly dues and ini-
tiation fees, as fixed by the UNION.  Employees who have elected not
to join the UNION, shall have deducted from their wages each pay
period a maintenance fee, equal to the amount of dues deducted from
the wages of UNION members.

Section 4.7 - The EMPLOYER shall be relieved from making such check-
off deductions upon (a) termination of employment, or (b) transfer to
a job other than one covered by the bargaining unit, or (c) layoff
from work, or (d) an agreed leave of absence.

Section 4.8 - The EMPLOYER shall not be obliged to make dues deduc-
tions of any kind, or maintenance fee deductions, from any Employee
who, during any payroll period involved, shall have failed to receive
sufficient wages to equal the dues deductions or maintenance fee.

Section 4.9 - Each pay period, the EMPLOYER shall remit to the UNION
all deductions for dues and/or maintenance fees made from the wages of
Employees for the preceding pay period together with a list of all
Employees from whom dues and/or maintenance fees have been deducted.

Section 4.10 - The EMPLOYER agrees to furnish the UNION each month
with the names of newly hired Employees, their addresses, social
security numbers, their dates of birth, their dates of hire, and names
of terminated Employees, together with their dates of termination, and
names of Employees on leave of absence.

Section 4.11 - It is specifically agreed that the EMPLOYER assumes no
obligation, financial or otherwise, arising out of the provisions of
this Article, and the UNION hereby agrees that it will indemnify and
hold the EMPLOYER harmless from any claims, actions or proceedings by
any Employee arising from deductions made by the EMPLOYER hereunder.
Once the funds are remitted to the UNION, their disposition thereafter
shall be the sole and exclusive obligation and responsibility of the
UNION.

ARTICLE 5 - GRIEVANCE AND ARBITRATION PROCEDURE

Section 5.1 - For the purpose of this Agreement, a grievance is de-
fined as a written statement signed by an individual Employee, or by
the UNION, claiming a violation of the terms of this Agreement or a
difference arising between the COMPANY and an individual Employee or a

5

ISI00459

C-2-E

number of individual Employees as to the interpretation or application of any of the terms of this Agreement, including discharge and disciplinary suspension.

Grievances shall be settled promptly in the following manner, and if the time limits contained therein are not followed, the grievance shall be considered void. No waiver of such time limits shall be effective unless reduced to writing, nor shall such waiver be deemed precedent. The parties may mutually agree to expedite the procedures in the Steps below:

Step 1 – Any Employee having a complaint or grievance under this Agreement shall first discuss his grievance with his immediate supervisor or with his UNION Delegate. The aggrieved Employee or his UNION Delegate shall discuss the grievance with the aggrieved Employee's immediate supervisor not later than ten (10) work days after such occurrence is discovered by the Employee or should have reasonably been discovered by the Employee.

Step 2 – If the matter is not resolved by the aggrieved Employee's immediate supervisor then the complaint or grievance shall be reduced to writing and signed by the aggrieved Employee and the UNION Delegate and submitted in duplicate to the Project Manager within ten (10) work days of the written response of the supervisor. Within ten (10) work days from the receipt of such written grievance or complaint, the project Manager shall submit his answer in writing to the aggrieved Employee and the UNION Delegate. If the Project Manager does not respond the grievance is deemed rejected.

Step 3 – If the matter is not resolved in Step 2, the UNION may request arbitration in the following manner:

Within twenty (20) days after the rejection of the grievance by the Project Manager or his designee, the UNION may request the Federal Mediation and Conciliation Service to arbitrate the grievance.

Section 5.2 – The arbitrator shall have no power to add to, subtract from or modify any of the terms of the Agreement or any supplementary agreement. The arbitrator's decision shall be based exclusively on evidence presented at the arbitration hearing.

Section 5.3 – The decision of the arbitrator shall be final and binding on both parties. Each party shall bear its own expense, including any witness expense, in presenting its case to the arbitrator. The party that loses the grievance will pay all fees and expenses of the arbitrator. The minutes of any arbitration case may be recorded by a qualified reporter if either party so requests. The party requesting that the minutes be recorded shall pay the cost of the recording of said reporter, plus the cost of a copy of the minutes, if requested. If the other party desires a copy of the minutes so recorded he shall purchase such at his own expense and pay half of the reporter's cost.

6

ISI00460

C-2-f

Section 5.4 - For .e purpose of this Article, Saturdays, Sundays and holidays shall be excluded in computing time periods.

Section 5.5 - It is a specific condition precedent to the processing of grievances that the time limits specified herein shall be strictly complied with and are jurisdictional unless waived mutually by the UNION and the COMPANY in writing.  Therefore, any grievance not originated and processed within the time limited and manner provided herein shall be considered settled on the basis of the decision which was not appealed, and the matter closed and final and binding on all parties.


ARTICLE 6 - SENIORITY

Section 6.1 - Company seniority shall be defined as the length of time since the Employee's first day of work as a guard, which shall include continuous employment by any and all prior companies that held contracts for this service, and continuous availability to work.

Section 6.2 - Seniority for Employees starting work on the same day will be determined alphabetically.

Section 6.3 - Regularly scheduled part-time Employees will have the same seniority rights as the full-time Employees, except where provided elsewhere in this Agreement.

Section 6.4 - Any new hire Employee shall be deemed to be on Probation for a period of one hundred twenty (120) calendar days worked.  After he has worked such a period, the Employee shall gain seniority status as set forth in Section 6.1 of this Agreement.

Section 6.5 - In the event of a layoff or recall from layoff, seniority shall control, provided the senior Employee is capable of performing the available work.  The Employee with the least seniority shall be laid off first and recall will be in the inverse order of layoff.  Employees will retain seniority while in a lay-off status for up to one (1) year.  In the event that a contract facility is closed, those affected Employees shall be considered on layoff under this Section.  All Employees on layoff shall have the right to bump less senior Employees as provided in Section 6.8.C of this Article.

Section 6.6 - An Employee who accepts an exempt position with the COMPANY shall retain the seniority he/she had as of the date of the promotion for one (1) year following promotion.

