## PLAINTIFF'S REPLY BRIEF

Plaintiffs International Protective Services Inc. d/b/a International Services Inc. ("ISI") and Ousama Karawia, President and CEO of ISI, submits this Reply Brief.

I.    Preliminary Statement

Defendant would have the Court forget that GSA paid ISI extremely late for excessive amounts for 5 of the months during the contract period.

| May 31, 2002: | GSA was late in paying ISI $987,201.41 over 30 days and an additional $299,787.42 over 60 days for a total late payment of $1,286,988.83 |
| July 31, 2002: | GSA was late in paying ISI $120,367.19 over 30 days. |
| August 31, 2001: | GSA was late in paying ISI $99,230.55 over 30 days. |
| July 31, 2001: | GSA was late in paying ISI $71,263.70 over 30 days. |
| May 31, 2001: | GSA was late in paying ISI $35,482.18 over 30 days.[1] |

See Exhibit 9 attached to Complaint.

In addition, after the contract was cancelled GSA continued its excessive late payments:

| November 2002: | GSA was late in paying ISI $1,063,940.69 over 30 days. |
| December of 2002: | GSA was late in paying ISI $106,841.74 over 30 days, and GSA was late in paying ISI $351,968.17 over 60 days. |
| May of 2003: | GSA was late in paying ISI $229,316.67 over 60 days. |
| June of 2003 | GSA was late in paying ISI over 90 days for $229,316.67. |

The Defendant's disingenuous analysis of the late payment issue is an attempt to disguise the strains placed on ISI's ability to timely pay its employees. The Government drew an arbitrary, imaginary line in the sand, skewing the data and making it seem like the late payments

---

[1] When referring to Exhibits attached to Complaint, Plaintiff will state "Ex. ___ to Pl. Comp." When referring to Exhibits attached to this Reply Brief, Plaintiff will state Ex. ___to Pl. Reply.

from GSA to ISI were minimal. The line drawn was not only fictitious but incorrect and the government's attempts to dismiss the GSA late payments as a "red herring" P.21 Gov. Brief, in addition to its conclusion that "the late payments from GSA could not have been the proximate cause for all of ISI's failure to pay its employees during the May 1, 2001 to April 30, 2002 period", is an attempt to hide half the picture.

The Government chose to "analyze" on Page 20, "the period of May 31, 2001 to April 30, 2002, *i.e.*, the first year after the entry of the May 2001 Consent Decree…" In its analysis on Page 21, it curiously concluded that "…. GSA's payment to ISI was late in just three months during that period … Further, none of these late payments exceeded $100,000; and all were eventually made to ISI within 60 days of being due." At the outset, despite labeling this as a 12 month period, the government in reality only analyzed an 11 month period, conveniently disregarding the 12th month, May 2002, the most substantial and crucial month where GSA was late in the millions, owing ISI over $987,201.41 for over 30 days and $299,787.42 for over 60 days. This was a substantial late payment. Ex. 9 to Pl. Comp. 9, P.2. In addition, there is no justification for the government's minimizing and dismissing the effects and importance of late payments less than $100,000, (the 8/31/2001ate payment of $99,230.55), or for the government stopping just short of May 2002 when GSA was late in paying ISI $987,201.31 over 30 days and an additional $299,787.42 over 60 days.

In stark contrast to the extreme late payments from GSA, the Defendant focused on ISI's Alaska contract. Gov. Br. P.21. The government at Tab G shows alleged violations showing gross amounts due from ISI to employees ranging from a low of owing one employee $14.96 to a high of $278.08 totaling $3,440.42. In addition this date covers purported gross amounts due from 3-3-2001 until 7-7-2001, where either all or significant portions occurred before the consent

decree in May 2001, despite the government's contention that these occurred in the "first year after the entry of the May 2001 Consent Decree." Furthermore, the Defendant points to Exhibit H, a summary of unpaid wages for 15 Alaska employees totaling $2,786.48 for the period of March 2, 2002 to May 4, 2002, the same critical time period where GSA was late in paying ISI in excess of $1,286,988.73, with $299,787.42 over 60 days and $987,201.41 over 30 days. Ex. 9 to Pl. Complaint.

In addition, the Court should recognize that GSA finally making these late payments to ISI did not relieve ISI's financial distress nor operate to excuse GSA. This is because, as Karawia explained during the Hearing and at Paragraph 59 of ISI's Complaint, GSA's late payment triggered default provisions allowing ISI's bank to seize other funds.

II.    Plaintiff in its request for injunctive relief seeks to maintain the status quo.

Defendant cites No Spray Coalition Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001) for the proposition where the preliminary injunction will affect government action the injunction should be granted only if the moving party meets the more rigorous likelihood of success on the merits standard.  Plaintiff believes it will be completely vindicated and prevail on the merits. In No Spray the court also said that in applying the more rigorous likelihood of success standard, this is particularly so where the injunction 'will alter rather than maintain the status quo' therefore "the movant must show 'clear' or 'substantial' likelihood of success, citations omitted. At this early juncture Plaintiff has satisfied the 4 criteria. The Administrative Record is voluminous and replete with evidence substantiating Plaintiffs' case which will be further discussed in subsequent motions for summary judgment. Plaintiff has established the irreparable harm necessary for the Court to maintain the status quo.  In point of fact in No Spray the second circuit affirmed the granting of the injunction.

Irreparable harm is clearly established as discussed below and defendant's arguments regarding rollover, bid protest cases, and loss of reputation are incorrect.

Courts have imposed additional criteria on the three prong test in order to ensure that a contractor is currently "responsible". In <u>Silverman v. United States Department of Defense</u>, 817 F. Supp. 846 (1993), the Court held that notwithstanding "DLA's admitted refusal to consider these facts, renders its decision arbitrary, capricious and an abuse of discretion" and terminated the debarment. The Court said that DLA did not consider Mr. Silverman's reasons for pleading guilty to a misdemeanor charge of conversion of government property. It said DLA chose not to undertake a de novo review of the facts established by the conviction. Therefore, DLA essentially failed to consider the mitigating effects of Mr. Silverman's motivation in pleading guilty some six years earlier, to the imposition of the debarment. See also <u>Roemer v. Hoffman</u> 419 F. Supp. 130, 132 (D.D.C. 1976), important in placing the May 2001 consent decree in context. As commentators have pointed out, a variety of factors should be considered in determining the present responsibility ie. passage of time, standards of conduct implementation, etc.

