# Gdanski & Gdanski LLP
3 Rockwood Lane
Suffern, New York 10901


Ph: (845) 362-4800                                          Fax: (845) 362-4700

Scott H. Gdanski                                            Sam Z. Gdanski
scottgdanski@gdanski.com                                   samgdanski@gdanski.com

                                                            July 10, 2008

**<u>Via ECF Filing</u>**


**Re:**    08 Civ. 5471 (HB)
Ousama Karawia and International Protective Services Inc. d/b/a ISI v. United States
Department of Labor

Dear Clerk:

Plaintiff attempted to file the Reply Brief along with supporting documents yesterday
evening and ran into technical problems up until 9:00 PM on July 9, 2008. A copy was
submitted to the Court's Chambers as well as to opposing counsel to ensure that they
timely received it. We are sending this letter as the ECF help site states that we are to file
such a statement explaining the "delayed filing". After speaking with the Clerk on the
morning of July 10, 2008 I was able to file the Reply Brief and supporting documents.
The Brief and Exhibit 1-4 were filed first and along with this letter Exhibits 5 and 6 are
being filed.

                                          Very truly yours,


                                          _____
                                          /s/ Sam Zalman Gdanski



## INTERNATIONAL SERVICES, INC.
### SECURITY AND INVESTIGATIONS
3771 242ND Street, Suite 205
Torrance, CA 90505
(310) 791-5015

State License No. PPO 11025
and Bonded
24 hrs. Service

San Francisco Municipal Transportation Agency
One South Van Ness Avenue, 7th Floor
San Francisco, CA 94103

ATTN: Lorraine R. Fuqua

Answer to San Francisco Municipal Transportation Agency

Answers Certification Regarding Debarment, Suspension and other Responsibility Matters

The Company is not presently debarred. It has been proposed for debarment since mid 2003 by US DoI for matters we believe the company is not liable. The Company is administratively challenging this and if necessary will take this to the US District Court for the Southern District of New York.

At the outset ISI will answer and cooperate in any questions that the SFMTA has.

We also wish to point out a 9th circuit case directly on point. . Silverman v. U.S. Department of Defense, 817 F. Supp. 846, (1993).

We believe after you evaluate the answers you will find that ISI and its Officers and employees possess the requisite current responsibility required of a government contractor. The ultimate inquiry in a debarment must be directed to the "present responsibility" of the contractor. The agency is required to carefully consider any favorable evidence of responsibility to ensure that all findings of responsibility are based on the presence of a realistic threat of harm to the government's proprietary interests. Government contractors must be afforded a meaningful opportunity to overcome a blemished past. Mitigating circumstances should be considered.

ISI had been proposed for debarment by the US Department of Labor since 2003 and has been internally contesting the same within the US Department of Labor for the past four years in an administrative dispute. Despite the fact that ISI was proposed for debarment in 2003, during the last 4 years, because of its excellent performance and pricing, ISI was awarded numerous California municipal Contracts, and various commercial contracts including contracts with Fortune 500 companies.

Los Angeles, CA        San Diego, CA          Oakland, CA          Seattle/Portland      Sacramento, CA                      Ontario, CA
1801 Beverly Blvd.     5494 Weathers Place, #100  80 Swan Way, Ste. 275  618 Industry Drive    1111 Howe Ave., Ste. 63  3595 Inland Empire Blvd.
Los Angeles, CA  90057  San Diego, CA  92121   Oakland, CA 94577     Tukwila WA            Sacramento, CA  95825  Ontario, CA  91764
(213) 353-0400         (858) 278-4310          (510) 614-9245        (206) 394-1360        (916) 448-0767            (909) 937-9000

Mitigating Circumstances of Debarment and Remedial Action

The debarment proceedings related to activities which occurred in the wake of the 9-11 tragedies in New York. The debarment proceedings focused on alleged payroll underpayments. These were caused by massive late payments by the contracting agency, GSA. ISI borrowed money, made all payments and additional procedures were implemented as described more fully below.

