UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
Ousama Karawaia and                          )
International Protective Services Inc.        )
doing business as ISI                         )        ECF CASE
                                              )        08 Civ. 5471 (HB)
Plaintiffs,                                   )        (Judge Baer)
                                              )
                                              )
-against-                                     )
                                              )
                                              )
United States Department of Labor             )
                                              )
Defendant.                                    )
------------------------------------------------------------X


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**




DATED:        November 12, 2008
              Suffern, NY 10901


                                              By: Sam Z. Gdanski
                                              Sam Z. Gdanski
                                              (SG-0382)
                                              Scott H. Gdanski
                                              Gdanski and Gdanski LLP
                                              3 Rockwood Lane
                                              Suffern, New York 10901
                                              (845) 362-4800
                                              Attorneys for Plaintiffs

i

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS …………………………………………………… ii

TABLE OF AUTHORITIES………………………………….………………iii

PLAINTIFF'S MEMORANDUM OF LAW…….……………….................... 1

I.      QUESTIONS INVOLVED……………………….……………..  1

II.  STATEMENT OF THE CASE………………………………………...  1

      A. Procedural History, Introduction, Background and History………..  1

III.  LEGAL ARGUMENT………………………………………………….  6

      A. The Department of Labor's Review was Unduly Narrow and     6
          Restrictive in Failing to Examine All the Evidence Before It.

      B. Racial Bias and Improper Interference From GSA COTR      6
          With The Contract.

      C. Debarment Is An Unusually Harsh Remedy.        11

      D. The ALJ and ARB Improperly Failed To Find        12
          Unusual Circumstances Existed That Mitigated Debarment.

      E. The ARB and the ALJ failed to consider how GSA's late     15
          payments operated so as to negatively impact ISI's ability to
          timely pay its employees.

      F. The improper interference from the GSA COTR constituted    21
          "unusual circumstances".

      G. The ARB's and ALJ's failure to properly take into consideration  21
          the defacto debarment which was a "unusual circumstance" was
          arbitrary and capricious.

      H. The DoL improperly found Ousama Karawia personally responsible. 29

      I. There was no jurisdiction because the proper party was not served. 29

IV.  CONCLUSION          30

# TABLE OF STATUTES AND AUTHORITIES

## FEDERAL CASES

Pg.#

Canales v. Paulson,                                                              29
2006 U.S. Dist. LEXIS 61915, D.D.C., August 30, 2006.

Dantran, Inc. v. United States,                                                  12
171 F. 3d 58, Mar 29, 1999.

Dantran, Inc. v United States,                                                   12
246 F.3d 36 2001.

Dynamic Aviation v. US,                                                          29
898 F. Supp. 11 August 28, 1995.

Elaine's Cleaning Services v. United States Department of Labor                   16
1995 U.S. Dist. LEXIS 22170, Sept 29, 1995, aff'd 106 F.3d 726 (6th Cir. 1995).

Federal Foodservice, Inc. v. Donovan                                             11
658 F.2d 830 (1981)

Hudson v. United States                                                          23
522 U.S. 93 (1997)

Impresa Construzioni Geom. and Domenico Garufi v. United States,                 13
238 F.3d 1323 (Fed. Cir. 2001).

Libertatia Associates Inc v. United States                                       21
46 Fed Cl. 702 (2000).

Mastercraft Flooring, Inc. v. Donovan                                            14
589 F. Supp 258, (1984).

Novicki v. Cook,                                                                 29
292 U.S. App. D.C. 64; 946 F.2d 938 (October 15, 1991).

Odunmbaku v New York Blood Center                                                21
1996 U.S. Dist LEXIS 13182;72 Fair Empl. Prac.Cas.(BNA) 202; 69 Empl.Prac.
Dec(CCH) p 44300(1996)

Roemer v. Hoffman                                                                13
419 F.Supp. 130, 132 (D.D.C. 1976).

Silverman v. United States Department of Defense,                                11
817 F. Supp. 846 (1993).

United States v. Halper,                                              23
490 U.S. 435 (1989)

United States v Murray                                               23
02 CR 1214, 2005 U.S. Dist. LEXIS 9469 (2005)

Administrative Decisions and Law Journals

Apex International Management Services.,                              21
94-2 BCA  26, 842 Mar. 4, 1995

Kleen-Rite Corp.,                                                    16
 BSCA No. 92-09, slip op. at 3 (Oct. 13, 1992),

After The Fall:  Conventional Debarment and Double Jeopardy,         23
21 Pub. Contr. L.J. 355 (Spring 1992).

Regulations

41 U.S.C. at 354(a).                                                 12

29 C.S.R. at 4.188(b)                                                16

<u>PLAINTIFFS' BRIEF</u>

Plaintiffs International Protective Services Inc. d/b/a International Services Inc. ("ISI") and Ousama Karawia, President and CEO of ISI, submit this memorandum in support of their Motion for Summary Judgment to remove Ousama Karawia and ISI from the United States Department of Labor's ("DoL's") Excluded Party List ("EPL").

I.        <u>QUESTIONS INVOLVED</u>

Whether Plaintiffs' debarment should be vacated because unusual circumstances existed due to any of the following factors:

1.1 Extreme Late payments from GSA to ISI.

1.2 Withheld payment to ISI from GSA as directed by Department of Labor ("DoL").

1.3 Improper contractual interference from the GSA Contracting Officer's Technical Representative ("COTR").

1.4 Defacto debarment in excess of 3 years, precluding further debarment.

1.5 Ousama Karawia is not personally responsible for Violations of the Act,

1.6 International Protective Services Inc. was never properly named in the Complaint.

1.7 An additional period of debarment would be an unlawful penalty.

II.       <u>STATEMENT OF THE CASE</u>

        A.       <u>Procedural History, Introduction, Background and History</u>

Plaintiff is filing this Motion for Summary Judgment to overturn the United States Department of Labor's 3 year debarment effective on July 22, 2008. ISI filed a preliminary injunction to reverse the debarment at this Court, which was denied by Judge Swain on July 17, 2008.

ISI was awarded contract GS-07-0195M on February 28, 2002 for security guard services in federal buildings throughout NY, other than metropolitan NYC.  It was competitively bid and

was awarded after ISI had satisfied GSA of its capabilities and "responsibility", a term of art in government contracting. <u>AR III 376-377</u>. Yet by June 2002, within 4 months of award, the New York Daily News and Attorney General Spitzer were targeting ISI. <u>AR II 16-26</u>. The press in a yellow journalistic fervor focused on ISI, owned by <u>Ousama Karawia</u>, an <u>Arab American</u>, guarding the Statue of Liberty. Elliot Spitzer in conjunction with the media witch hunt, the same month, in June 2002 instituted various NY state legal proceedings all of which were successfully opposed with ISI's vindication by the NY Courts. <u>AR II 95-98</u>. Nevertheless, this barrage ultimately led to <u>GSA's</u> October 2002 cancelling of the contract. <u>AR II 88-89</u>. This is a case where contributory venal actions by federal agencies GSA and DoL, and individual federal personnel including personnel from the Federal Protective Services, GSA contracting and technical personnel, and US DoL personnel, following 9/11, combined so that the government's actions constituted bad faith. 2001 was not a good time for an Arab American named Ousama Karawia in New York, with an armed guard company guarding the Statue of Liberty and various other New York sites.