Section 6.7 - An Employee who is laid off shall have call-back rights for a period of one (1) year.  It is the responsibility of the Employee to keep the COMPANY advised of any changes in his mailing address.  The COMPANY shall be considered to have fulfilled its obligation for recall under this Section by sending notice of the job opening to the Employee's last known address by both certified mail and first class mail.  The Employee shall express to the COMPANY his/her intent to return to work not more than one hundred twenty (120) hours after notice is sent by the COMPANY; thereafter, the Employee will have a maximum of seventy-two (72) hours in which to

ISI00461

C-2-9

report for duty.  Failure to report will result in immediate loss of seniority.

Section 6.8 —
A. Shift selection (as defined as first, second and third shifts at assigned posts) and vacation selection shall be done by COMPANY seniority.

B. Employees shall be permitted to bid for assignments based on Company seniority for any new opening in any existing or new site within the Employee's geographical region of employment.

C. If the COMPANY closes down (except to relocate the site) or down sizes a site, Employees may, based on COMPANY seniority, bump a less senior Employee at another site within their geographical region of employment.  Any Employee who is bumped under this Section may in turn bump another Employee with less COMPANY seniority, and so on.  All Employees involved in this process shall maintain their COMPANY seniority.

D. In the event of any position opening at a site, the COMPANY shall notify the UNION of such opening.  The UNION shall make such opening known to the Delegates in the affected geographical region.  The Delegates shall canvass the Employees in the region and respond to the UNION with candidates.  Within seventy-two (72) hours of the UNION receiving notification from the COMPANY, the UNION will provide the COMPANY with the list of candidates.  The seventy-two hour period does not include Saturdays, Sundays and/or Holidays.

Section 6.9 — An Employee who is unable to report for work because of a non-occupational injury or illness shall retain seniority for one (1) year, but shall be subject to layoff in accordance with this retained seniority.  The Employee will give a minimum of fifteen (15) days prior notice in writing when the Employee is returning from such leave.  Upon returning, the Employee will be required to meet all qualifications required.

Section 6.10 — An Employee's seniority shall be terminated upon the occurrence of any of the following events:

A. Employee is discharged for just cause after hearing as set forth in the Grievance Procedure;

B. Employee voluntarily quits;

C. Employee has been on layoff status in excess of the time limit provided in Section 6.8 of this Agreement;

D. Employee fails to express to COMPANY his intent to return to work and/or does not return to work in accordance with the requirements in Section 6.7 of this Agreement;

E. Employee has been retired for permanent and total disability on account of an occupational injury or illness;

8

ISI00462

C-2.h

F.  Employee fails, without valid reason, to report to work for three consecutive scheduled days without notifying the COMPANY within such period;

G.  Employee gives a false reason for a leave of absence.

Section 6.11 – The COMPANY shall prepare an up-to-date seniority list which shall be posted on the bulletin board, and the COMPANY shall furnish to the UNION a copy of such seniority list, advising monthly of any additions, deletions or corrections thereto.  If an Employee has a question regarding his seniority date, he will advise the COMPANY in writing of what he feels is his correct seniority date.  The COMPANY will check their records, if they agree or disagree with the Employee's date, they will so notify the Employee.  If there's a disagreement, the COMPANY and UNION will meet in an effort to resolve the issue, but such resolution will not involve the arbitration process.

ARTICLE 7 – REPORT AND CALL-IN PAY

Section 7.1 – In the event an Employee reports to work on his regular shift as scheduled, without having been previously notified not to report, or is called in to work after completion of his scheduled working hours, the Employee shall be given a minimum of four (4) hours at the applicable rate of pay.

Section 7.2 – Employees shall remain on their post until properly relieved or released by their supervisor.  Supervisors will make a reasonable effort to provide such relief or release.  Employees shall receive time and one-half (1.5) pay for any hours worked in excess of forty (40) hours per week.

Section 7.3 – Employees shall provide a current phone number and address to the COMPANY.

Section 7.4 – Employees shall receive paid meal periods and breaks pursuant to the policy manual.

Section 7.5 – Training
   A. The COMPANY shall conduct annual firearms training for all Employees, as well as any training that is, or may be, required by law.  The COMPANY shall, if possible, provide such training within the geographical region of employment of the affected Employees.

   B. Employees attending firearms and/or other training, within their geographical region of employment, at times other than their regularly scheduled work shift shall receive a minimum of four (4) hours pay at straight time for each such training period, which shall include travel time and mileage.

   C. Employees attending any required training outside their geographical region of employment shall be compensated for their

9

ISI00463

C.2.1

time and reimbursed for expenses in accordance with federal GSA rules.

Section 7.6 – Court Appearances – The COMPANY shall compensate Employees a minimum of four (4) hours pay, at the Employee's regular hourly rate of pay, for each time the Employee is required to appear, other than during regularly scheduled work hours, in any court or hearing as the result of any job related activity of the Employee. The Employee must provide proof of such appearance.

Section 7.7 – Jury Duty – Employees called for jury duty shall receive up to three (3) days pay at their regular daily rate for any days on jury duty during which they would normally have been required to work. Such Employees shall return to the COMPANY any jury duty fees received for those days for which they were paid their regular salary by the COMPANY.

## ARTICLE 8 – PAY DAYS

Employees shall be paid on the 1st and the 16th of each month. The pay period is Sunday through Saturday.

## ARTICLE 9 – HOLIDAYS

Section 9.1 – Eligible full-time Employees will be paid straight-time pay for eight (8) hours, and part-time Employees will be paid a pro-rated portion of eight (8) hours, for each of the following eleven (11) holidays whether or not they work on the holiday:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Day | Columbus Day |
| President's Day | Thanksgiving |
| Memorial Day | Veteran's Day |
| Independence Day | Christmas Day |
| Good Friday | |

Section 9.2 – In addition to these holidays, all Employees shall be granted any holiday that may hereinafter established by an Act of Congress of the United States or by proclamation of the President of the United States, providing prior approval for reimbursement has been received by the COMPANY.

Section 9.3 – Employees required to work on any of these holidays shall be compensated at their regular rate for all hours worked on the holiday, in addition to the holiday pay.

Section 9.4 – In order to be eligible for holiday pay an Employee must have been on pay status during the work week in which the holiday falls, and must have worked his last scheduled workday prior to and his next scheduled workday after such holiday, unless his absence is excused by the COMPANY.