III. <u>Plaintiff has established that it meets the three prong test.</u>

First, there was no culpable conduct by ISI or Ousama Karawia as the great majority of ISI's underpayments were directly attributable to GSA's late payments. Therefore the Defendant's failure to take into consideration the late payments which occurred during the course of the contract, focusing instead on the late payments which existed at the tail end of the contract is misleading. Defendant's brief at Page 13 states, based on the ARB's finding there existed "… no legal or factual basis to allow a contractor to underpay employees due to late or withheld payments". This is incorrect because the ARB failed to recognize the unrebutted

testimony of the late payments by GSA during the contract concerning GSA's constant and egregious late payments but only summarily notes "GSA admitted that it was in arrears on payments due to ISI." Ex. 7 to Pl. Comp., P. 9. However, these particular exhibits cited at footnote 43 only dealt with post contract invoices that were late. The ARB decision totally ignored the evidence of GSA's late payment during the contract. The ARB decision then ignored the "withheld" payments and moved on to reject legal entitlement to using the late payment argument citing Kleen-Rite Corp., BSCA No. 92-09, slip op. at 3 (Oct. 13, 1992), and ignoring the Federal Court Decision in Elaine's Cleaning Services v. United States Department of Labor, 1995 U.S. Dist. LEXIS 22170, Sept 29, 1995, aff'd 106 F.3d 726 (6th Cir. 1995) which effectively overruled Kleen-Rite. Further, GSA's late payments and withheld funds after the contract should also be considered because ISI still owed money to close out the contract.

During this time period other factors made ISI's performance exceedingly difficult. ISI's principal, Ousama Karawia had to take out personal loans, bridge loans, and personal mortgages to cover the late payments from GSA. Defense counsel has for the purpose of deciding this motion agreed that the aging chart is accurate. ISI performed its duties commendably notwithstanding a government supervisor who referred to ISI's CEO as a camel jockey and sand nigger. Notably there never was a cure notice or a show cause notice as those terms are commonly used in government contracting complaining by GSA the contracting agency that work was not being performed.

As a matter of fact just to show the incongruity or the Catch 22 nature of this situation, at the agency level in prior proceedings, DOL never cited to Elaine's Cleaning, Dantran, Inc., United States 171 F. 3d 58 Mar 29, 1999 ("Dantran I"), and Dantran, Inc. v United States, 246 F.3d 36 2001 ("Dantran II") Only now in federal court is the defendant attempting to distinguish

the facts.  If you examine the ALJ Decisions on the website of the U.S. Department of Labor and

go to <u>Kleen Rite</u>, a pop-up will come up showing in effect the overruling by <u>Elaine's Cleaning</u>.

Ms. Quinn, Assistant District Director, DoL, testified in marchstep:

 BY MR. GDANSKI :

Q.     Ms. Quinn, if the Government, GSA was the contracting agency under which ISI
       was performing this contract, was delinquent by over 60 days in paying the
       contractor for amounts roaming from 1.2 to 2 million dollars, would that have
       adversely affected the contractor's ability then pay its employees on time?

A.     I don't know. I don't know what their financial status is.

Q.     Could it have? Do you think it reasonable that that would negatively affect ISI's
       ability to pay its employees timely?

A.     It might, but they have an obligation to pay their employees regardless of what –
       if they're paid.

Q.     Regardless of whether they're paid by the government.

A.     That's correct.

Tr. P.279 Line 9–25. <u>Exhibit 4 to Pl. Reply Brief, Quinn Testimony.</u>

Since the late payment factually existed on a scale unprecedented therefore the nexus

exists to excuse culpable conduct and is the predominate proximate cause and underpinning of

ISI's underpayments. Once that proposition is accepted plaintiff passes the first test of the three-

pronged test laid out.

The undisputed evidentiary record establishes the late payments. <u>Ex. 9 to Pl. Comp.</u>

Defendants have "for purposes of this opposition solely, the Government assumes the accuracy

and admissibility [of] that table." "[sic]". Notwithstanding the governments' other comments at

P. 20, footnote 8 of its brief, DoL never chose to challenge this line of testimony by ISI, relying

on its belief that regardless of what and when GSA paid ISI, notwithstanding case law to the

contrary, ISI was not excused from payment to its employees. Further, the Court's review is of

6

the Administrative Record that was before the agency at the time of its decision <u>Buffalo Central Terminal Ltd. v. United States</u>, 886 F. Supp. 1031 (January 27, 1995) citing <u>Citizens to Preserve Overton Park Inc. v. Volpe</u> 401 U.S. 402, 420, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971); See also <u>New York v. Shalala</u>, 1996 U.S. Dist. LEXIS 2261 (February 28, 1996).

The balance of the first prong is satisfied because the ARB was correct when it said that the ALJ incorrectly looked to see whether there was a violation of the prior consent decree. Counsel herein in its prior submissions to the agency pointed this to the ARB.  We noted that in <u>Herman B. Taylor Construction v. U.S.</u>, 203 F.3d 808, the Court of Appeals for the Federal Circuit overturned a termination for default where the General Services Administration Board of Contract appeals terminated a contract for default because it determined that appellant had violated the labor standard provisions of the contract premised on consent findings of a settlement agreement with the Department of Labor.  The consent decree in ISI is similar in that neither party admitted any violations, the same as in <u>Taylor</u> supra. The issue of this prior consent decree comes up in discussions of prong one and prong three.

Consent Decrees commonly used in a wide variety of fields in the law, have consistently, where no liability is agreed to, been interpreted as such by the Courts.  A Consent decree is not an admission of liability

> "The lower court's determination was vacated and remanded because the consent decree was not an admission of liability**,** therefore, the judgment of back pay based on the admission was necessarily vacated."Reynolds v. G.M. Roberts , 202 F.3d 1303 (Feb. 2000).