ISI has instituted a Code of Conduct. All senior management personnel have attended in person or by Webinar. This policy, along with the steps taken and itemized below, should provide assurances that any instances which occurred in 2002 and prior, should not affect the present responsibility of ISI.

See Sellers v. Kemp., 749 F. Supp. 1001, 1009 (W.D. Mo. 1990), where although HUD had cause for debarment, the Secretary abused her discretion in concluding that no mitigating circumstances existed; Mastercraft Flooring Inc. v. Donovan, 589 F. Supp. 258, 262 (D.D.C. 1984) where the Labor Department acted arbitrarily and capriciously in setting aside ALJ's findings and recommendation that, despite cause for debarment for violations of the Service Contract Act, mitigating factors warranted removing the contractor from a list of ineligible contractors under the Act; and Roemer v. Hoffman, 419 F. Supp. 130, 132 (D.D.C. 1976) setting aside a debarment action because of agency's failure to consider the circumstances surrounding the offense which prompted the debarment action, payment or restitution, and change in the contractor's character since the offense and conviction. ISI has satisfied all of these criteria.

In Trilon Education Corp., 578 F.2d at 1358 (Ct. Cl. 1978) although a party argued that a contract award was invalid because the awardee (i.e) should have been found to be non-responsible due to the prior criminal conviction of the President of the parent corporation, the Court of Claims, in rejecting the argument stated:

> Careful analysis of the debarment provisions suggests that even had the contracting officer been cognizant of Mr. Koe's criminal conviction, he would still not have been compelled to make a determination of non-responsibility. Of course, subsequent conduct of the government indicates in fact he might have done so. Nevertheless, just as an individual's criminal conviction leading to debarment need to inevitably be imputed to an affiliated firm, it does not seem that an individual's lack of integrity should necessarily be attributed to a subsidiary firm for purposes of assessing responsibility.

The amount of time that has elapsed since the underlying instances that gave rise to
DoL's allegations, all of which occurred prior to October 2002 and have since been
rectified, is one of the mitigating factors to be considered in assessing whether,
notwithstanding cause, a Respondent is presently responsible. The bulk of these
instances concern late payment by the contracting agency, General Services
Administration. See, Roemer v. Hoffman, 419 F.Supp. 130, 132 (D.D.C. 1976); see also,
48 C.F.R. § 9.406-1(a)(9). An agency decision must be based on the consideration of all
the relevant factors and must be "reasoned and rational". Silverman v. U.S. Department
of Defense, 817 F. Supp. 846, (1993). The ultimate inquiry in a debarment must be
directed to the "present responsibility" of the contractor. The agency is required to
carefully consider any favorable evidence of responsibility to ensure that all findings of
responsibility are based on the presence of a realistic threat of harm to the government's
proprietary interests. Government contractors must be afforded a meaningful opportunity
to overcome a blemished past. Mitigating circumstances should be considered.

Case law has also recognized that the implementation of effective remedial measures is
important. ISI has retained the law firm of Gdanski & Gdanski LLP for the last three
years, in addition to the instant litigation, for advice on all other government contract
matters. This firm was lead counsel in Impressa Construzioni Geom. and Domenico
Garufi v. United States, 238 F.3d 1323 (Fed. Cir. 2001) the leading precedent on the
issues of the "responsibility" required of government contractors. The impact of the
underlying Garufi case on government contractors, and the public at large cannot be
overstated. The Government Accountability Office revised its regulations to hear
challenges to affirmative determinations of responsibility. In FN Manufacturing, Inc.
B-297172, B-297172.2, 2005 Comp. Gen. Proc. Decision Page 212 December 1, 2005,
the GAO explained the significant impact the Garufi series of cases had:

"on December 31, 2002 our Bid Protest regulations were revised to add as a specified
exception protests 'that identify evidence raising serious concerns that, in reaching a
particular responsibility determination, the contracting officer unreasonably failed to
consider available relevant information or otherwise violated the statute or regulation.'
67 Fed. Reg. 79, 833, 79, 836 (2002). This change was made in light of a seminal
decision from the United States Court of Appeals for the Federal Circuit Impressa
Construzioni Geom. and Domenico Garufi v. United States, 238 F.3d 1323 (Fed.
Cir. 2001) ("Garufi I"), which held that affirmative determinations of responsibility by
contracting officers are reviewable by the Court of Federal Claims under the 'arbitrary
and capricious' standard applicable under the Administrative Procedure Act. We
explained in the preamble to the revision that it was 'intended to encompass protests
where, for example, the protest includes specific evidence that the contracting officer
may have ignored information that by its nature, would be expected to have a strong
bearing on whether the

awardee should be found responsible.' 67 Fed. Reg. 79, 833, 79, 844; *see also* Verestar Gov't Servs. Group, B-291854, B-291854.2, April 3, 2003, 2003 CPD P 68 at 4."

Also in effect what has occurred historically, is that ISI has been de facto debarred since November 2002 .Other federal agencies have recognized that the amount of time that a contractor has been de facto debarred should run and be counted as time served. See Lou Dominick d/b/a Dominick Realty and Appraisal, HUD BCA No. 87-2420-D31, 1987 HUD Lexis 13 (September 30, 1987).

### Double Jeopardy

In the United States v. Halper, 490 U.S. 435 (1989) the Supreme Court held that a civil sanction can constitute punishment for purposes of the Double Jeopardy clause "when the sanction as applied in the individual case serves the goals of punishment" – – retribution and deterrence. While that Decision involved a civil penalty under the Civil False Claims Act, some argue that Halper could apply to a debarment or suspension action. See generally, After The Fall: Convention Debarment and Double Jeopardy, 21 Pub. Contr. L.J. 355 (Spring 1992).

### Conclusion

SFMTA should make a determination that ISI and Ousama Karawia currently possesses the requisite responsibility notwithstanding events that occurred more than four and a half years ago.

If you should want any further information about this issue, you can contact me at the number below or you are more than welcome to contact our legal counsel regarding this case. I have listed his contact information below. Mr. Gdanski is available for a telephonic, e-mail correspondence or in person overview to answer any questions you may have or to provide information about the proceedings in United States District Court, Southern District of New York. Sam Z Gdanski, Gdanski & Gdanski LLP, 3 Rockwood Lane, Suffern , New York 10901, Tel: 845 362-4800, Cell:914 589-0015, e-mail: samgdanski@gdanski.com.

COPY

1

1  UNITED STATES OF AMERICA
   UNITED STATES DEPARTMENT OF LABOR
2  NEW YORK, NEW YORK
   ----------------------------------------------X
3
   In the Matter of:
4
   INTERNATIONAL SERVICES, INC., and
5  OUSAMA KARAWIA, Individually and as
   President; RICHARD E. DELONG, Individually
6  and as Vice President of Operations;
   and, WILLIAM PEDRICK, Individually and as
7  Contract Manager, PEGGY ORLANDO, Individually
   and as Chief Financial Officer,
8
                                 Respondents.
9  ----------------------------------------------X
   CASE NO. 2003-SCA-18
10
11                                   201 Varick Street
                                     New York, New York
12
                                     February 11, 2005
13                                   2:45 P.M.
14

15

16        Examination Before Trial of ROGER

17  PINNAU, pursuant to Notice, Via Telephone,

18  taken by and before Renee S. Harris, a Notary

19  Public and Shorthand Reporter of the State of

20  New York.

20

21

22

23        ELLEN GRAUER COURT REPORTING CO., LLC.
            133 East 58th Street, Suite 1201
24               New York, New York
                   212-750-6434
25                 Ref:76629B

2

1

2

A P P E A R A N C E S:

3

4       OFFICE OF THE SOLICITOR
                Attorneys for United States
5               Department of Labor
                201 Varick Street, Room 983
6               New York, New York 10014
        BY:  HAROLD LeMAR, ESQ.
7            JENNIFER AMATO

8       GDANSKI & GDANSKI, LLP
                Attorneys for Defendant
9               25 Sherwood Ridge Road
                Pomona, New York  10970
10      BY:  SAM GDANSKI, ESQ.
             (VIA TELEPHONE)

11

12      ALSO PRESENT:

13              OUSAMA KARAWIA (VIA TELEPHONE)
                DAN WEEKS (VIA TELEPHONE)

14

15

16

17

18

19

20

21

22

23

24

25

3

1          IT IS HERE BY STIPULATED and

2    agreed by and between the attorneys for the

3    respective parties here.

4          THAT this deposition may be signed

5    and sworn to before any officer authorized to

6    administer an oath with the same force and he

7    infect as if signed and sworn to before the

8    officer before whom the deposition was taken.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                         PINNAU
 2     R O G E R  P I N N A U, having first been
 3     duly sworn by a Notary Public for and within
 4     the State of New York, upon being examined,
 5     testified as follows:
 6     EXAMINATION BY
 7     MR. LeMAR:
 8          Q.   Mr. Pinnau?
 9          A.   Yes.
10          Q.   This is Harold LeMar from the
11     Department of Labor.  By whom are you
12     employed?
13          A.   The Federal Protective Service which
14     is a division of Homeland Security.
15          Q.   And what is your title?
16          A.   Contracting officer.
17          Q.   And how long have you been with the
18     Federal Protective Service?
19          A.   I don't really recall right now.
20          Q.   Is it several years?
21          A.   Yes, it's probably a decade.
22          Q.   Okay.
23               MR. GDANSKI:  It's more like an
24          eternity; right?
25          Q.   And are you familiar with the term
```

5

1                      PINNAU

2    "FSS"?

3         A.   Yes, FSS, I am familiar with that

4    term.

5         Q.   What is that term?

6         A.   That's the Federal Supply Service,

7    which is a division of the General Services

8    Administration.

9         Q.   And are there contractors listed on

10   the FSS?

11        A.   Yes.  The Federal Supply Service has

12   schedule contracts that are listed on

13   Internet Web sites, and you can look up the

14   contractors and their contracts.

15        Q.   If a contractor is removed from the

16   FSS, Federal Supply Service, can that

17   contractor still bid on Federal Service

18   contracts?

19        A.   Yes.

20        Q.   Does the Federal government maintain

21   a central contractor registration?

22        A.   Yes.

23        Q.   Where?

24        A.   It's at crr.gov.

25        Q.   Would that be www.crr.gov?

6