The government personnel not only failed to cooperate, failed to timely pay, but discriminated against the principal owner Ousama Karawia, an Egyptian born American citizen, referred to by the government's Chief Contracting Technical Representative as a Camel Jockey. <u>AR II 2-3</u>. Testimony also indicated that COTR Soden alternately called Mr. Karawia a Sand Nigger and a Camel Jockey in front of Mr. Karawia's employees. Pedrick testified, "…He has referred to Mr. Karawia as camel jockey and sand nigger a minimum of three times." <u>AR II 324.</u>

This fact was inexplicably never addressed in the ALJ or ARB decisions. Also Judge Swain failed to appreciate the derogatory nature and effect these characterizations had on operations and more importantly the nexus, i.e. that COTR Soden controlled ISI's work

2

performance, its performance ratings and invoice approval. Although a formal Complaint was filed by ISI to GSA at the time, GSA never followed through on a promised investigation. AR II 3-5.

GSA's pattern of extreme late payments to ISI during contract performance, routinely in excess of One Million Dollars, were not taken into account as a mitigating circumstance to demonstrate there was no culpable actions by ISI, and Ousama Karawia, and further that there was "unusual circumstances". The dollar amounts of the late payments and the amount of time GSA was late was not contested during the evidentiary proceedings before the ALJ.   The ALJ's decision pays scant attention, totally failing to even mention this factor as a reason for ISI's actions.  DoL's testimony during the ALJ proceeding stating that the late payments cannot be considered "unusual circumstances", defies logic, common sense and the law.

GSA paid ISI extremely late for excessive amounts for 5 of the months during the contract period.  AR II 214-217.

| | |
|---|---|
| May 31, 2002: | GSA was late in paying ISI $987,201.41 over 30 days and an additional $299,787.42 over 60 days for a total late payment of $1,286,988.83 |
| July 31, 2002: | GSA was late in paying ISI $120,367.19 over 30 days. |
| August 31, 2001: | GSA was late in paying ISI $99,230.55 over 30 days. |
| July 31, 2001: | GSA was late in paying ISI $71,263.70 over 30 days. |
| May 31, 2001: | GSA was late in paying ISI $35,482.18 over 30 days. |

In addition, after the contract was cancelled GSA continued its excessive late payments:

| | |
|---|---|
| November 2002: | GSA was late in paying ISI $1,063,940.69 over 30 days. |
| December of 2002: | GSA was late in paying ISI $106,841.74 over 30 days, and GSA was late in paying ISI $351,968.17 over 60 days. |
| May of 2003 | GSA was late in paying ISI $229,316.67 over 60 days. |
| June of 2003 | GSA was late in paying ISI over 90 days for $229,316.67. |
| AR II 214-217. | |

During the crunch contract period GSA owed ISI as much as 3.5 million dollars.
.

3

When DoL initiated the debarment proceedings, ISI had fully paid its employees all amounts. This, despite the overlapping time frame where GSA both failed to pay timely proffered invoices and moreover, GSA withheld additional amounts owed to ISI pursuant to the direction of DOL.  DOL failed to release the withheld amounts even as payments were made by ISI to its employees.  <u>AR III 537-540</u>. During this time of late payments from GSA, ISI did all it could in a "bet the farm" case approach to keep payroll afloat and did not as many other companies fold, go bankrupt and leave the employees in the lurch.

The contract under which ISI operated was "cancelled" in bad faith by the Government after a request to novate the contract was denied on the same day. <u>AR II 88-89</u>. Subsequent attempts to obtain other federal government contracts after the cancellation of the instant contract were also turned down by the government for the same reason, because of a perceived lack of "responsibility".  <u>AR II 132, 627-628</u>.

As the case law will demonstrate, these actions constituted a de facto debarment.  The de facto debarment is based on a pattern of denials to ISI alleging that ISI was "non-responsible" under integrity and business standards.  Thus in effect from the date of the cancellation of the instant contract in October 2002 and until the date of formal debarment, July 2008 ISI has been de facto debarred from federal government contracts.  The ALJ, as of the date of its decision felt that ISI was already debarred for a three year period, but he was precluded from crediting that amount of time, as did the ARB, notwithstanding case law to the contrary. This should be taken into account in determining whether **"**unusual circumstances exist to preclude a further formal debarment of ISI.**"**

Debarment was sought by DoL on May 28, 2003, alleging that ISI failed to timely pay the minimum hourly rates due employees under the federal security guard services contracts and

to timely pay minimum fringe benefits and alleged at times ISI owed in excess of $600,000.00. The DoL Complaint conceded that no further payments were due from ISI to its employees, since all wages and fringes were paid, but sought debarment nevertheless. AR I, P.6.  ISI first contested debarment before the ALJ. On July 6, 2005, the ALJ ordered the debarment of ISI and Ousama Karawia for a period of three years. AR IV 376-387.  The decision was appealed by ISI ARB and on December 21, 2007, the ARB affirmed. AR IV 734-735. ISI filed a Motion for Reconsideration on January 2, 2008 which was denied on May 30, 2008. AR IV 868-872.

During the period of defacto debarment ISI explained to the non federal municipalities whose contracts ISI continued to receive that the acts which formed the basis of the DoL's Complaint, were in fact attributable to Governmental actions, i.e. late payments by GSA to ISI; and DoL ordering GSA to withhold payment to ISI.  ISI explained that notwithstanding this, all payments were promptly made, and that corrective actions were taken. The ALJ in its decision stated as such "It was clear from Mr. Karawia's testimony that the violations of the Act were not purposeful and Respondents" ("ISI") "promptly rectified most issues after being made aware of them by DoL," thus conceding no culpability.   AR IV 384, P. 9 of ALJ Decision. The ALJ decision noted that there were no outstanding payments due to any employees.

Furthermore, the ALJ sympathized with ISI's defacto debarment plight but said it was restricted, "Despite Respondents' compelling argument to the contrary.  I must agree with the Board of Service Contract Appeals.  The legislature has clearly indicated its intent that the three-year period begin running upon publication of the above-described list and I am therefore without authority to give Respondents credit for the time during which they were unable to contract with the Federal Government based on the fact that they were removed from the Federal Supply Schedule ("FSS")." AR IV 384.

The ALJ In Footnote 9, Page 9, correctly noted:

"Respondents argue they have been de facto debarred. Following cancellation of the GSA contract, ISI was eliminated from the FSS and was therefore unable to do any work with the Federal Government.  (TR at 457).  The other federal contracts that ISI had concurrently with the GSA contract were all lost following the cancellation of the GSA contract and the removal of ISI from the FSS.  The Veteran's Administration in Alaska, for example, would not allow ISI to re-bid on that contract because ISI was no longer listed on the FSS.  ISI also lost its contract with the National Park Service.  (TR at 458).  According to Mr. Karawia, ISI was then unable to contract with the Federal Government between October 18, 2002 and the date of the hearing which represents a period of over two years. (TR at 500).  Presumably, ISI has not been able to contract with the Federal Government through the present, representing a period of almost three years".