Section 9.5 – An Employee eligible as provided in this Article to

10

ISI00464

C-2-8

receive holiday pa, who is scheduled to work on a holiday and, after being assigned, refuses or fails to report to work without reasonable cause shall not receive holiday pay.

Section 9.6 - Time paid for but not worked on a holiday shall not be considered as time worked for the purpose of computing weekly over-time.

Section 9.7 - In the event a holiday falls during that time an Em-ployee is on vacation leave, the day off will be paid as a holiday as if the Employee worked.

Section 9.8 - In US Department of Labor Wage Determination, as provid-ed in the contract, will be followed if they provide for more than eleven (11) holidays.

ARTICLE 10 - VACATION

Section 10.1 - Each full-time Employee who has been continuously employed for one (1) year shall receive ten (10) work days paid vaca-tion.

Section 10.2 - Effective October 1, 1999, each full-time Employee shall receive paid vacation for continuous employment according to the following schedule:

| Continuous Employment | Paid Vacation |
| --- | --- |
| One thru Three years | Two weeks |
| Four thru Five years | Three weeks |
| Over Five years | Four weeks |

Section 10.3 - Part-time Employees shall earn a prorated share of the vacation benefit outlined in this Article, based on the number of hours worked in each twelve month period, according to the seniority schedule.

Section 10.4 - Employees shall be eligible for and shall earn (vest) vacation on the one-year and each subsequent anniversary of the first date worked with the COMPANY and/or predecessor employer engaged in providing similar services.

Section 10.5 - All vacation requests must be received in writing thirty days in advance to the Contract Manager. The COMPANY has the right to limit the number of Employees on vacation at any given time.

Section 10.6 - Compensation for the vacation period shall be computed at the Employee's straight-time rate of pay in effect at the time the vacation is taken up to a maximum of eight (8) hours per day, and shall be paid thirty (30) calendar days after submission of written request from the Employee.

Section 10.7 - An Employee who has completed one (1) year of service shall be paid for any unused vested vacation upon termination of employment. Such payment shall be made within thirty (30) calendar

11

ISI00465

days of the termination date.

Section 10.8 - Employees may request a cash-out of vacation hours in lieu of taking leave. Employees will only be allowed to request one cash-out per year, after the Employee's anniversary date. Such cash-out shall be paid within thirty (30) calendar days of the Employee's anniversary date.

Section 10.9 - Vacation will be granted based on COMPANY seniority.

ARTICLE 11 - BEREAVEMENT AND OTHER LEAVES

Section 11.1 - All Employees are entitled to take up to three (3) workdays with pay to attend the funeral and/or take care of personal matters related to the death of a member of the Employee's immediate family. (A parent, spouse, spouse's parent, child, spouse's child by a former marriage, grandchild, brother or sister). One (1) day of paid funeral leave will be granted in the case of a grandparent, spouse's grandparent or sibling, or any member of the Employee's extended family not living in the Employee's home.

Pay for a funeral leave will be made for actual time lost from work. If the death occurs at a time when work is not scheduled, payment will not be made. If a holiday or part of an Employee's vacation occurs on any days of absence, the Employee may not receive holiday or vacation pay in addition to paid funeral leave.

An excused absence for family death may not be retroactive, postponed or split.

Section 11.2 - Mitigating circumstances may be considered by the COMPANY to approve additional leave of absence for the purpose of arranging or attending the funeral or attending to family matters. This may be charged to available vacation hours or taken as leave without pay.

Section 11.3 - The COMPANY may require proof of death and/or deceased relationship to the Employee.

Section 11.4 - Military Leave of Absence will be granted upon orders received from the U.S. Armed Forces or National Guard in accordance with applicable law.

Section 11.5 - Reservists are expected to keep the COMPANY advised as far in advance as possible of their annual training dates and any other additional training which will interfere with their normal work schedule.

Section 11.6 - Family and medical leave shall be granted in accordance with federal and state Family Medical Leave Act laws.

Section 11.7 - Employees returning from unpaid leaves of absence who do not have a specific date of return shall notify the COMPANY in writing, fourteen (14) calendar days in advance of the intended date

12

C-2-k

of return to work.  The COMPANY shall attempt to return the Employee
to the status and shift that he worked before the leave of absence,
and as applicable by respective laws.

Section 11.8 - Sick Leave - Each Employee shall receive three (3) paid
sick leave days per year.  As of the Employee's anniversary date, the
Employee shall receive payment for all unused sick leave days, such
payment to be made within thirty (30) days of the anniversary date.


ARTICLE 12 - HOURS OF WORK AND OVERTIME

Section 12.1 - The sole purpose of this Article is to provide a basis
for computation of straight time, overtime and any other premium wages
which may be provided for in this Agreement.

Section 12.2 - The regular work week shall consist of forty (40) hours
of work within a seven (7) day period commencing immediately after
12:01 A.M., Sunday morning and ending at 12:00 midnight the following
Saturday.

Section 12.3 - All time actually worked in excess of forty (40) hours
in a work week shall be compensated at one and one-half (1.5) times
the Employee's straight time rate of pay.  Time paid for but not
actually worked shall be considered as time worked for the purpose of
computing overtime.

Section 12.4 - Personal breaks shall be granted on a fair and equi-
table basis.  When a personal break is requested, every attempt will
be made to relieve the Employee as soon as possible, within mission
requirements.

Section 12.5 - For each period of time for which an Employee is enti-
tled to compensation pursuant to a provision of this Agreement, he
shall be paid in accordance with that pay formula which provides the
greatest amount of compensation.  Time for which an Employee is com-
pensated pursuant to the preceding sentence at a premium rate shall
not be counted to enable the Employee to receive compensation pursuant
to another provision of this Agreement.

Section 12.6 - Vacant shifts - The COMPANY shall fill vacant shifts by
COMPANY seniority.  The Employees working the previous shift shall be
canvassed to secure coverage for the vacancy.  If no Employee working
the previous shift accepts the vacant shift, the COMPANY shall fill
the vacant shift with a standby guard, as long as such standby guard
does not receive overtime pay for such shift.