> "The consent decree was entered into without any admission of liability by defendants. Pursuant to the consent decree**,** defendants agreed to pay specified sums of money to reimburse the United States for the response costs it incurred, plus interest on any unpaid balances. The consent decree also set forth stipulated penalties in the event any defendant failed to make the payments called for therein.

> <u>United States v. The Providence Journal</u>, 1990 U.S. Dist LEXIS 20109 (July 1990).

Aside for the proposition that it was exactly that, an expeditious resolution of payment questions where DoL stated certain payments were due and ISI agreed to pay them, ISI also did not admit to any violations of the SCA, CWH, SSA, or the FLSA. Silverman, supra, requires that this Court view the circumstances the same way so that ISI's motivation in entering into the consent order is to be considered as a mitigating effect. Also, what is determinative is the current state of ISI's responsibility. The fact that ISI was de facto debarred for three years should also be gauged by this Court. Courts have imposed additional criteria on the three prong test in order to ensure that a contractor is currently "responsible". See Silverman v. United States Department of Defense, 817 F. Supp. 846 (1993).

Plaintiff meets the second prong of the test, compliance history, cooperation in the investigation, repayment of monies due, and sufficient assurances of future compliance. The ALJ in its decision stated as such "It was clear from Mr. Karawia's testimony that the violations of the Act were not purposeful and Respondents" ("ISI") "promptly rectified most issues after being made aware of them by DoL." See Exhibit 6 to Pl. Comp., P. 9 of ALJ Decision 2003-SCA-00018, Matter of International Services Inc. and Ousama Karawia. This notwithstanding counsel for Defendant's isolated reference in footnote 7 of its brief. The decision noted that there were no outstanding payments due to any employees. The company cooperated in the investigation, the monies were paid, even at the end of the contract when in excess of $1,000,000.00 was still owed by GSA to ISI.

We come to the third test. This must be gauged against the tremendous growth spurt that occurred and the strenuous conditions that existed for this security company and the unique situation in 2001 for an Arab American named Ousama Karawia in New York, with an armed guard company guarding the Statue of Liberty and various other New York sites. Soon after 9-

11-2001, ISI became an easy target of the tabloid media as well as of then Attorney General Elliot Spitzer. See Ex. 10-13 to Pl. Comp.

The government personnel not only failed to cooperate, failed to timely pay, but discriminated against the principal owner Ousama Karawia, an Egyptian born American citizen, referred to by the government's Chief Contracting Technical Representative as a Camel Jockey. Exhibit 14 and Exhibit 15 to Pl. Comp. Testimony during the proceedings also indicated that COTR Soden alternately called Mr. Karawia a Sand Nigger. The fact that the COTR called Mr. Karawia a camel Jockey and Sand Nigger in front of Mr. Karawia's employees, was inexplicably never mentioned in the ALJ or ARB decisions. Although a formal Complaint was filed from ISI to GSA at the time, GSA never followed through on a promised investigation. Exhibit 16 to Pl. Comp.

During this time of late payments from GSA, ISI did all it could in a "bet the farm" case approach to keep payroll afloat and did not as many other companies fold, go bankrupt and leave the employees in the lurch. Esch. v. Ling, 665 F. Supp. 6 (1987).

When DoL initiated the debarment proceedings, ISI had fully paid its employees all amounts which were due. This, despite the overlapping time frame where GSA both failed to pay timely proffered invoices and moreover, GSA withheld additional amounts owed to ISI pursuant to the direction of DOL. DOL failed to release the withheld amounts even as payments were made by ISI.

Unfortunately GSA's treatment of minority contractors was not isolated. See NCLN 20 v. United States, No. 02-1282C, United States Court of Federal Claims, Filed June 4, 2008,

The Decision went on to note that:

"the IG Report also stated, although it was unacceptable to contemplate starting the Michigan Guard Contract without armed guards, it 'appeared that FPS' response to the

<u>September 11, 2001 emergency was inconsistent with its treatment of incumbent and past guard contractors as compared to NCLN20.</u>"  i.d. at 550. ( underlining added) <u>As a matter of fairness in light of increased demand for armed service after the terrorist attacks on September 11, 2001 … and then it goes on to list a number of other options that GSA could have done.</u>"

The reference to FPS is Federal Protective Service which is the same in our case where the contracting officer Robert Soden worked for the Federal Protective Service which was an arm of GSA.  GSA has its contracting activity at that time and its supervision of security guard services under the FPS arm of GSA.

The point of illustrating this is that certain companies such as the minority companies like the one cited herein and obviously Ousama Karawia an Arab-American-Muslim company were treated grossly unfairly.

Defendant is also incorrect when it implies that Mr. Karawia set up "a process" that directed ISI employees to sidestep the compliance program, implying an intentional obfuscation. The actual transcript of Karawia cited for this proposition in Defendant's Exhibit D reveals in fact that Mr. Karawia did not instruct Hannibal to sidestep but actually call the employee up, tell him to talk to the manager, and make sure the manager first attempted to reconcile and resolve Tr. 644.

The fact that Ms. Quinn had to send a letter because on one occasion DOL was unable to reach Hannibal Almodovar is not surprising in the context of the communications between the parties because on numerous occasions ISI personnel had the same difficulties in reaching GSA personnel and had to repeatedly track down, follow through, follow up when GSA employees failed to return calls.  Again consider the time period that was involved herein which everybody seems to forget.  The Quinn letter is dated January 16, 2002 and specifically deals with the months immediately following 9/11.  As will be further demonstrated during subsequent

proceedings the personnel at ISI following 9/11 were ordered verbally through numerous

"change orders "to shift man-hours, & schedules from the previously scheduled rotations prior to

9/11.  The strain both on ISI and GSA should be understandable but should not operate to

penalize either side which DOL is seeking to do.