```
 1                      PINNAU
 2        A.    Yes.
 3        Q.    Is there a listing on that Web site
 4   of active vendors for security guard
 5   contracts?
 6        A.    Yes, there is.
 7        Q.    And have you had an opportunity
 8   earlier this month to visit that Web site?
 9        A.    Yes, I did.
10        Q.    Do you remember the date?
11        A.    February 1.
12        Q.    And how many active vendors for
13   security guard services were listed on the
14   date that you visited that Web site?
15        A.    Over 4,000.
16        Q.    Does GSA maintain a list of security
17   guard contractors on the FSS?
18        A.    Yes.
19        Q.    Where?
20        A.    That's at GSA dot -- let me repeat
21   that.  It's at fss.gsa.gov.
22        Q.    And that would be www.fss.gsa.gov?
23        A.    Yes.
24        Q.    And did you have an opportunity
25   earlier this month to visit that Web site?
```

7

1                          PINNAU

2       A.   Yes, I did on February 1.

3       Q.   And how many active vendors for

4  security guard services were listed on the

5  date you visited?

6       A.   I think it was 122.

7       Q.   Are all security guard contractors

8  with the federal government listed on the

9  FSS?

10      A.   No.

11      Q.   Does www.crr.gov list International

12  Protective Services, doing business as

13  International Services located in Torrance,

14  California as an active vendor?

15      A.   Yes, it does.

16           MR. LEMAR:  No further questions.

17  EXAMINATION BY

18  MR. GDANSKI:

19      Q.   Mr. Pinnau -- am I pronouncing that

20  right?

21      A.   Yes.

22      Q.   My name is Sam Gdanski, and I'm the

23  attorney for ISI and Mr. Karawia.  You're in

24  Chicago right now?

25      A.   Yes, I am.

8

PINNAU

Q.   No snow today?

A.   No snow.  Nice and sunny.

Q.   Okay.  How long have you been a contracting officer, a number of years?

A.   Yes, over a decade.

Q.   You're a contracting officer?

A.   Yes.

Q.   Now, GSA maintains what's known as an exclusive party list, an EPL list?

A.   Yes.

Q.   Do you know what that is?  That's a list of formerly departed contractors; right?

A.   Currently debarred contractors, I believe.

Q.   When I said "formerly," I meant f-o-r-m-e-r-l-y.

A.   Oh, okay.

Q.   Apologize for that.  Now, do you know what a de facto debarment is?

A.   Do you want to explain that to me?

Q.   Yes, a de facto means, as it were -- forgive me for this.  I don't have the proper Latin.  But it's as if someone was debarred, although they were not -- I used the word

9

PINNAU

2   formally, f-o-r-m-e-r-l-y, because if you're

3   debarred, you're entitled to a due process

4   here; is that correct, if you're formally,

5   f-o-r-m-a-l-l-y debarred?

6        A.   To my knowledge.

7        Q.   So a de facto debarment is something

8   that occurs when, by the actions of the

9   government, although they haven't formally

10  debarred, they have, in fact, debarred by

11  their actions.  So I'll -- do you understand

12  that?

13       A.   Yes, I understand what you're

14  saying.

15       Q.   And when someone is de facto

16  debarred, a number of courts can find that

17  that is illegal or improper because the

18  government hasn't formally -- and I want to

19  spell the word, f-o-r-m-a-l-l-y, followed the

20  procedures that exist in the Federal

21  Acquisition Regulations.  So do you

22  understand the concept?

23       A.   Yes.

24       Q.   Do you know that on occasion many

25  courts have found that the actions of the

10

PINNAU

1

2  government where they have not followed the

3  procedures of providing these procedural and

4  due process hearings constitute what's called

5  a de facto debarment.  If the act of the

6  debarment of the actions of the government in

7  not giving a contract to the government is

8  based on a lack of integrity or honesty,

9  that's generally the criteria for which the

10  government would debar, among others, a

11  contractor; do you understand that?

12        MR. LEMAR:  I'm going to object to

13     the question.  This seems more like

14     argument that should go into brief.  If

15     the witness understands the question,

16     he can answer it.

17        MR. GDANSKI:  Just so you

18     understand, although counsel has

19     objected, you are required to give an

20     answer.

21        THE WITNESS:  I'm not an attorney.

22     But I will accept whatever description

23     that you're giving of that, of a de

24     facto debarment.

25     Q.    Now, in point of fact, just since

11

PINNAU

you're testifying on this, I want to call
your attention to a number of cases that have
found a de facto debarment where the actions
of the government denied a contract the
opportunity to obtain a contact, if it was
based on, at least the government's
perception, that the contract lacked the
requisite integrity of the responsibility
requirement.

    MR. LeMAR:  I'm going to object to
      any questions regarding court cases and
      anything to do with de facto debarment.

      Mr. Gdanski, if you want to
      continue this line of questioning,
      we're going to have to call Judge
      Romano and ask him for a ruling.

    MR. GDANSKI:  That's fine.  I just
    want the witness to understand that
    you're called not as a fact witness but
    to rebute (sic) -- before we move on,
    that -- maybe it won't be necessary.
    Let me go -- let me ask you some
    questions, okay.

      So let's defer that unless you want

12

1                          PINNAU

2          to do that, but I'll omit the

3          references to the court cases and move

4          on with another line of questioning if

5          that's okay.

6               MR. LeMAR:  That's fine.

7          Q.   Now, just to be clear, as a

8     contracting officer, the government and a

9     contract officer who lets a contract is

10    supposed to be satisfied that a contractor

11    has the requisite -- I'm going to put the

12    word "responsibility" in quotes because

13    that's a term of art to government

14    contracting; right, Mr. Pinnau?

15         A.   Yes.

16         Q.   And do you understand the term

17    "responsibility" to equate to meaning that a

18    contractor must have the necessary integrity

19    to perform on a contract?

20         A.   Responsibility to my knowledge

21    actually includes more than that.

22         Q.   Okay.  But at least within the

23    review of responsibility, they have to

24    determine that the contractor has the

25    required integrity; is that right?

13

1                         PINNAU

2          A.    I think that's part of it.

3                MR. LEMAR:  Okay.  Sam, I think

4          we're going a little bit beyond the

5          purpose of this deposition that Judge

6          Romano allowed.  Judge Romano allowed

7          rebuttal of the testimony of

8          Mr. Karawia; that ISI was not able to

9          bid on contracts.

10               If you're -- if you're now going to

11         be going into very basic and general

12         topics, we are going to be here for a

13         long time, and I think that goes beyond

14         the original purpose of the deposition

15         as Judge Romano allowed.

16         Q.    Mr. Pinnau, did Counsel furnish you

17    a list of documents or any documents today to

18    aid in the deposition?

19         A.    No.

20         Q.    Okay.  So I'm going to speak to you

21    a document and ask you if you're aware of

22    this.  Are you are aware that the contract

23    with ISI was cancelled; right?

24         A.    Hello?

25         Q.    Mr. Pinnau, you are aware that the

14