III. <u>Legal Argument</u>

   A. <u>The Department of Labor's Review was Unduly Narrow and Restrictive in Failing to Examine All the Evidence Before It.</u>

      DOL took the position that regardless of whether GSA was late in paying invoices, no matter the sum or the amount of days late, there existed an absolute requirement that ISI pay its employees timely. AR III 281. DOL's perspective that there existed an "absolute requirement" to pay employees even if GSA did not pay ISI and even if ISI maxed out all loan opportunities, lending facilities, personal lending limitations, is in defiance of logic and law.

      While the primary cause of underpayments was attributable to GSA's late payments, there were minor occasions where ISI erred in the amount of payment. The alleged underpayments were for specific discrete items, such as increases due to Collective Bargaining Agreements and various fringe benefits.  The procedure in effect in 2002 required that an employee manually submit a listing of the hours worked for payment and ISI has long since switched to having its payroll handled by an independent contractor such as ADP which has modernized its employee payment system.

   B. <u>Racial Bias and Improper Interference From GSA COTR With The Contract</u>

The government's primary supervisor administering ISI's contract, the Federal Protective Service COTR who wielded life and death control over operations of the company, and had decision making authority approving payments, the timeliness of payments, referred to Ousama Karawia as a sand nigger and camel jockey.  Despite ISI's attempt to obtain supervisory corrective action by GSA and despite formal submission of complaints, neither GSA, the ALJ the ARB or Judge Swain  addressed this issue.

ISI was awarded the instant contract by GSA in early 2002 for a one year base with 4 one year options. AR III 376-378. In compliance with its 2001 consent decree, ISI and Ousama Karawia gave field presentations to employees. On September 11, 2001, a day that Mr. Karawia was to give a field presentation to employees in the Buffalo region, instead, arousing suspicion at his hotel because of his name, Ousama, the FBI was called and he was subject to an FBI interrogation in Buffalo.

After 9-11-2001 tabloid newspaper articles began to constantly play on the fact that the Statute of Liberty contract for security services was being handled by a security firm owned by an Arab American named Ousama.  ISI became a convenient pawn and target of numerous federal and state agencies.  ISI from the outset employed a team of reputable lawyers to handle each facet of the legal problems that ensued.

The New York Daily News in an article dated June 23, 2002, AR II 23-26,  broke a non-story tying in the terrorist attack on 9-11 and a security company run by Ousama Karawia, an Egyptian-born U.S. citizen guarding the Statue of Liberty. The article stated that International Services, Inc., employed ex-cons at the Statue of Liberty and stressed that the security company was run by Ousama Karawia, an Egyptian-born U.S. citizen.  The article quoted unnamed sources, saying the state is conducting a "very active comprehensive investigation" of the

security breach, including probes of International Services and state employees.  This article generated unimagined bad publicity despite Karawia's explanations that New York State erred by only checking New York State for conviction records instead of checking the rest of the United States.  Karawia explained that contractors who win successor contracts, generally under Federal Executive Orders which have the effect of binding regulations, are forced to incorporate the existing labor force, of which the two ex-cons fell within that category of employees inherited from prior contractors.  Yet the article only focused on the Ousama Arab twist and generated tremendous negative publicity.  AR II 16-23 are subsequent newspaper articles continuing the Daily News saga.  AR II 22 is a June 28, 2002 Business Review article titled "Spitzer sues Calif. Security guard company" and AR II 18-21 is June 30, 2002 Daily News article. A July 12, 2002 Daily News New York again discussed ISI stating a "Daily News investigation last month that found guards with criminal records had been working for months at the Statue of Liberty, even though security supposedly was tightened there after the September 11 terror attacks.  The state charged the California-based company that employed the ex-cons, International services, with using 208 unregistered guards and moved to revoke its license." AR II 16-17.

Days after the newspaper article dated July 12, 2002, ISI Supervisor Ray Postawa submitted a memo dated July 15, 2002 to Ousama Karawia saying that GSA COTR Robert Soden, in training sessions, was telling ISI employees that the State was coming after ISI for their license, ISI would have problems coming up with needed money, and warning that a new company may come in. AR II, 1.

On August 27, 2002, another ISI Supervisor, Ralph Purdy sent an e-mail recapping a Union Meeting in which Robert Soden stated to members of Local 618 that the "camel jockey" is

under investigation and will be going out of business soon. E-mail dated 8-27-2002 from Ralph Purdy to Ousama Karawia, <u>AR II, 2</u>.

After being apprised of the comments of Mr. Soden by Mr. Purdy, on August 28, 2002, ISI filed a Complaint to GSA concerning the comments by Robert Soden, the COTR, which was submitted to the Contracting Officer, Roger Pinnau, GSA Contracting, the CO based in Chicago while the on-site work performance and payment authorization was supervised by Mr. Soden. Mr. Pierce ISI VP informed the CO that disparaging, inflammatory, and racial slurs were made by a U.S. Government official in front of a group of security guards in a recent training session <u>AR II 3-4</u>. Mr. Pierce stated that these could prejudice ISI's ability to deliver services required to the government, could disrupt union relations and affect the workforce and noted that similar complaints had been logged in the past and requested an immediate and impartial investigation of the charges.  Mr. Pinnau promised an inquiry which never occurred. <u>AR II 6</u>.

After the publication of the newspaper articles, New York State attempted to revoke ISI's license with an ex parte proceeding and also sought monetary damages. ISI requested an extension of time in order to obtain  counsel in light of New York State's acceleration of the hearing date, the administrative judge refused and the hearing proceeded on August 30, 2002. ISI requested an adjournment.  That request was also denied and  special counsel appeared for the sole purpose of requesting an adjournment, such request also being denied.

The State presented its case and the administrative judge, by decision dated September 12, 2002, revoked the license effective six weeks hence, October 15, 2002. <u>AR II 69</u> and <u>AR II 75-79</u>.  ISI was able to obtain a Temporary Restraining Order which vacated the administrative law judge's decision. The NY Supreme Court decision was dated <u>Oct 1, 2002.</u> <u>AR II 92-94</u>. This decision vacated the revocation of ISI's NY license.  The parties entered into a stipulation to

adjourn on October 24, 2002, which carried forward the stay imposed by the Order to Show

Cause.  The New York State Temporary Restraining Order at <u>AR II 95-98</u>, which continued to

be carried forward by various stipulations between New York State and ISI counsel, found that

the Administrative Law Judge's decision prospectively revoking ISI's license was improper. ISI

had argued that New York's actions were  unconstitutional both under the United States

Constitution and the New York State Constitution. The Court's decision revoked the

administrative law decision "on the grounds that Petitioner's had demonstrated a likelihood that

they will succeed on the merits of their Article 78 petition and further on the ground that the

Petitioners would be irreparably and permanently harmed by the failure to grant such stay."  <u>AR</u>

<u>II 95-98</u>.

ISI was pleased with the result of the New York State Article 78 Order to Show Cause /

Temporary Restraining Order because GSA was delaying ruling on the Novation and getting this

Temporary Restraining Order kept ISI in business in New York State.  New York State's

business in total was 55 percent of ISI's overall business. ISI had a Department of Homeless

Shelters' contract of approximately $10,000,000.00; OTB, Off Track Betting contract; Statue of

Liberty contract and the GSA contract.