ARTICLE 13 - EQUAL OPPORTUNITY

Section 13.1 - In connection with the performance of work under this
contract, the COMPANY and the UNION agree not to discriminate against
any Employee or applicant for employment because of race, religion,
color, sex, age, national origin, Veteran status, UNION membership or
activity, or as prohibited by the Americans with Disabilities Act

13

ISI00467

C-2-m

(ADA). The aforesaid provisions shall include, but not be limited to, the following: employment, upgrading, promotion, demotion or transfer; recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training.

Section 13.2 – The parties agree to comply with all Federal laws and Executive Orders pertaining to non-discrimination and equal opportunity in employment. The COMPANY agrees to post in conspicuous places, available for Employees and applicants for employment, notices to be provided by the appropriate contractual/regulatory agencies setting forth the provisions of the Equal Opportunity requirements.

Section 13.3 – The use of the masculine pronoun in this Agreement is understood and agreed by the parties hereto to refer to and include both the masculine and feminine gender.

ARTICLE 14 – WAGES

Section 14.1 – The base hourly wage rate for all Employees in the bargaining unit shall be effective on the following dates:

| 10/01/99 | 10/01/00 | 10/01/01 | 10/01/02 | 10/01/03 |
|----------|----------|----------|----------|----------|
| 13.95/hr | 14.51/hr | 15.09/hr | 15.69/hr | 16.32/hr |

During the term of this Agreement, in the event that the Federal Wage and Hour guidelines provide for a higher minimum hourly wage than as stated above, the above hourly rates shall be raised to conform with those guidelines.

Section 14.2 – In addition to the base hourly wages provided for in Section 14.1 above, Employees in the bargaining unit shall be entitled, subject to the terms and conditions as stated elsewhere in this Agreement, to the following compensation:

    A. Clothing maintenance – (Section 17.3) $.18 per hour tax free

    B. Pension fund contribution – (Section 16. ) $.90 per hour

    C. Medical Plan – (Section 16.5) COMPANY contributions effective on the following dates:

| 10/01/99 | 10/01/00 | 10/01/01 | 10/01/02 | 10/01/03 |
|----------|----------|----------|----------|----------|
| $1.79/hr | $2.24/hr | $2.80/hr | $3.50/hr | $4.38/hr |

ARTICLE 15 – OCCUPATIONAL ILLNESS OR INJURY

Section 15.1 – Any Employee who is injured while performing scheduled work for the COMPANY and who is released from duty will receive up to the amount of hours said Employee was scheduled on the day of injury.

Section 15.2 – The COMPANY will make reasonable provisions for the

14

ISI00468

C-2-n

safety and health _ the Employees during the .ours of their employ-
ment.

ARTICLE 16 - HEALTH AND WELFARE BENEFIT SYSTEM AND 401K PLAN

Section 16.1 - The COMPANY provides an Employee benefit plan as de-
scribed in the plan description to all eligible Employees, their
eligible dependents and qualified beneficiaries under COBRA.

Section 16.2 - The COMPANY also provides a CSA 401(k) profit sharing
plan.

Section 16.3 - All new Employees, for the first 120 days, are covered
under Health and Welfare Benefits automatically. After 120 days, an
Employee can switch to the 401(k) plan if the Employee presents proof,
for the previous six months, of medical insurance coverage.

Section 16.4 - The date of enrollment for the entire COMPANY is June 1
of each year. On June 1 of each year, an Employee can change from one
plan to the other on the condition that if the Employee is opting to
change into the 401(k) plan the Employee must show proof of medical
coverage for the previous six months.

Section 16.5 - The health and welfare payment for every Employee will
be effective on the following dates in the following amounts:

| Date | Amount | |
| --- | --- | --- |
| 10/01/99 | $1.79/hr* | (i.e.: $71.60 per week; $310.27 per month) |
| 10/01/00 | $2.24/hr* | |
| 10/01/01 | $2.80/hr* | |
| 10/01/02 | $3.50/hr* | |
| 10/01/03 | $4.38/hr* | |

Section 16.6 - All Employees in the health and welfare benefit system
will receive additional benefits during the term of this Agreement
based on any increases pursuant to Federal Wage & Hour guidelines.

Section 16.7 - The hourly benefit rate (Section 16.5) may be applied,
at the Employee's option, to a COMPANY benefit plan which includes
group term life, routine examinations and dental benefits, or to an
accident and health insurance plan established by the Employees or the
UNION. The amount and distribution of such contributions shall be
shown separately on the Employee's quarterly statement.*

Section 16.8 - The health and welfare benefit amount as stated in
Section 16.5 will remain in effect during the term of this Agreement,
unless a greater amount is mandated by the Client in accordance with
the Department of Labor, Service Contract Act as amended.*

Section 16.9 - Pension - The COMPANY shall contribute $.90 per hour to
a pension fund for each Employee. The amount and distribution of such
contributions shall be shown separately on the Employee's quarterly
statement.*

15

ISI00469

C-2-0

Benefit rates increase pursuant to Federal Wage & Hour guidelines

ARTICLE 17 - UNIFORMS AND EQUIPMENT FOR INCLEMENT WEATHER

Section 17.1 - All necessary uniforms and equipment shall be provided by the COMPANY at no cost to the Employee, to include items listed below:

    1) One (1) regulation windbreaker
    2) One (1) winter weight jacket (parka)
    3) One (1) full-length raincoat with hood
    4) One (1) sweater
    5) One (1) level 3 bullet proof vest

Section 17.2 - Change in Equipment/Uniform - If the COMPANY decides to add, replace or change enmasse a piece of equipment of the Employee's uniform, said cost shall be borne by the COMPANY.

Section 17.3 - Maintenance - The COMPANY shall pay each Employee $.18 per hour tax free for uniform maintenance.

Section 17.4 - All uniforms will remain the property of the COMPANY. Worn out uniforms will be replaced by the COMPANY on a one for one basis at no cost to the Employee.

Section 17.6 - All Employees hired after ratification of this Agreement, who are provided with any uniforms and/or equipment at the expense of the COMPANY, shall return all such uniforms and/or equipment prior to the Employees receiving their final pay check.