Taking the sub issues of the third prong in reverse order we state 1) the sums due were

promptly paid, 2) there was negative impact on the unpaid employees because once ISI was paid

by GSA it promptly paid the employees, 3) the contractor attempted to ensure compliance by

attempting to get paid from GSA during the performance of the time period in questions, 4) the

boon issue was a bona fide legal issue, 5) there were no recordkeeping violations which impeded

the investigation and there was only a prior investigation which was consented to in which there

were no admissions of liability. Plaintiff never failed to pay employees their base pay checks.

The various alleged underpayments generally encompassed wage rate adjustments, fringe

benefits.

IV. <u>Plaintiff has met the requirements for a preliminary injunction.</u>

Plaintiff has demonstrated it will succeed on the merits and has established irreparable

harm, therefore to maintain the status quo, this Court should enter a preliminary injunction.

There is no downside to the Government during the pendency of this litigation while the

livelihood of Plaintiff and its employees is extremely at risk if the Court does not do so.

A. <u>Irreparable Harm</u>

The crucial distinction for irreparable harm is placement on the excluded parties list. <u>The</u>

Federal Acquisition Regulations, FAR 2.101, defines "List of Parties Excluded from Federal

Procurement and Nonprocurement Programs ("GSA List): as "A list compiled, maintained, and

distributed by the General Services Administration containing the names, addresses, and identity

of parties debarred, suspended, or voluntarily excluded from Federal contracts or Federal

assistance programs and parties proposed for debarment from Federal contracting found at

http://epls.arnet.gov/." Until such time as placed on the Excluded Parties List electronically

maintained by GSA, ISI and Ousama Karawia have not yet been formally debarred. That is

precisely why the issuance of this preliminary injunction is so important because in discussing

the timing of this litigation with agency counsel on the day of filing, June 17, 2008, agency

counsel represented that subject to this litigation, ISI and Ousama Karawia would not be placed

on the Excluded Parties List until the matter was heard by a United States District Judge and

after the Defense had the opportunity to submit its legal papers. In point of fact, the initial

request for a preliminary injunction, filed with the Court contained a Temporary Restraining

Order Request. When the papers were hand delivered to Judge Baer's Chambers by counsel after

a courtesy copy was filed with Mr. Harold LeMar, Office of the Solicitor, Department of Labor,

201 Varick Street, New York, NY, the Judge's law clerk stated she would speak with Judge Baer

on the issue of a TRO and a return date for the Government's initial response papers. While at

the Court house but after the above took place, counsel telephonically spoke to Ms. Racine,

Headquarters Department of Labor, Solicitor's Office, Washington D.C., who represented that

DoL would not place ISI and Ousama Karawia on the Excluded Parties List until a reasonable

period after the preliminary injunction matter was heard by this Court. See Gdanski Dec. Ex. 2.

Par. 2-6.

Upon counsel's return to his office that evening, Counsel spoke with Judge Baer's law

clerk and informed her of the same and stated the TRO would not be necessary but the

preliminary injunction was still being sought on an expedited basis. The law Clerk requested that

Plaintiff's counsel fax a revised OTSC application deleting the TRO request. Because of

Plaintiff's counsel's celebration of the birth of a grandchild, Plaintiff's counsel asked that it be returnable June 30, 2008, which apparently was the last day of Judge Baer's work schedule prior to other commitments. The law clerk also stated that it was quite possible that the return date would have to be June 25, 2008 which required counsel's earlier return from Florida and counsel stated he would do so if necessary. See Gdanski Dec. Ex. 2, Par. 2-6.

Judge Baer set the oral argument for June 25, 2008 4:00 PM and the government was required to file its initial papers by June 20, 2008, the preceding Friday, or two days after the filing of Plaintiff's papers. On or about June 18, 2008, Mr. Li Yu called and asked to defer under the present schedule to which counsel for Plaintiff agreed to. See Gdanski Dec. Ex. 2, Par. 2-6.

There is a crucial distinction between a contractor who has not yet been formally debarred and a contractor who is either proposed for debarment or the subject of an order for debarment. Previously, prior to the ARB decision on the Request for Reconsideration, ISI had been proposed for debarment and thus answered such questions as set forth in its City of San Diego bid dated May 20, 2008, see Plaintiff's Ex 4 to Compl., four pages from the end titled

"City of San Diego Bid No. 9331-08-B Procurement

Addendum to Question #2 Compliance "ISI had been proposed for debarment by the US Department of Labor since 2003 ...."

On that day, ISI had to disclose as pointed out in Plaintiff's moving papers that on April 23, 2008, it was placed on the Excluded Parties List but was going into the United States District Court within the week. As this Court knows, that resulted in Exhibit 26 to Plaintiff's Complaint, the US DoL letter dated May 28, 2008, rescinding the placement on the EPL and ISI so notified the City of San Diego. On new procurements the format varies as it has in the past between "proposed for debarment" or "debarred". ISI has always said that prior to ARB's Request for Reconsideration decision that ISI was administratively challenging within the DoL such a

13

proposed debarment. Now for new procurements, if ISI is questioned whether it is proposed for

debarment, ISI will supply a slightly revised explanation to that as was originally supplied to the

City of San Diego explaining what has historically occurred and that ISI is presently in litigation

before this Court on the propriety of such an action but until such time as ISI and Ousama

Karawia are placed on the EPL it has not yet been debarred, and only proposed for debarment.

Further, that ISI is seeking injunctive relief precluding such placement. However, under federal

government guidelines and case law there is no automatic finding of non-responsibility until

actual placement on the EPL. However, the federal government, and by implication all municipal

agencies, considers that once a contractor has been placed on the EPL, that contractor is

debarred.

On the issue of what contracting agencies look at to determine whether a bidder is

responsible as a go/no go proposition, the Federal Circuit in a non precedential decision which

affirmed a published decision of the Court below, Precision Standard, Inc v. US 228 Fed Appx.

980, 2007 U.S. App LEXIS 8092 (April 6, 2007) confirmed Plaintiff's position, that it is

placement on the EPL List.

> "The court held that the trial court did not err in considering a contracting specialist's
> declaration, which stated that the contracting officer searched for the successful bidder's
> name in the consolidated list of debarred, suspended, and ineligible contractors and the
> local defense contract management agency's mechanization database, in finding a
> sufficient basis for the responsibility determination."