```
 1                     PINNAU
 2   contract that ISI had was cancelled; right?
 3        A.   I'm aware that the FSS schedule
 4   contract between GSA, Federal Supply Service
 5   and ISI was cancelled.
 6        Q.   Okay.  Well, let's look at -- hold
 7   on, or let me read to you a document and ask
 8   if you're aware of it.  Hold on while I find
 9   the citation here.  I have in front of me a
10   letter -- hold on.
11            MR. LeMAR:  Sam, do you have an
12        exhibit number?
13            MR. GDANSKI:  Yeah, I'm looking for
14        it to see if it's in your tab or my
15        tab.
16            Yes, it's respondent's documents,
17        Tab 26.
18            MR. LeMAR:  Okay.  I'm going to
19        need a minute.  Go ahead.
20        Q.   This is a letter in front of me,
21   Mr. Pinnau, from Sheila Brannan; do you know
22   who she is?
23        A.   Yes.
24        Q.   In which she -- I'm going to read
25   the last paragraph.
```

15

PINNAU

1
2    "Accordingly, pursuant to clause
3    522.238-73 Cancellation, contract number
4    GS-07F-0195M is cancelled effective October
5    19, 2002.  Modification A001 is enclosed
6    effecting this action."
7        And it is a modification to the contract
8    that says exactly that; it cancelled that
9    contract.  Do you remember that, Mr. Pinnau?
10            MR. LeMAR:  I'm objecting to the
11        question.  This is a document the
12        witness doesn't have in front of him.
13        It goes beyond the scope that Judge
14        Romano allowed for this deposition,
15        which was rebuttal of Mr. Karawia's
16        testimony that ISI has been already
17        been debarred.
18            If the witness doesn't have it in
19        front of him, he can't really testify
20        regarding the document and he's not the
21        author of the document.
22            MR. GDANSKI:  He can testify
23        regarding his knowledge of whether the
24        document existed and whether he's aware
25        of it.  He was the contracting officer.

16

1                    PINNAU

2          MR. LeMAR:  But it goes beyond the

3     scope of Judge Romano's allowance of

4     the deposition.

5          MR. GDANSKI:  Just a preparatory

6     question if you remember that the

7     contract was cancelled.

8          MR. LeMAR:  You can answer if you

9     can.

10         THE WITNESS:  Yes.

11         MR. GDANSKI:  Now, Mr. LeMar, let's

12    go to Respondent's 46.

13         MR. LeMAR:  I have it.

14    Q.   Okay.  Mr. Pinnau, do you remember

15 or do you know that after the contract was

16 cancelled some months later, ISI reapplied to

17 get back on the schedule?

18    A.   Excuse me.  I just sneezed.  Could

19 you repeat yourself?

20    Q.   Yes.  Do you remember that after the

21 cancellation of the contract that ISI

22 reapplied to get back on the schedule?

23    A.   I'm not aware of that because I'm

24 not with GSA Federal Supply Service.

25    Q.   It would have been in May of 2003?

17