Karawia attempted to novate the contract in the event it was unsuccessful in maintaining

the contract and hired *Arnold & Porter*, and was assured by GSA CO Pinnau that if it followed

the procedures it would be a formality.  But, GSA through Sheila Brannan contracting officer

Fort Worth, Texas denied the request for a novation stating it was not in the government's

interest to novate this contract without providing any substantiations, justifications, reasons or

clarifications and concurrently also canceled the contract. <u>AR II 88-89</u>. GSA had never raised

any concerns about the adequacy of the paperwork or any failure to comply with any FAR

requirements. GSA's letter terminating of September 19, 2002 made the termination of the

contract effective October 19, 2002.   AR II 88-89.

   C.   Debarment Is An Unusually Harsh Remedy

    The preeminent Court of Appeals for the District of Columbia Circuit in Federal

Foodservice, Inc. v. Donovan 658 F.2d 830 (1981) in reversing a lower District Court finding

that there were no unusual circumstances noted there is no provision for any lesser sanction.  It is

the executioner's axe or nothing. Therefore, when the Court analyzed DOL's position, it

recognized that Judicial Review was appropriate.  The government had argued as herein that

there was a long history of violations.  The Court took issue with the vital finding that most

influenced the ALJ and the district court that "proper management would have precluded the

continuing occurrences of these widespread underpayments".

    The failure of the ARB and the ALJ in ISI to totally consider all the factors present to

determine whether "unusual circumstance" existed preclude debarment, and renders both

decisions fatally flawed. In Silverman v. United States Department of Defense, 817 F. Supp. 846

(1993), the Court held that notwithstanding "DLA's admitted refusal to consider these facts

renders its decision arbitrary, capricious and an abuse of discretion" and terminated the

debarment. The Court said that DLA did not consider Mr. Silverman's reasons for pleading

guilty to a misdemeanor charge of conversion of government property. It said DLA chose not to

undertake a de novo review of the facts established by the conviction. Therefore, DLA

essentially failed to consider the mitigating effects of Mr. Silverman's motivation in pleading

guilty. As discussed in our Complaint, the ruling of the ALJ and ARB should be overturned

because the ARB in affirming the ALJ decision below, failed to address the effects of the ALJ's

11

unlawfully narrow review of the record when it improperly debarred ISI because of a failure to fulfill obligations under a May 2001 consent decree.

The decision is tainted because the ALJ never examined or reviewed what role the racial bias, drastic interference with performance of the contract by Federal employees, extreme late payment and other factors played in ISI's inability to fully timely pay, thus demonstrating there was no culpable neglect.  In its decision in note 6, the ALJ specifically stated 'The record in this matter is voluminous.  Although I have carefully considered all of the evidence and testimony, based on my analysis of the issue presented, the pertinent facts relate to Respondents' <u>disregard of its obligations pursuant to the Consent Findings</u> (underlining added) and Order and <u>only evidence</u> relevant thereto will be discussed.'"  <u>AR IV 378 note 6</u>.  Furthermore, the ALJ never found that Respondent's actually violated the Act, believing mistakenly that ISI admitted this issue, "The only issue presented for my resolution is whether Respondents shall be debarred pursuant to §354(a) of the Act. Furthermore, in reaching an outcome I need not address whether Respondents actually violated the Act since they have admitted doing so, although they argue these violations were inadvertent. I thus need only determine whether Respondents have established that they are entitled to relief from debarment."  <u>AR IV 377</u>. Thus the ALJ compounds one error with another. The ALJ decision should have been overturned by the ARB on this issue.

D.   <u>The ALJ and ARB Improperly Failed To Find Unusual Circumstances Existed That Mitigated Debarment.</u>

In order to examine whether "unusual circumstances" exist we have to determine whether the violations were willful, deliberate or a result of culpable disregard. In our case, the violations were not willful, deliberate or a result of culpable disregard. We cited <u>Dantran, Inc. v. United States,</u> 171 F. 3d 58 Mar 29, 1999 ("Dantran I"), and <u>Dantran, Inc. v United State.</u> 246 F.3d 36

2001. ("Dantran II") supra for what willful, deliberate or culpable disregard is, and the facts herein do not support such a finding.

The amount of time that has elapsed since Oct 2002 is one of the mitigating factors to be considered in assessing whether, notwithstanding cause, a Respondent is presently responsible. See, <u>Roemer v. Hoffman</u>, 419 F.Supp. 130, 132 (D.D.C. 1976); see also, 48 C.F.R. § 9.406-1(a)(9). An agency decision must be based on the consideration of all the relevant factors and must be "reasoned and rational". <u>Silverman v. U.S. Department of Defense</u>, 817 F. Supp. 846, (1993). The ultimate inquiry in a debarment must be directed to the "present responsibility" of the contractor. The agency is required to carefully consider any favorable evidence of responsibility to ensure that all findings of responsibility are based on the presence of a realistic and articulable threat of harm to the government's proprietary interests. Government contractors must be afforded a meaningful opportunity to overcome a blemished past. Mitigating circumstances should be considered.

Case law has also recognized that the implementation of effective remedial measures is important. ISI has retained the law firm of Gdanski & Gdanski LLP for the last three years, in addition to the instant litigation for advice on all other government contract matters. This firm was lead counsel in <u>Impresa Construzioni Geom. and Domenico Garufi v. United States</u>, 238 F.3d 1323 (Fed. Cir. 2001). ISI has also hired as in-house CFO a CPA from a big five accounting firm as in-house CFO. Patrick Harper, c.v. attached. <u>Exhibit 24 attached to Complaint</u>.

Among the criteria set out at 48 CFR9.406-1 governing non Labor DoL Suspension and Debarment Issues which determine whether despite a cause for debarment existing, whether sufficient remedial measures of mitigating factors have been taken are the following: whether

the contractor cooperated fully with Government agencies during the investigation and any court or administrative action; whether the contractor has paid or has agreed to pay all criminal, civil and administrative liability for the improper activity, including any investigative or administrative costs incurred by the Government and has made or agreed to make full restitution; whether the contractor has taken appropriate disciplinary action against the individuals responsible for the activity which constitutes cause for debarment; whether the contractor has implemented or agreed to implement remedial measures, including any identified by the Government; whether the contractor has instituted or agreed to institute new or revised review and control procedures and ethics trainings program; whether the contractor has had adequate time to eliminate the circumstances within the contractor's organization that led to the cause for debarment.

ISI has fully paid all the costs to all the employees notwithstanding that many other firms as the record reveals folded and left the employees unpaid. AR IV 6, top two lines. ISI has through the corporation and personally by Mr. Ousama Karawia incurred substantial interest in bank loans and ensuring that all the employees were paid. AR III 537-543. ISI cooperated fully and fired the CFO Peggy Orlando who was responsible for ensuring payment procedures. AR III 556-558. ISI has implemented a Code of Conduct, Exhibit 25 attached to Complaint, with a briefing by counsel to senior management and supervisory personnel. Gdanski & Gdanski, LLP will further request appropriate GSA officials to make suggestions, additions and revisions in order to qualify to get back on the GSA contract schedule.