ARTICLE 18 - UNION BUSINESS

Section 18.1 - A bulletin board will be provided for exclusive UNION business at each and every site of the COMPANY utilizing bargaining unit Employees. The COMPANY shall provide the UNION with a current list of those sites, as well as updates as necessary.

Section 18.2 - There shall be no UNION business conducted during an Employee's work time.

Section 18.3 - The UNION shall be entitled to represented by two (2) Delegates and no more per site. The UNION is responsible for providing written notification to the Project Manager and the Director of Human Resources, as to individuals officially designated to act as Delegate within ten (10) calendar days of their appointment. An employee shall not be permitted to engage in Delegate duties until notification is received by the COMPANY.

Section 18.4 - A Delegate shall perform his assigned security related duties and shall not leave his post during work hours to conduct UNION business and address grievances without written approval of the Site Supervisor, or his designee, and such approval will not be unreasonably denied. When so approved the Delegate shall immediately notify

16

IS100470

the shift supervi_ _ upon returning to his du._ assignment.  The
Delegate shall not abuse the office of Delegate; and shall perform
Delegate duties as expeditiously as possible within a reasonable
amount of time.  The primary duty of a Delegate shall be a security
officer, and Delegate duties shall be secondary.

ARTICLE 19 – SEPARABILITY OF THE CONTRACT

     Should any provision or provisions of this Agreement be rendered
or declared invalid by reason of any decree of a court of competent
jurisdiction, such invalidation of such part or parts of this Agree-
ment shall not invalidate the remaining portions hereof and the said
remaining portions shall remain in full force and effect.

ARTICLE 20 – DISCIPLINARY PROCEDURE

     No Employee shall be discharged for cause without a hearing as
set forth in Article 5, Grievance Procedure, of this Agreement.

ARTICLE 21 – DURATION

Section 22.1 – This Agreement shall be binding upon the parties here-
to, their successors and assigns and no provisions, terms or obliga-
tion herein contained shall be affected, modified, altered or changed
in any respect whatsoever by the consolidation, merger, sale, transfer
or assignment of either party hereto or affected, modified, altered or
changed in any respect whatsoever by any change of any kind in the
legal status, owner or management of either party hereto.

Section 22.2 – This Agreement shall be effective as of the 1st of
October, 1999, and shall remain in full force and effect until Septem-
ber 30, 2004, and from year to year thereafter, unless notice is given
in writing of a desire to change or modify or terminate this Agreement
by either party to the other party sixty (60) days or more prior to
the expiration of this Agreement.

For: International Services, Inc.
     Security Division

_____          _____
Ousama Karawia, President               Date    8/31/99

For: United Federation of Security Officers, Inc.
     and its affiliated Local 618

_____          _____
Ralph M. Purdy, President               Date    6-29-99

17

ISI00471

C-2-a

# EXHIBIT G

## Summary of Unpaid Wages

### U.S. Department of Labor
Employment Standards Administration

Wage and Hour Division



| ( Office Address) | Seattle WA FO/Anchorage<br>605 West 4th Street<br>Suite G69<br>Anchorage, AK  99501-<br>907-271-2867 | | |
|---|---|---|---|

Investigator: _Albertina Jenson_

Date: **08/27/2001**

Employer Fed Tax ID Number **95-4316092**

| 1. Name | 2. Address | 3. Period Covered | 4. Act | 5. Gross Amounts Due |
|---|---|---|---|---|
| _Ault, Sarah R_ | 601 E 15th Terrace, #13<br>Anchorage, AK, 99501 | 03/03/2001<br>to   07/07/2001 | 3 | $267.19 |
| _Bailey, Michael_ | 11539 Heritage Court #2<br>Eagle River, AK, 99577 | 03/03/2001<br>to   07/07/2001 | 3 | $218.24 |
| _Beck, Eric C_ | 20209 Chapel Dr<br>Chugiak, AK, 99567 | 03/03/2001<br>to   07/07/2001 | 3 | $236.72 |
| _Breaux, Thomas Jr. H_ | 7948 Chaimi Loop<br>Anchorage, AK, 99504 | 03/03/2001<br>to   07/07/2001 | 3 | $111.94 |
| _Brown, Timothy E_ | 1800 Stratford Court<br>Anchorage, AK, 99508 | 03/03/2001<br>to   07/07/2001 | 3 | $222.20 |
| _Carroll, Genene_ | 5311 Mockingbird dr #109<br>Anchorage, AK, 99507 | 03/03/2001<br>to   07/07/2001 | 3 | $14.96 |
| _Defresne, Mike W_ | 11539 Heritage Court #7<br>Eagle River, AK, 99577 | 03/03/2001<br>to   07/07/2001 | 3 | $274.56 |
| _Donnelly, Michael J_ | 8622 Shrub Ct<br>Anchorage, AK, 99504 | 03/03/2001<br>to   07/07/2001 | 3 | $242.88 |
| _Dufresne, Thomas,Jr_ | 11539 Heritage Court #7<br>Eagle River, AK, 99577 | 03/03/2001<br>to   07/07/2001 | 3 | $108.86 |
| resne III, Thomas | 11539 Heritage Court<br>Eagle River, AK, 99577 | 03/03/2001<br>to   07/07/2001 | 3 | $215.60 |
| _Joiner, Nathanael J_ | 1501 Alpehorn Ave #2<br>Anchorage, AK, 99507 | 03/03/2001<br>to   07/07/2001 | 3 | $238.48 |
| _Kracker, Bonn C_ | 4411 Edinburgh Dr<br>Anchorage, AK, 99515 | 03/03/2001<br>to   07/07/2001 | 3 | $227.04 |
| _McBride, Michael J_ | 3116 Glenn Don Dr<br>Anchorage, AK, 99504 | 03/03/2001<br>to   07/07/2001 | 3 | $197.23 |
| _Perry, Sylverster W_ | 4809 Mills Dr<br>Anchorage, AK, 99508 | 03/03/2001<br>to   07/07/2001 | 3 | $93.64 |
| _Spindler, Michael A_ | 6664 Holly Lane<br>Anchorage, AK, 99502 | 03/03/2001<br>to   07/07/2001 | 3 | $278.08 |
| _Taylor, Richard J_ | PO Box 874121<br>Wasilla, AK, 99687 | 03/03/2001<br>to   07/07/2001 | 3 | $232.32 |
| _Thompson, Leslie D_ | 2807 W 34th Ave<br>Anchorage, AK, 99517 | 03/03/2001<br>to   07/07/2001 | 3 | $260.48 |