The Court affirmed 71 Fed Cl. 216, (2006), and 69 Fed. Cl. 738 (2006).

The government contends we have not proved the existence of the rollover effect because

we haven't shown a lost municipal contract.  Would the government have us lose a contract then

come into court and file papers asking for injunctive relief at which point the government would

argue laches or we've already failed to preserve the status quo?  Would the government concede

that if we lost the municipal contract because of a federal debarment then we have proven irreparable harm, and then argue Plaintiff is not entitled to relief. Is Defendant stating that if Plaintiff is placed on the EPL it would have to legally challenge every municipal decision not to give ISI a contract since it has been federally debarred in separate California proceedings and argue the impropriety of the federal government's decision, when defendant is asking the Court not to issue an injunction. How will a California court deal with this. The answer is obvious. For guidance, we examine <u>CF & I Steel d/b/a/ Rocky Mountain Steel Mills</u>, 2000 U.S. LEXIS 13810; 142 Lab. Cas. (CCH) P59, 131, (September 19, 2000), involving federal state preemption issues not relevant herein the Court noted that California agencies utilizing federal funds determine a bidders responsibility aside from capability on whether it has been debarred by other agencies:

> "BART's procurement policies are governed by Public Contract Code Sections 20220-22029.1 (*id.* at [*10] P 33). BART also follows the federal guidelines for projects funded by the Federal Transit Administration. Both of these regulations require that contracts be awarded to the lowest responsible bidder (*id.* at P 34). BART's current procurement practice looks at a number of factors to determine whether a bidder is responsible, including a bidder's capability to perform, experience doing similar work, financial and labor resources, record of past performance, and whether the bidder has been debarred or suspended by other agencies (*id.* at P 35)."

Defendant is asking a California Court to accept a premise which Defendant will not accept. To date since ISI has not yet been debarred, many of the questionnaires which have asked have you been proposed for debarment, we have in good faith asserted that until we are placed on the EPL list we are not debarred. To date, municipalities accepted Plaintiff's explanation that it was in administrative litigation. That no longer becomes the case once plaintiff is placed on the EPL.

15

We now also include other examples of submissions explaining ISI's status in which ISI candidly and properly, and accurately reflects that it has been proposed for debarment and citing case law that the municipalities should find ISI presently responsible.  All that changes now if ISI is placed on the EPL.

Subsequent to Mr. Karawia's Declaration, Exhibit A to Pl. Compl., dated May 27, ISI has bid on several pending municipal procurements such as the San Francisco Metropolitan Transit Association.  That had a variation which asks specifically in the solicitation whether ISI had been presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from contracting with any federal, state or local governmental department or agency, Appendix G, SFMTA. ISI submitted a current answer which is a variation on those it had been submitting over the last few years, that it was not presently debarred and had been proposed for debarment since mid-2003 by USDOL for matters. Exhibit 5 Attached to Reply Brief. ISI included this statement to San Francisco:

"The company is not presently debarred. It has been proposed for debarment since mid 2003 by US DoL for matters we believe the company is not liable. The Company is administratively challenging this and if necessary will take this to the U.S. District Court for the Southern District of New York.

At the outset ISI will answer and cooperate in any questions that the SFMTA has.

We also wish to point out a 9th Circuit Case directly on point, *Silverman v. U.S. Department of Defense*, 817 F. Supp. 846, (1993)."

This shows the explicit concern ISI had regarding the rollover effect of an actual debarment.

Defendant's conclusions that plaintiff's allegation about loss of reputation is insufficient, while untenable, is also as a matter of law unsupportable.  In A.F.C. Enterprises v. New York City School Construction Authority, in a very thoughtful reasoned decision 2001 U.S. Dist.

LEXIS 24447 (Sept 2001),the Eastern District found that notwithstanding the school authority's arguments that plaintiff's liberty interests were not stigmatized or challenged with a burden on its legal rights or status defendant's actions do so satisfy the "stigma plus" test. ISI's concerns about its loss of reputation are not illusory.

The mainstay of its business today is the municipal contracts, and in light of the numerous examples given and subsequently provided of municipal contracts the issue now becomes, not is ISI proposed for debarment but is it debarred?  It is a given that new contracts will not be given by municipal contractors to contractors who have been federally debarred. While we have cited case law, because of the passage of time, the corrections that have been implemented, the underlying factual underpinning, that ISI should not be debarred, ISI will not be able to legally financially contest each and every municipal contract that it will seek arguing California agencies should not rely on a Federal debarment.  It is more than likely that these municipal agencies will not enter into new contracts or exercise option period under existing contracts for a contractor found to have been non-responsible by the federal government. Federal Agencies in considering exercising options, can view them as a new contract and therefore a bidder on the EPL is debarred and non-responsible. Bither v. US  1992 U.S. Dist.LEXIS 7833, 38 Cont. Cas. Fed. (CCH) P 76,337 (1992). Therefore, for the defendant's counsel to state, that formal debarment "*could*" cause significant adverse effects, and characterizing it as a "mere possibility" of adverse effects defies logic as a formal debarment most certainly would preclude further municipal contracts.  At the same time Defendant is not conceding that if we give them a statement from a California agency stating it will not award any new contracts to ISI if placed on the EPL, Defendant will consent to the entry of a preliminary and permanent injunction precluding placement of ISI on the EPL excluded parties list i.e., debarred bidders list.  The bid

17

protest cases Plaintiff cited predominately from the Federal Circuit but also from the D.C. Circuit as well the Second Circuit are exactly on point.

It is just plain unfathomable to accept a premise that a federal debarment, if this Court does not grant relief, is not a negative connotation as to the responsibility of ISI when it seeks bids with municipal agencies and federal agencies.  As Mr. Karawia's supplemental declaration states, ISI could have been a shining example during the last five years of how the U.S. government is a melting pot and that Arab American Muslim owned companies are respected and effective contractors particularly in the field of security guard services protecting U.S. government's interests.