```
 1                      PINNAU
 2        A.   I'm not aware of that.  I'm not with
 3   GSA Federal Supply Service.
 4        Q.   Were you with them in that time
 5   period?
 6        A.   No.  I never have been with GSA
 7   Federal Supply Service.
 8        Q.   While GSA contracted, you were the
 9   implementing contract for FSS, as it were --
10   at the same time, I mean?
11        A.   Can you rephrase that again?
12        Q.   Yeah.  You were a contracting
13   officer with FSS; right?
14        A.   No.
15        Q.   I'm sorry.  With what agency?
16        A.   With the Federal Protective Service.
17        Q.   And in 2003 was that still part of
18   GSA, or was it already put off into Homeland
19   Security?
20        A.   On March 1 of 2003, FPS broke off
21   from GSA and was observed by Department of
22   Homeland Security.
23        Q.   Were you aware in May that GSA
24   denied ISI the opportunity to get back on the
25   schedule, finding that they did not possess
```

18

1                          PINNAU

2    the requisite responsibility and they cited

3    the Federal Acquisition Regulations saying a

4    contractor must have a satisfactory

5    performance record and have a satisfactory

6    record of integrity and business ethics?

7              MR. LeMAR:  I'm objecting to the

8         question.  The witness was not employed

9         by GSA at the time.  However, if the

10        witness can answer, he can go ahead and

11        answer.

12        Q.   Were you aware of that?

13        A.   I don't actually remember.  I don't

14   know if I heard about that or not.

15        Q.   Okay.

16        A.   I wasn't any part of it.

17        Q.   You heard the language I just heard;

18   that the denial was specifically because GSA

19   had the perception or the position that ISI

20   lacked the integrity and responsibility?

21        A.   I don't know.

22        Q.   Okay.  Now, are you aware of the

23   fact that later in that year, ISI attempted

24   to get an FAA contract and was similarly

25   denied that opportunity because FAA also said

19

PINNAU

1
2  they could not make an affirmative
3  determination of ISI's business ethics to be
4  responsible; were you aware of that?
5          MR. LeMAR:  I'm objecting to the
6      question.  The witness was not employed
7      by the FAA at the time, and I don't see
8      how he has the foundation to be able to
9      answer the question.  However, if he
10     can answer it, he can go ahead.
11         THE WITNESS:  I'm not aware of that
12     at all.
13         MR. GDANSKI:  Okay.  I have no
14     further questions.  Thank you
15     Mr. Pinnau.
16         MR. LeMAR:  Thank you, Mr. Pinnau.
17     Have a good weekend.  Thank you.
18         (TIME NOTED:  3:01 P.M.)
19
20
21
22
23  - - - - - - - - - - - - - - - - - - - - - - - - - - - -
24                        ROGER PINNAU
25

20

```
 1                          PINNAU
 2     Subscribed and sworn
 3     to before me this
 4         day of        , 2005.
 5
 6
 7
 8
 9     ----------------------
10     NOTARY PUBLIC
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```