In Mastercraft Flooring, Inc. v. Donovan 589 F. Supp 258, (1984), once again, despite the Solicitor's brief that debarment is the norm, the Court stated "Debarment is a severe penalty which may have a serious economic impact upon a business and may well cause it to fail.  It

should, therefore, be used prudently and not, as in this case, with a reckless hand.  As had been well-stated, the "very absence of any sanction other than the catastrophic of three years debarment supports the legislative history that use of debarment against innocent and petty violations was not the norm".  Interestingly, the Court noted, as ISI did when it attempted to introduce evidence concerning mismanagement and violations of other governmental Fortune 500 contractors, which ALJ Judge Romano excluded "The media reports almost daily large-scale violations of procurement laws and regulations by mammoth corporations, but the government appears generally to bear such violations with equanimity, making ever larger purchases from offenders.  Yet here, where the Department of Labor's own Administrative Law Judge has in a careful opinion found these plaintiffs to have committed violations which were inadvertent, relatively insignificant and quickly rectified, the Administrator of the Wage and Hour division rubber stamped the brief of the Department's prosecuting arm without apparently either thought or deliberation."

E. The ARB and the ALJ failed to consider how GSA's late payments operated so as to negatively impact ISI's ability to timely pay its employees.

Had the ARB properly considered the extreme late payments from GSA as the cause for ISI's underpayments, under Elaine's Cleaning Services v. United States Department of Labor, 1995 U.S. Dist. LEXIS 22170, Sept 29, 1995, aff'd 106 F.3d 726 (6th Cir. 1995) it would have found unusual circumstances.  DoL's view of business operations ignore the negative effect of GSA's late payment, and in certain instances, total failure to pay timely. ISI's situation of late payments was not a matter of convenience but of necessity.

ISI has demonstrated that the instances of failure to pay were either as a result of legitimate legal differing interpretations i.e. the Boon issue, during a period ISI had totally been eviscerated, had exhausted all avenues of attempting to obtain funds elsewhere.  In ISI, any

failure to make appropriate payments was not willful but excusable and there was no issue of

falsification of payroll records. Kleen-Rite Corp., BSCA No. 92-09, slip op. at 3 (Oct. 13, 1992),

relied on by the ARB and ALJ was distinguished and in effect overturned by the Federal Court

Decision in Elaine's Cleaning Services v. United States Department of Labor, 1995 U.S. Dist.

LEXIS 22170, Sept 29, 1995, aff'd 106 F.3d 726 (6th Cir. 1995) where a court reversed the

decision of the Administrative Law Judge and Board, and determined that their decision that the

facts surrounding the violations did not constitute "unusual circumstances" under 41 U.S.C. §

3548 was an abuse of discretion and not in accordance with law.  The Court looked to the criteria

set out in 29 C.F.R. at 4.188, the legislative history, findings that the cleaning service promptly

paid back all back holiday pay and paid the fringe benefits, although not in a timely fashion

because of the government's failure to make required supplemental payments.  What is

important, is the court's finding that it was attributable to the government's failure to make

required supplemental payments.  Thus, this Court decision takes precedence over Kleen-Rite

Corporation, a DoL agency Board Decision.  Elaine's Cleaning Service was sustained on appeal

to the Sixth Circuit 106 F.3d 726.  There the Court discussed the affect of the government's

failure to pay Elaine's under the contract, Elaine's knew that it was obligated to pay its

employees an increase in fringe benefits financed by the Air Force.  As a result, Elaine's

disbursement of the increase depended completely upon the arrival of the Air Force payments.

The Air Force was late in sending the payments to Elaine's so Elaine was late in supplying the

benefits to its employees.  Although the DoL Board did not accept Elaine's explanation, the

Appellate Court sustained the District Court finding that the Debarment Order was not supported

by the record.  ISI's case is similar due to late payment, and non-payment by GSA and further

DoL directed withholding.

Ousama Karawia explained GSA's late payments at the hearing that as of May, 2002, GSA owed a peak of $3.5 million and took issue with DoL's Ms. Quinn's testimony that she would not consider as mitigating or unusual circumstance to be excluded from debarment whether or not GSA pays or doesn't pay on time. AR III 281. Ms. Quinn, Assistant District Director, DoL, testified:

> Q.  Ms. Quinn, if the Government, GSA was the contracting agency under which ISI was performing this contract, was delinquent by over 60 days in paying the contractor for amounts roaming from 1.2 to 2 million dollars, would that have adversely affected the contractor's ability then pay its employees on time?
> A.  I don't know. I don't know what their financial status is.
> Q.  Could it have? Do you think it reasonable that that would negatively affect ISI's ability to pay its employees timely?
> A.  It might, but they have an obligation to pay their employees regardless of what – if they're paid.
> Q.  Regardless of whether they're paid by the government.
> A.  That's correct.

AR III 281, Tr. P.279 Line 9–25.

Defendant would have the Court forget that GSA paid ISI extremely late for excessive amounts for 5 of the months during the contract period. AR II 214-217 is an Aging report of a compilation of amounts owed from GSA to ISI from 1/31/2001 until 6/30/2003. As of 6/30/2003 seven months after completion of the contract GSA still owed the amount of $229,316.67 solely for services rendered.  No further work was performed or billed after October 18, 2002 yet by 11/30/2002 the sum of $1,063,940.69 was over 30 days delinquent to ISI.  This is during the crunch period when DOL could not stop writing letters demanding payment while at the same time directing withholding of payments with DOL asserting that only approximately less than $150,000.00 was "withheld" pursuant to its direction.  Yet the numbers actually indicate that in excess of a million dollars was not paid and was late and in excess of 30 days as of November 30, 2002.  On December 31, 2002, $351,968.17 was aged over 60 days and this is the time period

at which the purely "directed" withheld amounts were being frozen and not released despite ongoing payment by ISI to its employees with DOL not authorizing release until 1/31/2003 and even at that point there was close to $400,000.00 that was over 30 days owed.  As of December 31, 2002 with no additional billing occurring after October 18 GSA still owed in excess of $1 million.  The ARB and the ALJ failed to consider how DoL's direction to withhold funds compounded GSA's already late payments which constitutes "unusual circumstances" precluding debarment.

Mr. Weeks of the Department of Labor conceded that there had been times when payments had not been made by GSA up to 90 days late. AR III 675-676.

> Q. You said that one question was, although you demanded a withholding of $500,000.00, it's your understanding that less was actually withheld.
> A. That's correct.
> Q. You've been in the courtroom the entire time we've had proceedings, right?
> A. Yes, I have.
> Q. And you've heard testimony that GSA officials couldn't tell you how much they owed ISI at any given time during the latter part of 2002.
> A. That's correct.
> Q. And you know that there were periods of time in which payments had not been made for 30 to 60 to 90 days.
> A. That's correct.
> Q. So, if payment had not been made, are you drawing a distinction and saying that's not a withholding?
> A. Yes.
> Q. Okay.

AR III 675-676.

While the ARB decision states with respect to the "withheld" funds issue that GSA did not withhold funds until after November 14, 2002, it fails to take into recognition as an "unusual circumstance" what occurred. The significance is that the "late payment" issue was compounded by the "withheld funds" issue. December 2002, the same time period that GSA was late in excess of $1 million, was also the same time period that DoL directed further withholdings.  DoL, although it promised contracting activities that it would notify them as payments were made by

ISI so that funds could be released by GSA and no longer withheld, did not do so until January 31, 2003. However, it took several months thereafter to even begin to get partial payment. Late payment by contracting activities have been found to constitute unusual circumstances.