I agree to pay the listed employees the back wages shown due and to mail proof of payment to the Wage and Hour District Office shown above by

Signed: _____

Employer Name and Address:

**International Security, Inc.**
**International Security, Inc.**
**2925 Debarr Rd**

**Anchorage, AK 99508**

**TOTAL** $3,440.42

* Column 4-Code

| | |
|---|---|
| FLSA | 1 |
| PCA | 2 |
| SCA | 3 |
| DBRA | 4 |
| CWHSSA | 5 |
| CCPA | 6 |
| FMLA | 7 |

Form WH-56

_Service Contract Act_

# EXHIBIT H

Summary of Unpaid Wages

# U.S. Department of Labor
Employment Standards Administration

Wage and Hour Division



| ( Office Address) | Seattle WA District Office 1111 Third Avenue, Suite 755 | Investigator: | Date: |
|---|---|---|---|
| | | *Albertina Jenson* | 06/17/2002 |
| | Seattle, WA  98101-3212 206-398-8039 | Employer Fed Tax ID Number    95-4316092 | |

| 1. Name | 2. Address | 3. Period Covered by Work Week Ending Dates | 4. Act(s) | 5. Gross Amounts Due |
|---|---|---|---|---|
| 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 Sarah R Ault | 601 E 15th Terrace #13 Anchorage, AK, 99501 | 03/02/2002 to    05/04/2002 | 3 | $178.54 |
| 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 Michael A Bailey | 11539 Heritage Court #2 Eagle River, AK, 99577 | 03/02/2002 to    05/04/2002 | 3 | $198.88 |
| 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 Eric C Beck | 20209 Chapel Dr Chugiak, AK, 99567 | 03/02/2002 to    05/04/2002 | 3 | $210.18 |
| 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 Thomas H Breaux | 7948 Chaimi Loop Anchorage, AK, 99504 | 03/02/2002 to    05/04/2002 | 3 | $108.48 |
| 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 Timothy E Brown | 1800 Stratford Court Anchorage, AK, 99508 | 03/02/2002 to    05/04/2002 | 3 | $214.70 |
| 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 Adonis B Davis | 9836 Wren Lane Eagle River, AK, 99577 | 03/02/2002 to    05/04/2002 | 3 | $135.60 |
| 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 Michael J Donnelly | 8622 Shrub Court Anchorage, AK, 99504 | 03/02/2002 to    05/04/2002 | 3 | $198.88 |
| 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 Mike W Dufresne | 11539 Heritage Court #7 Eagle River, AK, 99577 | 03/02/2002 to    05/04/2002 | 3 | $153.68 |
| -38-3599 Thomas III W Dufresne | 11539 Heritage Court Anchorage, AK, 99577 | 03/02/2002 to    05/04/2002 | 3 | $198.78 |
| 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 Nathanael J Joiner | 1501 Alpehorn Ave #2 Anchorage, AK, 99507 | 03/02/2002 to    05/04/2002 | 3 | $203.40 |
| 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 Bonn C Kracker | 11220 Lillian Lane Anchorage, AK, 99575 | 03/02/2002 to    05/04/2002 | 3 | $198.88 |
| 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 Michael J McBride | 3116 Glenn Don Drive Anchorage, AK, 99504 | 03/02/2002 to    05/04/2002 | 3 | $226.00 |
| 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 Michael A Spindler | 6664 Holly Lane Anchorage, AK, 99502 | 03/02/2002 to    05/04/2002 | 3 | $198.88 |
| 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 Richard J Taylor | PO Box 874121 Wasilla, AK, 99687 | 03/02/2002 to    05/04/2002 | 3 | $189.84 |
| 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 Tramain  Young | 361 6th St Apt #D Ft Richardson, AK, 99505 | 03/02/2002 to    05/04/2002 | 3 | $171.76 |

| I agree to pay the listed employees the back wages shown due and to mail proof of payment to the Wage and Hour District Office shown above by  Signed: _____ | Employer Name and Address  *International Services, Inc. International Services, Inc. 2925 DeBarr Rd*  *Anchorage, AK 99505* | TOTAL | $2,786.48 |
|---|---|---|---|

* Column 4-Code

| | |
|---|---|
| FLSA | 1 |
| PCA | 2 |
| SCA | 3 |
| DBRA | 4 |
| CWHSSA | 5 |
| CCPA | 6 |
| FMLA | 7 |

Page    1

Form WH-56

# EXHIBIT I



**CALIFORNIA**
DEPOSITION REPORTERS

*When Every Word Counts...*

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF LABOR
NEW YORK, NEW YORK

IN THE MATTER OF:                          )
                                           )
INTERNATIONAL SERVICES, INC.,              )
AND OUSAMA KARAWIA, INDIVIDUALLY           )    CASE NO.  99-SCA-12
AND AS PRESIDENT; RICHARD E.               )
DELONG, INDIVIDUALLY AND AS VICE           )
PRESIDENT OF OPERATIONS; AND,              )
WILLIAM PEDRICK, INDIVIDUALLY              )
AND AS CONTRACT MANAGER, PEGGY             )
ORLANDO, INDIVIDUALLY AND AS               )
CHIEF FINANCIAL OFFICER,                   )
                                           )
        RESPONDENTS.                       )

DEPOSITION OF:   HANNIBAL ALMODOVAR
Taken by      :  HAROLD LEMAR, ESQUIRE
Commencing    :  9:33 A.M.
Location      :  700 SOUTH FLOWER STREET, SUITE 1100
                 LOS ANGELES, CALIFORNIA
Day, Date     :  THURSDAY, NOVEMBER 6, 2003
Reported by   :  MARGARET A. FORD, C.S.R. NO. 10530
Pursuant to   :  SUBPOENA
Original to   :  HAROLD LEMAR, ESQUIRE