As Ousama Karawia explained, having been disappointed after attempting on two occasions to reacquire federal contracts being denied both by GSA and separately by the Federal Aviation Administration on issues of non-responsibility, it could ill afford at that time the investment financially and from a business perspective and attempt to litigate the issue of a de facto debarment while contesting vigorously independently DOL's attempt to formally impose a debarment. Karawia Supp. Dec. Ex. 1, Par. 4.

Thus the bid protest cases cited by Plaintiff are directly on point because the de facto debarment resulted in the loss of previous federal contracts sought, and to be sought. While Mr. Karawia could not afford to litigate the de facto debarment, if Plaintiff is successful in this litigation, because of the passage of time and other factors, Plaintiff will actively seek federal contracts. Thus the Federal Circuit's case law that the loss of a federal government contract constitutes irreparable harm is clearly on point.

Plaintiff argued and the ALJ accepted the premise of its de facto debarment. However, Defendant now labels Plaintiff's argument as unsupported. In Footnote 9, Page 9, of the ALJ decision, the Judge correctly noted:

> "Respondents argue they have been de facto debarred. Following cancellation of the GSA contract, ISI was eliminated from the FSS and was therefore unable to do any work with the Federal Government. (TR at 457). The other federal contracts that ISI had concurrently with the GSA contract were all lost following the cancellation of the GSA contract and the removal of ISI from the FSS. The Veteran's Administration in Alaska, for example, would not allow ISI to re-bid on that contract because ISI was no longer listed on the FSS. ISI also lost its contract with the National Park Service. (TR at 458). According to Mr. Karawia, ISI was then unable to contract with the Federal Government between October 18, 2002 and the date of the hearing which represents a period of over two years. (TR at 500). Presumably, ISI has not been able to contract with the Federal Government through the present, representing a period of almost three years".

See Footnote 9 of Pl. Exhibit 6 to Pl. Comp.

The record below established that this was a supported allegation. As the ALJ noted, when the FSS was cancelled, ISI was denied the opportunity to contract with a number of contracting entities which had placed contracts under the FSS. In addition, ISI reapplied to gain entry to the FSS schedule and was denied by Sheila Brannan May 1, 2003 alleging an unsatisfactory record of integrity and business ethics. See Exhibit 3 attached to Reply Brief[2]. Later that year, the Federal Aviation Administration on September 24, 2003, found ISI to be a non-responsible contractor in regard to a security guard contract ISI was seeking. Exhibit 3 attached to Complaint. A de facto debarment occurs where a firm is excluded from contracting because a contracting agency makes repeated determinations of non-responsibility, or even a single determination of non-responsibility as part of a long-term disqualification attempt, without following the procedures for suspension or debarment set forth in Federal Acquisition Regulation Subpart 9.4. As the facts indicate when GSA denied ISI the opportunity to once again be placed

---

[2] This should have been Exhibit 20 attached to the Complaint as the Index correctly cites it, but we apologize for including an inadvertent document.

on the FSS schedule and FAA subsequently for the same reasons, citing a lack of integrity, refused to give ISI a contract, the government de facto debarred ISI and its affiliates and principals. This Court has the authority as did <u>Dantran</u> to find that the de facto debarment that occurred notwithstanding anything else should preclude a further imposition of a three year prospective debarment.

Further, In any event, for the defense to state that Mr. Pinnau substantiated that the mere exclusion from the pre-approved list, i.e. the Federal Supply Schedule contracts did not preclude in itself obtaining a federal contract, is misleading and incomplete. I have annexed the full Pinnau Transcript in addition to the 5 page extract submitted in Defendant's Exhibit J. <u>See Exhibit 6 attached to Reply Brief.</u>  A review of the rest of the deposition indicates at page 14 that Mr. Pinnau was aware of the FSS schedule contract between GSA and the Federal Supply Service through 16 where he answers at line 10 yes, at pages 16. While accurate, a contractor removed from the FSS can still bid on Federal Service contracts, as the record evidences, if a contracting officer utilizes the same grounds ie. a non responsibility determination as the FAA did and GSA did when ISI reapplied, that constitutes a de facto debarment.  At page 18, Mr. Pinnau was no longer with GSA and was absorbed by the Department of Homeland Security and thus was unaware of the fact that ISI reapplied to get back on the FSS schedule and was denied and that it similarly attempted to get an FAA contract and was denied.  The record reflects these facts.

Rather this Court should focus on the present responsibility of the company. Even if there were no de facto debarment the issue remains the same. With the de facto debarment, all the more so. The Court in <u>Silverman</u> held:

> "…The ultimate inquiry in a debarment must be directed to the "present responsibility" of the contractor. <u>Robinson v. Cheney, 277 U.S. App. D.C. 393, 876 F.2d 152, 160 (D.C.</u>

Cir. 1989). The agency is required to carefully consider any favorable evidence of responsibility to ensure that all findings of responsibility are based on the presence of a realistic and articulable threat of harm to the government's proprietary interest. Id. at 159-160. The Robinson court expressly admonished federal agencies that government contractors must be afforded a meaningful "opportunity to overcome a blemished past," to ensure that an agency "will impose debarment only in order to protect the government's proprietary interest and not for the purpose of punishment."

The Court noted that the DLA's decision to debar Mr. Silverman came six years after he made the statement that underlies his misdemeanor conviction.

This goes to both the issue of the current responsibility of ISI & Ousama Karawia as well as to minimize any negative connotations to the 2001 Consent Decree

Double Jeopardy

Defendant is correct that the Court in Hudson v. United States ,citations omitted, that a debarment imposed was not so severe that it should be treated as criminal despite Congress' intent to the contrary. However, the Court did not address the duration of the debarment. Because of the de facto debarment that occurred herein, Plaintiff distinguishes Hudson v. United States because a formal debarment of 3 years after a de facto debarment since 2002 is not what Hudson sanctioned.

As to the issues of jurisdiction and personal liability, Plaintiffs rests on its arguments in its moving papers.

V. Conclusion

WHEREFORE, Plaintiff, requests entry of judgment for Plaintiffs in accordance with the relief requested in the Complaint or other relief as the Court so deems.