Since Judge Swain mistakenly failed to see the applicability of Elaine's Cleaning, we briefly address her errors.

Judge Swain incorrectly starts with the premise that since culpable conduct existed in ISI, therefore "unusual circumstances" couldn't operate to obviate debarment.  Briefly Judge Swain premised the finding of culpable conduct on the "sheer size of the underpayments and number of employees affected" page 6. She felt the culpable conduct was a combination of the magnitude of the underpayments and the disregard of ISI's obligation to implement mechanism's to prevent "future" violations following the Consent Order in 2001. However nothing ISI could do would preclude any such "future" violations nor limit the "sheer size" of the overpayments if GSA was in arrears to ISI in millions of dollars of overdue invoices. ISI could swear it would pay but that is dependant on GSA paying.  The decision then again in error states "Nor do Plaintiff's point to any controlling authority requiring Defendant to withhold debarment when violations are allegedly attributable to late payments by the government entity".

In point of fact Elaine's Cleaning holds exactly that:

"Elaine's second fringe benefit violation resulted from a lack of funds. Elaine's knew it was obligated to pay its employees an increase in fringe benefits financed by the Air Force, but the unexpected increase caught Elaine's short of assets. As a result, Elaine's disbursement of the increase depended completely upon the arrival of the Air Force payments. The Air Force was late in sending the payments to Elaine's so Elaine's was late in supplying the benefits to its employees. The Board did not accept Elaine's explanation."

The district court and the sixth circuit did.

Judge Swain then accepts the factually unsupported proposition that…"the ARB's decision makes it clear that the ARB considered and rejected Plaintiff's cash flow argument."

19

That alleged finding by the ARB is incorrect as the ARB failed to recognize the unrebutted testimony of the late payments by GSA during the contract concerning GSA's constant and egregious late payments but only summarily notes "GSA admitted that it was in arrears on payments due to ISI." AR IV 742. However, these particular exhibits cited at footnote 43 only dealt with post contract invoices that were late. The ARB decision totally ignored the evidence of GSA's late payment during the contract.  The ARB decision then ignored the "withheld" payments and moved on to reject legal entitlement to using the late payment argument citing Kleen-Rite Corp., BSCA No. 92-09, slip op. at 3 (Oct. 13, 1992), and ignoring the Federal Court Decision in Elaine's Cleaning Services v. United States Department of Labor, 1995 U.S. Dist. LEXIS 22170, Sept 29, 1995, aff'd 106 F.3d 726 (6th Cir. 1995) which effectively overruled Kleen-Rite. Further, GSA's late payments and withheld funds after the contract should also be considered because ISI still owed money to close out the contract.

The only alleged "culpable" conduct found by the ALJ was a minor instance where he felt ISI's prior labor counsel was not consulted in connection with the Boon issue.  The AR shows that throughout the time period from the Consent Order until initiation of the Complaint against ISI in 2003 labor counsel was consulted and even on the Boon issue it rapidly refunded within ten days when directed to do so by labor counsel after DOL pointed out the issue.

Judge Swain improperly distinguishes Elaine's relying on a distinction not significant. Because  the ALJ in Elaine's didn't properly elucidate what conduct was culpable, the court could find that the government's failure i.e. the Air Force's failure to pay Elaine could operate as a mitigating circumstance i.e. unusual circumstance. Judge Swain was also incorrect in her interpretation of the application of Elaine's Cleaning.  There, the 6th Circuit recognized that the district court was correct when it noted it was improper for the Department of Labor to fail to

extend the exception, i.e., apply unusual circumstances to "appellee's **innocently culpable** conduct". So even "**culpable**" conduct could be considered "**innocent**".

We have to stress that the ALJ in ISI found that any underpayments were completely and relatively promptly paid by ISI. The alleged sheer magnitude that seems to capture DOL's imagination and Judge Swain is solely due to GSA. The record has not been rebutted that GSA was late for significant sums at times in excess of millions of dollars.   The underpayments had nothing to do with any culpable conduct and the court should factor that in. Judge Swain felt that Elaine's did not apply because the ALJ's decision did not define culpable conduct.  Swain ignored the very same fact pattern that exists in Elaine which is almost identical to that present in ISI.   Judge Swain's circular reasoning and DOLs in our case is similar because the preponderance of the underpayments were directly attributable to GSA's failure to timely pay ISI and therefore it was not the result of culpable conduct. To say that ISI's failure, because of the number of underpayments, makes its conduct culpable and therefore bereft of the opportunity to proffer "unusual circumstances" without recognizing that the number of underpayments is directly tied into the lack of timely payment by GSA, cuts to the core of the case.

In order for the Court to grant ISI relief  it should take cognizance of the real world. Looking at the recent Wall Street meltdown and its rollover effects on the world economy, demonstrates that acts do not occur in isolation. It is simply ludicrous to state that GSA's late payments do not operate as "unusual circumstances" which proximately caused the sheer magnitude of the underpayments.

    F.   The improper interference from the GSA COTR constituted "unusual circumstances".

The record shows that the most immediate supervisor who supervised day to day operations and controlled payment to ISI, referred to Ousama Karawia as a Camel Jockey and

Sand Nigger and breached the government's obligation not to interfere with the performance of the contract.  Libertatia Associates Inc v. United States 46 Fed Cl. 702 (2000). In Libertatia, supra, the COTR's actions which were very similar to that of Robert Soden's were condemned by the Court as were those in  Apex International Management Services., 94-2 BCA  26, 842 Mar. 4, 1995. See also Odunmbaku v New York Blood Center decided by this court for the effect racial slurs can have. (citation below).

G.   The ARB's and ALJ's failure to properly take into consideration the defacto debarment which was a "unusual circumstance" was arbitrary and capricious.

In actuality, ISI has been defacto debarred from federal government contracts since Oct. 19, 2002.  AR II 88-89.  ISI was found non-responsible, on May 1, 2003 by General Services Administration, and again on September 24, 2003 by the US Department of Transportation, Federal Aviation Administration. See AR II 132, 627-628. During this period of federal defacto debarment, ISI vigorously contested DoL's proposed debarment utilizing the mandatory administrative appeals process. During this process, ISI sought and received many contracts from Municipalities and other non federal governmental agencies as well as major commercial entities despite having to answer diverse certification requirements whether the contractor had been either proposed for debarment, found non-responsible, etc. ISI explained to the satisfaction of customers, such as the County of San Diego, California, and other counties that while ISI had been proposed for debarment, no such formal act had yet occurred. Since the formal debarment on July 22, 2008, ISI has lost City of Los Angeles, City of San Diego, and County of San Diego contracts. ISI's attempts to obtain federal contracts until it was formally debarred on 22 July 2008 were of naught because of the de facto debarment. The ALJ In Footnote 9, Page 9, conceded this occurred which should be considered "unusual circumstances" to obviate an additional three year debarment.

Judge Swain similarly failed to appreciate the real world significance of the cumulative, punitive nature of a further three year additional "formal" debarment, following the defacto debarment that occurred beginning Oct 2002. While ISI survived during the de facto period, the formal placement on the EPL list has begun the destruction of the company. We want the court to understand the distinction of the punitive nature of this prospective three year further debarment.  Our "double jeopardy" argument is an extension of when the doctrine of "unusual circumstance's should apply. It is not a 3 year debarment but rather an ongoing debarment from the day the contract was canceled in Oct. 2002. ISI has been de facto debarred as the ALJ found since Oct 2002.