Pages 1 - 56

JOB NO:  82428

# CERTIFIED COPY

ISI01430

APPEARANCES OF COUNSEL

1

2

3

4     FOR THE COMPLAINANT:

                                   U.S. DEPARTMENT OF LABOR

                                   201 VARICK STREET

5                                  ROOM 983

                                   NEW YORK, NEW YORK  10014

6                                  212/337-2095

                                   BY:  HAROLD LEMAR, ESQUIRE

7

8

9

10

11     FOR THE RESPONDENTS:

                                   MCGUINESS NORRIS & WILLIAMS LLP

                                   1015 FIFTEENTH STREET, N.W.# 1200

12                                 WASHINGTON, D.C. 20005

                                   202/789-8600

13                                 BY:  MARK E. BAKER, ESQUIRE

14

15     ALSO PRESENT:               OUSAMA KARAWIA

16

17

18

19

20

21

22

23                                                    **ISI01431**

24

25                                                            Page 2

```
  1                              I N D E X

  2
                                                          PAGE
  3      WITNESS:

  4      HANNIBAL ALMODOVAR

  5

  6        Examination by  Mr. LeMar                        04

  7

  8

  9

 10                          EXHIBITS

 11                          (NONE.)

 12

 13                   INFORMATION REQUESTED

 14                          (NONE.)

 15

 16              QUESTIONS NOT ANSWERED

 17                          (NONE.)

 18

 19

 20

 21

 22

 23

 24                                        ISI01432

 25
```

1          MR. BAKER:  Objection.

2          THE WITNESS:  I don't understand the question.

3     Q    BY MR. LeMAR:  Okay.  Did there come a day where

4  all of a sudden you were working vacations and it was just

5  you, or was it sort of phased in over a period of time?

6     A    I think it was phased in.  I think Peggy did some

7  and I did some.

8     Q    Did there come a time where it was your exclusive

9  duty?

10    A    Yes.

11    Q    And once that happened, was it your exclusive

12 duty until the end of your employment?

13    A    That's correct.  Yes.

14    Q    You ever heard of the term ombudsman?

15    A    Yes.

16    Q    Did you hear about it with respect to your

17 employment at ISI?

18    A    Yes.

19    Q    When you were hired, did you hear anything about

20 it?

21    A    When I was hired, no.

22    Q    Okay.  How soon after you were hired did you hear

23 about it?

24    A    Again, it would have to have been a few months

25 after I was hired.  I don't remember the exact date.

ISI01458

Deposition of: HANNIBAL ALMODOVAR 11/6/03

1    Q    And how did you hear about it?

2    A    Mr. Karawia informed me of the position.

3    Q    What did he say?

4    A    He basically told me that he was going to assign

5    me to that position.  And he gave me some documents to read

6    that were going to be passed out to the employees.

7    Q    Do you remember anything in the documents?

8    A    No.

9    Q    Any information, any names?

10   A    Names, no.

11   Q    Did the document --

12   A    The document said to contact me if they had some

13   problems.  I remember that.

14   Q    It had your name?

15   A    And it talked about, I guess, their rights or

16   their wages and so forth, I think.

17   Q    Okay.  And when you say to contact you, it had

18   your name?

19   A    Yes.

20   Q    And the telephone number or address?

21   A    Yes.

22   Q    And address?

23   A    It had the phone number, I think.  I'm assuming

24   it had the address.

25   Q    Okay.

Page 30

# EXHIBIT J

**U.S. DEPARTMENT OF LABOR**　　Employment Standards Administration
Wage and Hour Division
P.O. Box 7245
Federal Building, Room 1373
Syracuse, NY 13261
Phone: (315) 448-0630
Fax: (315) 448-0632

January 16, 2002

Peggy Orlando
Chief Financial Officer
International Services, Inc.
371 242nd Street, Suite 205
Torrance, CA 90505

**VIA FACSIMILE TO (310) 791-5009**
**VIA CERTIFIED MAIL:  ARTICLE NO. 7000 0600 0020 8345 4780**

Dear Ms. Orlando:

The United States Department of Labor, Wage & Hour Division, is responsible for the administration and enforcement of a number of federal labor laws.  These include the McNamara-O'Hara Service Contract Act, as amended, and the Contract Work Hours and Safety Standards Act, as amended.  Your firm's contract with the General Services Administration, Contract No. GS-02P-94-CID-0141, is subject to these Acts.

Underpayments to the following employees performing work under this contract have been brought to our attention.

ALBANY, NY FEDERAL BUILDING (Location #157):

Costanzo, James V.　　(Emp. No. 1223)
Wiliman, Clayton R.　　(Emp. No. 1111)

SYRACUSE, NY FEDERAL BUILDING (Location #151):

Armstrong, Kenneth L.　　(Emp. No. 2144)
Duszak, Donald J.　　(Emp. No. 2145)
Marcon, Philip T.　　(Emp. No. 2187)

Please review the following detail of each underpayment outlined below.

**Costanzo, James V.**

Pay Period:  11/16/2001 – 11/30/2001

| Worked: | 98 Hours Regular | x ($15.27) | = | 1496.46 | |
|---|---|---|---|---|---|
| | 25 Hours Overtime | x ($15.27)(1.5) | = | 572.63 | |
| | 8  Hours Holiday | x ($15.27) | = | | 122.16 |

TOTAL EARNED = $2191.25
TOTAL PAID = $2110.31 (Check #174704)

BALANCE DUE = $80.94

*Working for America's Workforce*
*http://www.doLgov*

<u>Willman, Clayton R.</u>

Pay Period:  11/16/2001 – 11/30/2001

| Worked: | | | | |
|---|---|---|---|---|
| | 74 hours Regular | @($15.27) | = | 1129.98 |
| | 26 hours overtime | @($15.27)(1.5) | = | 595.40 |
| | 8 hours worked holiday | @($15.27) | = | 122.16 |
| | 8 hours unworked holiday | @($15.27) | = | 122.16 |
| | | TOTAL EARNED: | = | 1969.70 |
| | | paid check #174684 | | -1710.24 |
| | | paid check # 174811 | | - 113.48 |
| | | BALANCE DUE: | = | $145.98 |

<u>Armstrong, Kenneth L.</u>

**Pay Period:  11/01/2001 – 11/15/2001**

Worked:        79.5 hours Regular
              10.5 hours (holiday worked)
               7.8 hours (holiday unworked)

Paid:          79.5 hours only.