DATED:    July 9, 2008
          Suffern, NY 10901

                                    By: s/Sam Z. Gdanski
                                    Sam Z. Gdanski (SG-0382)

21

Scott H. Gdanski
Gdanski and Gdanski LLP
3 Rockwood Lane
Suffern, New York 10901
(845) 362-4800
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
Ousama Karawaia and                                )
International Protective Services Inc.              )
doing business as ISI                              )          ECF CASE
                                                   )          08 Civ. 5471 (HB)
Plaintiffs,                                        )
                                                   )
                                                   )
-against-                                          )
                                                   )
                                                   )
United States Department of Labor                  )
                                                   )
Defendant.                                         )
-------------------------------------------------------------X

## <u>PLAINTIFFS' REPLY BRIEF</u>

DATED:       July 9, 2008
             Suffern, NY 10901

                                            By: <u>Sam Z. Gdanski</u>
                                            Sam Z. Gdanski
                                            Scott H. Gdanski
                                            Gdanski and Gdanski LLP
                                            3 Rockwood Lane
                                            Suffern, New York 10901
                                            (845) 362-4800
                                            Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ……………………………………………………… i

TABLE OF AUTHORITIES………………………………………………………ii

PLAINTIFF'S REPLY BRIEF..........…………………………........................  1

   I.       Preliminary Statement ……………………………….…………….. 1

   II.  Plaintiff in its request for injunctive relief seeks to maintain the status quo. 3

   III. Plaintiff has established that it meets the three prong test………………… 4

   IV. Plaintiff has met the requirements for a preliminary injunction…………… 11

        A.  Irreparable Harm                        11

   V.  Conclusion                        21

## TABLE OF STATUTES AND AUTHORITIES

### FEDERAL CASES

Pg.#

A.F.C. Enterprises v. New York City School Construction Authority          16
2001 U.S. Dist. LEXIS 24447 (Sept 2001)

Bither v. US  1992                                                          17
U.S. Dist.LEXIS 7833, 38 Cont. Cas. Fed. (CCH) P 76,337 (1992).

Buffalo Central Terminal Ltd. v. United States,                            7
886 F. Supp. 1031 (January 27, 1995)

CF & I Steel d/b/a/ Rocky Mountain Steel Mills,                            15
2000 U.S. LEXIS 13810; 142 Lab. Cas. (CCH) P59, 131, (September 19, 2000)

Dantran, Inc. v. United States,                                            5
171 F. 3d 58, Mar 29, 1999.

Dantran, Inc. v United State.                                             5
246 F.3d 36 2001.

Elaine's Cleaning Services v. United States Department of Labor            5
1995 U.S. Dist. LEXIS 22170, Sept 29, 1995, aff'd 106 F.3d 726 (6th Cir. 1995).

Esch v. Lyng                                                               9
665 F. Supp. 6 (1987).

Herman B. Taylor Construction v. U.S.,                                     7
203 F.3d 808

Hudson v. United States                                                   21
522 U.S. 93 (1997)

NCLN 20 v. United States                                                  9
No. 02-1282C, United States Court of Federal Claims, Filed June 4, 2008.

New York v. Shalala,                                                       7
1996 U.S. Dist. LEXIS 2261 (February 28, 1996).

No Spray Coalition Inc. v. City of New York                               3
252 F.3d 148, 150 (2d Cir. 2001)

Precision Standard, Inc v. US                                            14
228 Fed Appx. 980, 2007 U.S. App LEXIS 8092 (April 6, 2007)

Precision Standard, Inc v. US                                            14
71 Fed Cl. 216, (2006),

Precision Standard, Inc v. US                                            14
69 Fed. Cl. 738 (2006).

Roemer v. Hoffman                                                        4
419 F.Supp. 130, 132 (D.D.C. 1976).

Silverman v. United States Department of Defense,                       4
817 F. Supp. 846 (1993).

United States v. The Providence Journal,                                7
1990 U.S. Dist LEXIS 20109 (July 1990).

Administrative Decisions

Kleen-Rite Corp.,                                                        5
BSCA No. 92-09, slip op. at 3 (Oct. 13, 1992),

<u>CERTIFICATE OF SERVICE</u>

I, Sam Z. Gdanski, an attorney with the firm Gdanski & Gdanski, LLP, certify that on July 9, 2008, I caused a copy of the foregoing Reply Brief and the attached Exhibits to be served by electronic filing and e-mail and via Federal Express upon counsel at the following address: Li Yu Assistant United States Attorney, 86 Chambers Street, 3rd Floor, New York, NY 10007.

Dated: Suffern, New York

July 9, 2008

/s/ Sam Z. Gdanski

Sam Z. Gdanski

Gdanski & Gdanski, LLP.

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Ousama Karawia and | ) | |
| International Protective Services Inc. | ) | |
| d/b/a ISI | ) | ECF CASE |
| | ) | |
| Plaintiffs, | ) | 08 Civ. 5471 (HB) |
| | ) | |
| | ) | **Supplemental** |
| -against- | ) | **Declaration of Ousama** |
| | ) | **Karawia in Support of** |
| | ) | **Plaintiffs' Reply Brief** |
| United States Department of Labor | ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------------------------------------X | | |

### SUPPLEMENTAL DECLARTION OF OUSAMA KARAWIA, PRESIDENT OF INTERNATIONAL PROTECTIVE SERVICES, INC. D/B/A INTERNATIONAL SERVICES INC.

1. I, Ousama Karawia, am the President of International Protective Services Inc. d/b/a International Services, Inc. ("IPS"), or ("ISI") and submit this supplemental declaration in support of ISI's Reply Brief.

2. ISI attempted after cancellation of the underlying contract in October 2002, to re-enter the Federal marketplace.

3. In applying for a Federal Supply Schedule Contract, ISI was rejected on May 1, 2003, by the very same GSA contracting officer based on an alleged lack of responsibility.

4. Later that year on September 24, 2003, ISI was once again rejected by a Federal agency, the Federal Aviation Administration, alleging ISI to by a non-responsible contractor. Thus, it became clear that the Federal market was foreclosed.

Although ISI felt these decisions were improper, ISI lacked the financial resources to challenge them at that time.