Thus Judge Swain's analysis is in error when stating the issue of a de facto debarment does not apply because the cases cited by ISI merely require due process and that "on this record" ISI will not be able to succeed in setting aside the DOL formal debarment. Swain ignores the cumulative effect of the time period of the entire debarment.  The court did not focus on the length of time of ISI's debarment and prior de facto debarment, which is what one of the "Law Review" articles pointed out might be a distinguishing factor so that Hudson v. United States 522 U.S. 93 (1997), does not exclude consideration of a double jeopardy argument. The imposition of a further prospective debarment constitutes double jeopardy. Therefore United States v. Halper, 490 U.S. 435 (1989) where the Supreme Court held that a civil sanction can constitute punishment for purposes of the Double Jeopardy clause "when the sanction as applied in the individual case serves the goals of punishment" – – retribution and deterrence may still apply. While that Decision involved a civil penalty under the Civil False Claims Act, the same principles in Halper apply to a debarment or suspension action.  See generally, After The Fall: Conventional Debarment and Double Jeopardy, 21 Pub. Contr. L.J. 355 (Spring 1992).

If the court does not accept the premise of double jeopardy because this is a civil case, nevertheless the court should not be blinded from considering the analogy.  This court's own decision in <u>United States v Murray</u> 02 CR 1214, 2005 U.S. Dist. LEXIS 9469 (2005) that a resentencing hearing should consider events occurring after the initial sentencing, should allow for the mitigation of the harsh sentence of debarment for in effect a 10 year period, Oct 2002, until June 16, 2011 the date ISI & Karawia's name come off the EPL list.

There has developed two distinct bodies of case law on the issue of suspension & debarment and the mitigating factors to be considered. The more advanced modern one is that involving non DOL debarment. Cases focus on the "current" state of the entity, has there been cooperation, has there been mitigating factors, what were the operative reasons giving rise to any cause for debarment, have there been corrective measures and the guiding principle for all such considerations does the punishment fit the crime. This last concept is not in the literal sense since we are discussing civil issues but the courts look at the totality of the circumstances. Again to draw an analogy DOL debarment is sought by DOL under guidelines similar to the previous mandatory criminal sentence guidelines as opposed to the current state of the law which allows judges greater latitude. One is DOL and the other is everything but DOL.  The non-DOL body of law has advanced to the point where in recognizing the severity that a debarment has, loss of employment, et cetera, in this particular case acutely affecting a significant number of minorities, et cetera, that  mitigating circumstances and steps taken thereafter since Oct 22, 202 should be taken into consideration. Even a significant amount of DOL cases recognize these mitigating circumstances. In <u>Dantran II</u> "But by the time of the ALJ's decision the Secretary's enforcement actions already had imposed a severe punishment by triggering the loss of their business. It is hard to imagine a more compelling case for leniency"…the insistence on forging ahead was

exacerbated in this case, moreover, by the Secretary's apparent refusal to consider appellant's repeated offers to cut short the litigation with a settlement that would have conceded the legal issues in exchange for the relief from debarment to which they ultimately were found entitled. Dantran II followed Dantran I where just as in ISI, whenever it received late payments from GSA immediately paid its underpayments to its employees. Yet as in Dantran II DOL requested GSA to freeze payments, notwithstanding GSA was already late in paying ISI. This ultimately led to the "cancellation" of the contract, cancellation of its FSS schedule and the resulting loss of all federal contracts it had and the ensuing de facto debarment, followed by the formal debarment." The timing could not have been worse. Cf. Benjamin Franklin, Poor Richard's Almanac(explaining how for want of a nail, the kingdom was lost)." Even within DoL cases, Mastercraft, Federal Food etc have recognized the severity of debarment and thus followed a liberal application of the doctrine of "unusual circumstances".

ISI has since retaining Gdanski & Gdanski similarly asked for settlement, i.e. a finding of violation but credit for the de facto period the ALJ found ISI to have been debarred. DOL represented by the Solicitor throughout the agency proceedings declined. The US attorney's office explored this option but was bound by DOL who refused. Other offers of settlement have gone unanswered.

A contractor that violates the SCA is debarred for a period of three years unless the contractor can demonstrate "unusual circumstances." 41 U.S.C. at 354(a). The term is not defined in the SCA. Therefore the regulations that exist at 29 C.S.R. at 4.188(b) should be looked at for guidance but not as exclusive approaches.

The COTR, Contracting Officer Technical Representative from GSA Ralph Soden, who supervised ISI's performance under the contract and was in charge of approving ISI's invoices

repeatedly referred to Mr. Karawia, as a sand nigger and camel jockey. At oral argument when Plaintiff's counsel noted this, Judge Swain dismissed any significance to this despite counsel pointing out the integral role played by Mr. Soden and despite ISI requesting a review of the propriety of his remarks, with no response from GSA. This goes to the key argument that the late payments by ISI were directly attributable to GSA, and thus should authenticate a finding of unusual circumstances. This court in Odunmbaku v New York Blood Center 1996 U.S. Dist LEXIS 13182;72 Fair Empl. Prac.Cas.(BNA) 202; 69 Empl.Prac. Dec(CCH) p 44300(1996)in the context of a Title VII and ADEA case recognized  the harmful significance of racial slurs .

Here in effect we have a debarment from November 2002 with an additional three years going prospectively from July 22, 2008 until 2011 so there would be a period of debarment of approximately ten years but unfortunately the debarment will end sooner by the demise and insolvency of the corporation.

Many of DoL's complaints relating to underpayment by ISI are similar to Dantran I. An underlying issue was how often the employees were paid. Since Dantran was paid on a monthly basis the contractor had argued that since the post office paid him on a monthly basis, he paid his employees on a monthly basis and if and when the post office switched to a biweekly basis then the contractor would switch to a biweekly basis. ISI has demonstrated that it was dependent specifically upon payment from GSA to make the relevant payments to its own employees yet DOL took the position that ISI's obligations operated totally independent.  The court in Dantran rejected the ARB's finding that Dantran's explanation of when they would pay was dependent on when they were paid by the post office constituted a culpable disregard of the law and therefore aggravating circumstances.  The court in Dantran II in finding entitlement to attorney's fees also recognized that mere payment by a contractor after deficiencies occurred would not necessarily

26

excuse relief from debarment, but the facts there went far beyond that situation since the

Secretary's enforcement actions had previously imposed severe punishment by triggering the

loss of their business.  Therefore, the court said it would be hard to imagine a more compelling

case for leniency.  Our situation of de facto debarment is quite similar.  The initial ALJ also

found that the revenue freeze by the postal service led to the subsequent collapse of the business

and loss of potential partners.  Here in <u>Dantran</u> also the court condemned the Secretary's

insistence on forging ahead despite appellants repeated offers to cut short the litigation with a

settlement that would have conceded the legal issues in exchange for the relief from debarment

to which they ultimately were found entitled.   ISI had specifically stated to DoL Counsel and to

the ALJ as well as the ARB that it should in effect be punished by the time served, i.e. the period

for which it has been ineligible as a result of a de facto debarment. ISI argued that it should not

be further punished because of the rollover effect it will have not only against obtaining federal

contracts but on its good name and integrity with bona fide reputable Fortune 500 customers, and

now San Diego, Sacramento, and other municipalities in the near future.