Payroll Adjustment Request processed by I.S.I, 12/16/2001,  by "Marie, but only paid for 10.5 hours in this adjustment (Check #175324)

Still unpaid for 7.8 hour holiday (11/12/2001)

7.8 hours x $15.27/hr = $119.11 BALANCE DUE

**Pay Period:  11/16/2001 –11/30/2001**

Worked:        54 hours Regular ($15.27/hr)
              25 hours Supervisory($15.27/hour)
              6.8 hours holiday ($15.27/hr)

               TOTAL DUE:   $1310.17
               <u>TOTAL PAID:   $1228.31</u>  (Check # 174484)

               BALANCE DUE:  $81.86

Pay Period 12/01/2001 – 12/15/2001

Worked:        52 hours Regular ($15.27)
              23 hours Supervisory ($15.77)

Paid:          52 hours Regular ($15.27)
              19 hours Supervisory ($15.77)

Unpaid for 4 hours = $61.08 BALANCE DUE

TOTALS FOR K. ARMSTRONG:

11/01/2001 – 11/15/2001: $119.11

11/16/2001 – 11/30/2001: $ 81.86

12/01/2001 – 12/15/2001: $ 61.08

**TOTAL DUE:**          $262.05

Duszak, Donald J.

Pay period:  11/01/2001 – 11/15/2001:

Did not receive holiday pay for Veterans' Day 11/12/2001

8     Hours @ $15.27 = $122.16 BALANCE DUE

Marcon, Philip T.

Pay Period:  11/16/2001 – 11/30/2001

Did not receive holiday pay for Thanksgiving 11/22/2001

6.2 Hours @ $15.27 = $94.67 BALANCE DUE

**TOTALS:**

| | | |
|---|---|---|
| Costanzo, James V. | Employee No. 1223 | $ 80.94 due |
| Willman, Clayton R. | Employee No. 1111 | $145.98 due |
| Armstrong, Kenneth L. | Employee No. 2144 | $262.05 due |
| Duszak, Donald J. | Employee No. 2145 | $122.16 due |
| Marcon, Philip T. | Employee No. 2187 | $ 94.67 due |

TOTAL DUE:                    $705.80

Please provide checks in the stated amounts to these employees immediately, and provide proof of such payments to this office by 01/25/2002.  Calls to your firm's Ombudsman, Mr. Hannibal Almodovar, on 01/02/2002, 01/03/2002, and 01/09/2002 regarding these issues have gone unreturned.  Per the Consent Findings issued 09 May 2001 by the United States Department of Labor Office of Administrative Law Judges, Case No. 99-SCA-12, at Attachment A, Paragraph 3, complaints submitted are to be resolved "…within 10 days of completion of the ombudsman's investigation, with no complaint to remain unresolved for more than 30 days after the complaint is filed;"

It is my understanding that the employees involved have already filed internal payroll adjustment requests with your firm. Furthermore, these underpayments all appear on the face of your payroll records.  If, however, you should need copies of paystubs, timesheets, etc., please do not hesitate to contact Investigator Daniel Weeks of my office at 315/448-0630 ext. 27 immediately.

Thank you for your anticipated immediate response to these requests.

Sincerely,

Catherine A. Quinn
Assistant District Director

# EXHIBIT K

1

# ORIGINAL

1   UNITED STATES OF AMERICA
    UNITED STATES DEPARTMENT OF LABOR
2   NEW YORK, NEW YORK
    ------------------------------------------------X
3
    In the Matter of:
4
    INTERNATIONAL SERVICES, INC., and
5   OUSAMA KARAWIA, Individually and as
    President; RICHARD E. DELONG, Individually
6   and as Vice President of Operations;
    and, WILLIAM PEDRICK, Individually and as
7   Contract Manager, PEGGY ORLANDO, Individually
    and as Chief Financial Officer,
8
                                    Respondents.
9   ------------------------------------------------X
    CASE NO. 2003-SCA-18
10
                                    201 Varick Street
11                                  New York, New York
12                                  February 11, 2005
                                    2:45 P.M.
13
14
15
16        Examination Before Trial of ROGER
17   PINNAU, pursuant to Notice, Via Telephone,
18   taken by and before Renee S. Harris, a Notary
19   Public and Shorthand Reporter of the State of
20   New York.
20
21
22
23        ELLEN GRAUER COURT REPORTING CO., LLC.
            133 East 58th Street, Suite 1201
24               New York, New York
                   212-750-6434
25                 Ref:76629B

2

```
1

2
       A P P E A R A N C E S:
3

4          OFFICE OF THE SOLICITOR
              Attorneys for United States
5             Department of Labor
              201 Varick Street, Room 983
6             New York, New York 10014
       BY:   HAROLD LeMAR, ESQ.
7             JENNIFER AMATO

8          GDANSKI & GDANSKI, LLP
              Attorneys for Defendant
9             25 Sherwood Ridge Road
              Pomona, New York  10970
10     BY:   SAM GDANSKI, ESQ.
              (VIA TELEPHONE)
11

12         ALSO PRESENT:

13            OUSAMA KARAWIA (VIA TELEPHONE)
              DAN WEEKS (VIA TELEPHONE)
14

15

16

17

18

19

20

21

22

23

24

25
```

5

1                    PINNAU

2    "FSS"?

3         A.    Yes, FSS, I am familiar with that

4    term.

5         Q.    What is that term?

6         A.    That's the Federal Supply Service,

7    which is a division of the General Services

8    Administration.

9         Q.    And are there contractors listed on

10   the FSS?

11        A.    Yes.   The Federal Supply Service has

12   schedule contracts that are listed on

13   Internet Web sites, and you can look up the

14   contractors and their contracts.

15        Q.    If a contractor is removed from the

16   FSS, Federal Supply Service, can that

17   contractor still bid on Federal Service

18   contracts?

19        A.    Yes.

20        Q.    Does the Federal government maintain

21   a central contractor registration?

22        A.    Yes.

23        Q.    Where?

24        A.    It's at crr.gov.

25        Q.    Would that be www.crr.gov?