5.  As a Muslim Arab American, I recognized that there was a tremendous increase in the need for Federal guard services and that my company could have been a shining example for the opportunities that existed for Muslim Arab American owned companies since 2003.

6.  The Federal government has increasingly privatized security guard services previously performed by the military and the need for increased security at other Federal facilities has grown as well, but that opportunity was denied to me.

7.  If ISI prevails in its litigation it will actively once again seek to enter the Federal market.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

DATED July 9, 2008

Ousama Karawia
President of International Protective
Services, Inc. DBA International Services,
Inc.

2

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ousama Karawia and<br>International Protective Services Inc.<br>d/b/a ISI<br><br>Plaintiffs,<br><br>-against-<br><br><br>United States Department of Labor<br><br>Defendants.<br>-------------------------------------------------------------------X | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ECF CASE

08 Civ. 5471 (HB)

**Declaration of Sam
Z. Gdanski in Support of
Plaintiffs' Reply Brief**

## DECLARATION OF SAM Z. GDANSKI

I, Sam Z. Gdanski, pursuant to 28 U.S.C. § 1746, declare the following under penalty of perjury:

1. I am an attorney with the law firm of Gdanski & Gdanski, LLP, attorney for Plaintiffs Ousama Karawia and International Protective Services Inc. d/b/a ISI, in the above captioned action. I am fully familiar with the proceedings herein and make this declaration in support of Plaintiffs' Reply Brief.

2. On June 17, 2008, the day of the filing of the Complaint and Memorandum of Law, I conferred telephonically with Ms. Barbara Racine of the Office of Solicitor of the United States Department of Labor, as well as another counsel in the same office, who both represented that ISI and Ousama Karawia would not be placed on the Excluded Parties List until the matter was heard by a United States District Judge and until the Defense had the opportunity to submit its legal papers.

3.  In addition, the initial request for a preliminary injunction, filed with the Court on June 17, 2008, contained a Temporary Restraining Order request. When the papers were hand delivered to Judge Baer's Chambers by counsel after a courtesy copy was filed with Mr. Harold LeMar, Office of the Solicitor, Department of Labor, 201 Varick Street, New York, NY, the Judge's law clerk stated she would speak with Judge Baer on the issue of a TRO and a return date for the Government's initial response papers.

4.  While at the Court house but after the above took place, counsel telephonically spoke to Ms. Racine, Headquarters Department of Labor, Solicitor's Office, Washington D.C., who represented that DoL would not place ISI and Ousama Karawia on the Excluded Parties List until a reasonable period after the preliminary injunction matter was heard by this Court.

5.  Upon counsel's return to his office that evening, counsel spoke with Judge Baer's law clerk and informed her of the same and stated the TRO would not be necessary but the preliminary injunction was still being sought on an expedited basis. The law Clerk requested that Plaintiff's counsel fax a revised OTSC application deleting the TRO request. Because of Plaintiff's counsel's celebration of the birth of a grandchild, Plaintiff's counsel asked that it be returnable June 30, 2008, which apparently was the last day of Judge Baer's work schedule prior to other commitments. The law clerk also stated that it was quite possible that the return date would have to be June 25, 2008 which required counsel's earlier return from Florida and counsel stated he would do so if necessary.

6.  Judge Baer set the oral argument for June 25, 2008 4:00 PM and the government was required to file its initial papers by June 20, 2008, the preceding Friday, or two days after the filing of Plaintiff's papers. On or about June 18, 2008, Mr. Li Yu called and asked to defer under the present schedule to which counsel for Plaintiff agreed to.

Dated: Suffern, NY
July 9, 2008

/s/ Sam Z. Gdanski
Gdanski & Gdanski, LLP
Scott H. Gdanski
3 Rockwood Lane
Suffern, New York 10901
(845) 362-4800
Attorneys for Plaintiffs



U.S. Department
of Transportation

**Federal Aviation
Administration**

P.O. Box 92007

Los Angeles, CA 90009

September 24, 2003

International Services, Inc.
Attn: Mr. Bunce Pierce
3771 West 242nd Street, Suite 205
Torrance, CA 90505

Reference:    Solicitation Number DTFA08-03-R-00000-NCT; Northern Calif. TRACON; Armed
Security Guard Services; Finding of Non-responsibility

Dear Mr. Pierce:

On September 8, 2003, a letter was sent to you stating that the Federal Aviation Administration (FAA)
had received unfavorable information about your performance and legal problems in the State of New

Mr. Pierce
September 24, 2003
Page 2 of 2

Based on my review of ISI's conduct when it engaged in business in New York as IPS, as well as your response, I cannot make an affirmative determination that ISI's business ethics are those that the FAA is entitled to expect from a responsible contractor. Therefore, I am finding ISI to be a non-responsible contractor.

If you have any comments or questions, please contact me by any of the following methods: phone 310.725.7556, fax 310.725.6842 or james.travers@faa.gov.

Sincerely,

JAMES L. TRAVERS
Contracting Officer
Acquisition Management Branch, AWP-55

1          JUDGE ROMANO:  46 is in evidence.

2                              (Whereupon, the document

3                              referred to as Administrator

4                              Exhibit 46 was received

5                              into evidence.)

6          MR. LeMAR:  No further questions, Your Honor.

7          JUDGE ROMANO:  Cross.

8                         CROSS-EXAMINATION

9          BY MR. GDANSKI:

10     Q    Ms. Quinn, if the Government, GSA, was the

11 contracting agency under which ISI was performing this

12 contract, was delinquent by over 60 days in paying the

13 contractor for amounts roaming from 1.2 to 2 million dollars,

14 would that have adversely affected the contractor's ability to

15 then pay its employees on time?

16     A    I don't know.  I don't know what their financial

17 status is.

18     Q    Could it have?  Do you think it reasonable that that

19 would negatively affect ISI's ability to pay its employees

20 timely?

21     A    It might, but they have an obligation to pay their

22 employees regardless of what -- if they're paid.

23     Q    Regardless of whether they're paid by the

24 government.

25     A    That's correct.

**Free State Reporting, Inc.**