In <u>Dantran I</u> the Court of Appeals, which reversed the district court, noted that it was

hesitant to find every violation to be considered culpable because that would for all practical

purposes turn the debarment provision into a strict liability regime.  "The very invocation of a

culpability standard, however, is a sure sign that strict liability is not what he Secretary of Labor

intended.  A strict liability regime drains § 29 C.F.R. § 4.188(d)(2) of meaning; after all, a

violation of an unambiguous regulation can be minor, inadvertent, wholly disproportionate to a

proposed debarment, or all of the above.  Thus simply stating that an employer violated an

unambiguous regulation, without more cannot justify debarment."  The court held that while the

regulations speak in terms of "deliberate" or "willful" conduct, "culpable neglect" and "culpable

disregard" since these terms are not defined except with an example of "falsification of records" culpability must require more than simple negligence or a mere failure to ascertain whether one's practices coincide with the law's demands.

      Similar to DoL's direction to withhold additional funds by GSA, while at the same time demanding ISI make those payments to the employees, despite GSA already being late and delinquent in making its payments, the court in <u>Dantran</u>, in a similar circumstance where, upon recommendation by the DOL investigator, the Secretary froze an amount owed to Dantran by the Postal Service to satisfy the investigator's estimate of what <u>Dantran</u> owed to its employees which the Secretary obliged, the court said "The timing could not have been worse."  Without those withheld funds, Dantran could not cover insurance premiums on its fleet of trucks and was unable to keep the uninsured trucks in service and suspended operations.  This in turn precipitated a further withholding of funds, to which Dantran could not then meet its payroll. The Secretary subsequently then held against Dantran its failure to pay its employees at the precise time that the Secretary froze Dantran's revenue stream.  The appellate court took all of this into consideration when it determined that relief from debarment was warranted.  It analyzed the criteria and first determined whether there existed aggravating factors and/or the presence of mitigating factors.  Again, the court found that culpable conduct must be more than simple negligence. In our situation, the ALJ and the ARB failed to take into account all these mitigating similar factors.

      Clearly "unusual circumstances" existed herein because of the absence of aggravating factors and the presence of mitigating factors. In order to establish "unusual circumstances" we do not have to prove that the government acted in bad faith. Unfortunately though, here the government acted in bad faith.

The ARB in UISSI also took into consideration that a debarment might even result in the demise of UIISI citing the Mastercraft Flooring case finding this consideration relevant "debarment is a severe penalty which may have a serious economic impact upon a business and may well cause it to fail.  It should be therefore be used prudently and not . . . with the reckless hand Mastercraft Flooring, Inc. v. Donovan, 589 F. Supp. 258, 263 (D.D.C. 1984).  In enacting the SCA, Congress intended that violators be spared the "catastrophic" debarment sanction, Federal Food Service v. Donovan, 658 F.2d at 834.

A further formal three year would be punitive and fail to recognize as Dantran did its harsh effect. In Dantran the company actually went out of business. See also Dynamic Aviation v. US, 898 F. Supp. 11 August 28, 1995.

H.   The DoL improperly found Ousama Karawia personally responsible.

Where there is a 6,000 employee company and the company has directed several chief officials responsible for ensuring compliance, it is not reasonable to hold the CEO personally responsible,  Novicki v. Cook, 292 U.S. App. D.C. 64; 946 F.2d 938 (October 15, 1991). Canales v. Paulson,  2006 U.S. Dist. LEXIS 61915, D.D.C., August 30, 2006.

I.   There was no jurisdiction because the proper party was not served.

The legal entity as it exists, International Protective Services Inc. has never been served, and thus there exists no jurisdiction.  The Complaint by DoL only named International Services Inc. which is a d/b/a.

As ISI is precluded from attaining any municipal contracts in the near term, ISI will rapidly lose its workforce and its viability. Karawia Supp Dec. dated November 10, 2008 and attached as Exhibit 1 to this Memorandum of Law.  ISI was the incumbent contractor for the San Diego Department of General Services RFP 2908, with a projected start date of October 1, 2008

for a total contract value of $8,043,225. ISI was denied this contract because of placement on the EPL List. ISI was the incumbent contractor for the San Diego Health and Human Services Agency RFP 2719, for a total contract value of $19,798,460 and was denied this contract because of placement on the EPL List. The loss of these two incumbent contracts represented a loss of gross revenue of approximately $5.5 Million dollars on an annual basis. Last year ISI did approximately $38 Million dollars in gross revenues and the loss of these two contracts represented approximately a 14% decrease in gross revenues and a lost profit factor of approximately $550,000.00.

In addition, ISI bid on new contracts for which it was rejected because of its placement on the EPL List including County of San Diego Various Sites RFP 9331-08-B with a total dollar value of $5,361,230 and City of Los Angeles RFP 2006 with a total dollar value of $28,171,660. The loss of these two contracts on an annualized basis was approximately $6.5 Million Dollars and thus the opportunity of profits of $650,000.00 per annum. As a result of these actions ISI has had to dismiss 29 employees, 10 Hispanic, 7 African American, 5 Asian and 7 Caucasian. The continuing loss of both existing incumbent and new contracts will force the layoff of ISI's employees, a significant number of whom are minorities, and the ultimate demise of ISI.

III. <u>CONCLUSION</u>

For all the reasons set forth, Plaintiff's request that the Court grant its motion in its entirety.

DATED Nov 12, 2008                    By: <u>Sam Z. Gdanski</u>
                                      S/Sam Z. Gdanski (SG-0382)
                                      Scott H. Gdanski
                                      Gdanski and Gdanski LLP
                                      3 Rockwood Lane
                                      Suffern, New York 10901
                                      (845) 362-4800
                                      Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
Ousama Karawia and                         )
International Protective Services Inc.      )
doing business as ISI                       )        ECF CASE
                                            )        08 Civ. 5471 (HB)
Plaintiffs,                                 )        (Judge Baer)
                                            )
                                            )
-against-                                   )
                                            )
                                            )
United States Department of Labor           )
                                            )
Defendant.                                  )
-------------------------------------------------------------X

<u>CERTIFICATE OF SERVICE</u>

       I, Sam Z. Gdanski, an attorney with the firm Gdanski & Gdanski, LLP, certify that on November 12, 2008, I caused a copy of the following documents to be sent by electronic filing:

1. Plaintiffs' Motion for Summary Judgment
2. Plaintiffs' Memorandum of Law in Support of its Motion for Summary Judgment
3. Plaintiffs' Statement of Undisputed Facts in Support of its Motion for Summary Judgment
4. Declaration of Ousama Karawia Pl. Ex. 1.

To: Li.Yu@usdoj.gov

Li Yu, Assistant U.S. Attorney, Civil Division, Southern District of New York

86 Chambers Street, Third Floor

New York, New York  10007

(212) 637 2734 (telephone)

(212) 637-2686 (fax)


Dated: Suffern, New York
        November 12, 2008

                                      <u>/s/ Sam Z. Gdanski</u>
                                        Sam Z. Gdanski
                                        Gdanski & Gdanski, LLP.