UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
OUSAMA KARAWIA AND             :
INTERNATIONAL SERVICES, INC.,    :
                                :
            Plaintiffs,     :    08CV5471 (HB)
                            :    <u>OPINION & ORDER</u>
   -against-             :
                            :
UNITED STATES DEPARTMENT OF LABOR :
                            :
           Defendant.    :
-------------------------------------------------------------x
Hon. HAROLD BAER, JR., United States District Judge:[1]

       This case concerns the McNamara-O'Hara Service Contract Act, 41 U.S.C. § 351 (the "SCA" or the "Act"), which requires federal service contractors to pay their employees certain minimum wages and fringe benefits.  Plaintiffs Ousama Karawia and International Services, Inc. (collectively, "ISI") seek relief from an administrative order that debarred them from federal contracting for three years for violations of the Act.  Before the Court are cross-motions for summary judgment filed by ISI and defendant United States Department of Labor ("DOL").  For the following reasons ISI's motion is DENIED and the DOL's motion is GRANTED.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

       ISI is a California-based security company with more than 6,000 employees.  (Tr. of Admin. Hearing, ("Hearing Tr.") 627:22-25.)  Ousama Karawia is the owner of Karawia Industries, the holding company for International Protective Services, which does business as ISI.  (*Id*. at 628:7-23; 631:23-25.) Mr. Karawia is also the President and CEO of both Karawia Industries and International Protective Services.  (*Id.*)  Mr. Karawia's duties include negotiating government contracts, third-party contracts and collective bargaining agreements, signing payroll checks, hiring and firing employees, supervising executives, and assigning job responsibilities.  (*See* Decision of DOL Administrative Review Board, dated December 21, 2007 ("ARB Decision"), at ARIV00753 (citing Hearing Tr.))

       ISI had several contracts to provide security services to federal agencies, including a contract with the United States General Services Administration ("GSA") for security services at federal facilities in upstate New York (the "GSA Contract").  On March 8, 1999 the DOL filed a

---

[1] Brittany Nilson, a Spring 2009 intern in my Chambers and a second-year law student at Brooklyn Law School, provided substantial assistance in the research and drafting of this opinion

complaint against ISI and certain of its executives, including Karawia, alleging that investigations had revealed numerous and repeated breaches of ISI's federal service contracts in violation of the SCA.  (Complaint, dated March 8, 1999 (the "Initial Complaint"), ARI00001–07.)  The DOL alleged that ISI had underpaid its employees by at least $134,756.00, although by the date the Initial Complaint was filed the full amount had been repaid.  (*Id*.)  The Initial Complaint sought to debar ISI from federal contracting for a period of three years, the statutorily prescribed penalty for violations of the SCA absent "unusual circumstances."  (*Id.*)

In May 2001, ISI and the DOL resolved the allegations of the Initial Complaint by signing a Consent Finding and Order that required ISI to establish a compliance program that included employing a full-time ombudsman to handle all payroll complaints, retaining legal counsel with experience in wage and hour matters, and providing informational programs for employees.  (Consent Findings and Order, dated May 1, 2001 ("Consent Order") ARI00010-21.) In February 2002, the GSA renewed ISI's contract for security services in upstate New York for a one-year period with optional extensions.  (Contract Renewal Letter, ARI00254.)

Mr. Karawia is of Egyptian descent and ISI contends that both heightened security concerns and racial tensions in New York following the terrorist attacks of September 11, 2001 are relevant to this lawsuit.  In June 2002, the State of New York filed a complaint against ISI to revoke its state license to employ security guards, alleging, *inter alia*, that ISI had employed unregistered security guards and failed to file employee fingerprints. (ARII00009.)  At the same time, several articles in New York newspapers alleged that ISI had employed ex-convicts to guard the Statue of Liberty.  (ARII00017-26.)  ISI contends that the publicity prompted the State to file suit and amounted to "yellow journalistic fervor" focused on the fact that an Arab-American had been awarded the contract to guard the Statue of Liberty.  (Pls' Mem. at 2, 9.)

ISI ultimately resolved the New York State licensing issues.[2]  (*See* Stipulation of Settlement, dated Feb. 20, 2003, ARII00121-130.)  However, during the summer of 2002 when the status of ISI's New York license was uncertain, the company sought to novate the GSA

---

[2] ISI's license was initially revoked in an *ex parte* state administrative proceeding, but ISI obtained a temporary restraining order against the revocation by way of an Article 78 proceeding in the New York Supreme Court. Pursuant to its settlement agreement with the State,  ISI agreed to pay more that $1 million in restitution, to be offset against amounts the State owed to ISI, and to cease providing security guard services in New York for a period of five years.  (ARII00121-30.)  Mr. Karawia later provided the following explanation to the Federal Aviation Administration in connection with a bid to provide services to that agency: "we surrendered our New York State License because we found the regulatory atmosphere in New York to be quite hostile to companies that were not based in New York." (ARII00630.)

Contract to substitute a new entity as obligor.  (Hearing Tr. 20:8-25.)  In September of 2002, the GSA denied the proposed novation and cancelled the contract.[3]  (Notice of Cancellation, dated Sept. 19, 2002, ARII00088-89.)  ISI contends that the GSA cancelled the contract in bad faith as a result of not only the unfounded negative publicity, but also the racial animus of the GSA's Chief Contracting Technical Representative, Robert Soden, who is alleged to have directed racial slurs at Karawia in front of ISI employees at training seminars he conducted.[4]  (Email Corresp., dated Jul. 15, 2002, ARII00002.)  According to emails sent by an ISI employee to Karawia, Soden referred to Karawia as a "camel jockey" and a "sand nigger" and informed ISI employees that Karawia was under investigation and would be soon going out of business.  (*Id*.)  If true, these allegations are certainly reprehensible especially as they come from a government employee, but they do not have a causal connection with ISI's claims here.

Subsequent to the May 2001 Consent Order, and during the period of the renewed GSA Contract, the DOL continued to receive payroll complaints from ISI employees.  On May 23, 2003, the DOL filed a second complaint against ISI alleging numerous and repeated violations of the SCA, including underpayments to employees in excess of $600,000. (Complaint dated May 23, 2003 (the "Second Complaint"), ARIV00002-06.)  Similar to the Initial Complaint, the Second Complaint also sought to debar ISI from federal contracting pursuant to the Act. (*Id.*)

Following extensive discovery and several adjournments made at the requests of both ISI and the DOL, an administrative hearing was held before a DOL Administrative Law Judge ("ALJ") in November 2004 and January 2005.[5]  In July 2005, following receipt of post-hearing briefs,[6] the ALJ issued a decision that found ISI had violated the SCA "an astounding number of times" after the Consent Order, which constituted "culpable neglect" precluding relief from debarment. (Decision of ALJ, dated Jul. 6, 2005 ("ALJ Decision"), ARIV00376-86.)

---

[3] As discussed below, the Government need not approve a proposed novation unless it is in its own best interest.  The contract expressly provided that it could be cancelled by either party on thirty days' notice.

[4] ISI filed a separate action in the Court of Federal Claims alleging that the GSA Contract was cancelled in bad faith.  (Hearing Tr. 21: 21-25.)

[5] The DOL requested extensions of time to reply to discovery requests. (*See* ARIV00140).  ISI's initial requests to adjourn the hearing date were granted, but its motion to adjourn the hearing from November to January was denied. (*See* ARIV00036, ARI00185, ARIV00212.)

[6] Deadlines for submissions of post-hearing briefs were also extended at the parties' requests. (*See* ARIV00310.)

ISI appealed the ALJ Decision to the DOL's Administrative Review Board ("ARB"). The ARB upheld the ALJ Decision and found that the record contained ample evidence that ISI had violated the Act, including evidence that ISI had underpaid 1,943 employees a total of $631,081.07 in wages and fringe benefits. (ARB Decision, ARIV00748.) After ISI's request for reconsideration before the ARB was denied, it commenced this action in June 2008.  In July 2008, the three-year period of ISI's debarment commenced when its name was added to the list maintained by the Comptroller General of persons and entities prohibited from contracting with the United States. [7]  (*See* 41 U.S.C. §354(a)).

## II. STANDARD OF REVIEW

### A. Appropriate Standard of Review

Although this matter is before me on cross motions for summary judgment, the familiar legal standard of Federal Rule of Civil Procedure 56 does not apply.  My jurisdiction to review the ARB Decision derives from the Administrative Procedures Act, 5 U.S.C. §702, but straightforward application of the "arbitrary and capricious" and "substantial evidence" standards that typically apply to judicial review of agency determinations is also inappropriate.  Rather, the statutory language that governs judicial review of administrative actions under the SCA requires that I apply a unique standard of review, the contours of which are a question of first impression in this Circuit.

The Secretary of Labor's authority to enforce the SCA—including its authority to make rules, issue orders, hold hearings, and make decisions based upon findings of fact—is governed by the hearing provisions of the Walsh-Healy Act, 41 U.S.C. §38-39, which are incorporated by reference into the SCA.  41 U.S.C.  §353(a).  Section 39 of the Walsh-Healy Act ("Section 39") provides that the Secretary or his authorized representative "shall make findings of fact after notice and hearing, which findings of fact shall be conclusive upon all agencies of the United States, and if supported by the preponderance of the evidence, shall be conclusive in any court of the United States." 41 U.S.C. § 39.   This standard, however, "presents certain interpretative difficulties," because "in its normal iteration, the preponderance of the evidence standard … establishes a quantum of proof to be measured by the fact finder, not a standard for error-detection." *Dantran v. U.S. Dep't. of Labor*, 171 F.3d 58, 70 (1st Cir. 1999); *see also, J.N. Moser*

---

[7] In July 2008, ISI moved to enjoin the DOL from placing its name on the Comptroller General's debarment list. Judge Swain, sitting in Part I, denied the motion, finding that ISI had failed to show the requisite likelihood of success on the merits.  (*See* Order, dated July 17, 2008, Swain, J. (Part I)).

*Trucking, v. U.S. Dept of Labor*, 306 F.Supp.2d 774, 781 (N.D. Ill. 2004) ("the precise standard that Congress intended is obscured by a poor choice of phrase, for 'preponderance of the evidence' customarily sets a standard of proof and not a standard of review.")

Although the Second Circuit has not addressed the issue, courts have generally agreed that the "preponderance of the evidence" language in Section 39 mandates application of a standard of review somewhat more exacting than the "substantial evidence" standard that ordinarily applies to judicial review of agency fact finding.  Although they have taken different paths to reach the same answer (at times reluctantly), courts have generally held that the DOL's administrative decisions concerning the SCA should be reviewed for clear error.[8]  *See, e.g. Dantran*, 171 F.3d at 70; *Amcor, Inc. v. Brock*, 780 F.2d 897, 899 (11th Cir. 1986); *J.N. Moser Trucking,* 306 F.Supp.2d at 784.  In *Dantran*, the First Circuit settled on a clearly erroneous standard reasoning by analogy from the Seventh Circuit's adoption of that standard to judicial review of arbitral decisions under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").  *Dantran*, 171 F.3d at 70.  That provision specifies "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."  29 U.S.C. §1401(c).  In contrast, the court in *J.N. Moser*, 306 F.Supp.2d at 784, found *Dantran*'s analogy misplaced and the judicial review provision of the Individuals with Disabilities in Education Act ("IDEA," 20 U.S.C. §1415(i)(2)) a more apt comparison.  That provision allows a party "aggrieved by the findings and decision" of a state administrative agency to bring an action in a district court which "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. §1415(i)(2)) (internal subparts omitted).  Because the Seventh Circuit has held that the "clear error" review applies to judicial review of administrative decisions under

---

[8] Several courts have cited the following language from *American Waste Removal Co. v. Donovan*, 748 F.2d 1406, 1408 (10th Cir. 1984), to articulate the appropriate standard of review: "The district court's scope of review is limited to the legal question whether the ALJ applied and satisfied the standard of proof required to find a violation of the Service Contract Act." *See, e.g., Elaine's Cleaning Service, Inc. v. U.S. Dept. of Labor*, 1995 WL 1612534, *2 (S.D. Ohio 1995); *Vigilantes, Inc. v. Administrator, Wage and Hour Div., U.S. Dept. of Labor*, 769 F.Supp. 57, 61 (D.Puerto Rico 1991); *Fields v. Chao*, 2009 WL 425016, 2 (D. Kan. 2009).  However, this reformulation of the language of Section 39 strikes me as less than helpful when, as noted by the court in *Johnson v. U.S. Dept. of Labor*, 2005 WL 1970742, *6 (S.D.Ohio 2005), *aff'd* 205 Fed. Appx. 312 (6th Cir), "there is obviously some substantive component to the Court's review beyond assuring that the decision recites that [the correct] standard was utilized."  The standard articulated by *American Waste Removal* begs the question of how a district court is to properly determine if the ALJ "satisfied" the preponderance of the evidence standard.

IDEA, the district court in *J.N. Moser* concluded that it was "constrained to apply the clearly erroneous standard" to Section 39.  306 F.Supp.2d at 784.

Although the thoughtful analysis of the courts in both *Dantran* and *J.N. Moser* is helpful to the task at hand, in my view neither of the statutory analogies they suggest is entirely apposite. On the one hand, the MPPAA, the object of *Dantran*'s analogy, speaks of a presumption that may be overcome only by a "clear preponderance," but Section 39 neither refers to a "*clear* preponderance," nor speaks in terms of a presumption.  On the other hand, the IDEA requires the district court to "hear additional evidence at the request of a party," and neither Section 39 nor the DOL's implementing regulations expressly permit introduction of new evidence before either the ARB or the district court.[9]  *See* 29 C.F.R. §8.1(d).

The Second Circuit has not interpreted the judicial review provision of the MPPAA, but it has expounded upon the "independent" judicial review of agency decisions required by IDEA and the Supreme Court's decision in *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176, 206 (1982).  Unlike the Seventh Circuit, the Second Circuit has held that a modified form of *de novo* review applies in the IDEA context: while "review is *de novo*, it is tinged with a significant degree of deference to the state educational agency, as we are essentially acting in an administrative-law-style capacity.'"  *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008).[10]  Although the court must not "simply rubber stamp administrative decisions [under IDEA], they are expected to give 'due weight' to these proceedings"; "[i]ndependent judicial review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'"  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (quoting *Rowley*, 458 U.S. at 206).

The Second Circuit has also interpreted another analogous statutory provision to similarly require a form of deferential *de novo* review.  The Commodities Exchange Act, 7 U.S.C. §9, provides for circuit court review of orders by the Commodities Future Trading Commission

---

[9] Indeed, the DOL's regulations state that the "Secretary's findings of fact after notice and a hearing are conclusive upon all agencies of the United States, and if supported by a preponderance of the evidence, conclusive in any court of the United States, without a *trial* de novo." 29 C.F.R. §4.189 (emphasis added).

[10] Of relevance to the procedural posture of this case, the Circuit has also noted that in an action under IDEA, a motion for summary judgment "often triggers more than an inquiry into possible disputed issues of fact… [and] serves as a pragmatic procedural mechanism for reviewing a state's compliance with the [statute]." *Lillbask v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n. 3 (2d Cir. 2005) (internal citations omitted).

("CFTC") and requires the Court of Appeals to treat as "conclusive" the "findings of the [CFTC] as to the facts, if supported by the weight of evidence."  The Second Circuit defines its own standard of review in this circumstance as follows: "Legal questions are subject to plenary review, but where a question implicates [CFTC] expertise, we defer to the [CTFC]'s decision if it is reasonable."  *Piccolo v. Commodity Futures Trade Comm'n.*, 388 F.3d 387, 389 (2d Cir. 2004).  Although judicial review under the Commodities Exchange Act bypasses district court review, the statute is an apt comparison to Section 39 because facts supported by the "weight of the evidence" are the effective equivalent of facts supported by a "preponderance" thereof.

The Second Circuit's consistent treatment of how a district court is to review administrative decisions under IDEA and the circuit is to review administrative decisions under the Commodities Exchange Act, where each statute requires the reviewing court to uphold the administrative decision if supported by a preponderance of the evidence, lead me to conclude that in this Circuit a "modified *de novo*" standard of review is appropriate under Section 39. Accordingly, I must undertake an independent or plenary review of the administrative record as a whole, but my review must be "tinged with a significant degree of deference to the agency," particularly where the questions implicate their expertise.[11]  *Newington Bd. of Ed.*, 546 F.3d at 118.  Although this standard is slightly more exacting than the "clear error" standard other courts have used to review DOL decisions under Section 39, I need not decide precisely how much more strict it is because, as explained below, I find that the ARB Decision here must be upheld under the more exacting standard and thus is not clearly erroneous.

### 2. To whom is deference owed?

Before turning to the merits, I must also resolve a second and related standard-of-review question:  "whether deference is due to the ALJ or the ARB."  *Dantran*, 171 F.3d at 71.  This is also a question of first impression in the Second Circuit.  Although the *Dantran* majority correctly notes that the DOL's regulations refer to the ARB as an "appellate body" without the power to receive new evidence, this limitation does not lead inexorably to the conclusion that the ARB "must accept an ALJ's fact finding absent clear error." *Id*.  Rather, I find compelling Judge Cudahay's dissent in *Dantran* which notes that *de novo* review on mixed questions of law and fact is clearly within the reviewing powers of an appellate body.  *Id.* at 77.  The standards of review under the IDEA and the Commodities Exchange Act addressed *supra* are but a few of

---

[11] Determining whether an employer's payroll practices and fringe benefit practices violate the SCA is within the unique expertise of the DOL and its administrative tribunals.

many examples of appellate-style review that is not limited to detection of purely legal errors.  If, as an appellate body, the ARB does more than simply review ALJ fact finding for clear error, then this Court's deference should be to the ARB's account of the facts.

The DOL's regulations confirm that the ARB is tasked with an independent review of the record evidence to decide mixed questions of fact and law.  First, the regulations make clear that the ARB has jurisdiction to hear "appeals from questions of law *and fact* . . . from decisions of Administrative Law Judges," which suggests that the ARB's role is more than simply looking for legal errors. 29 C.F.R. §8.1(b) (emphasis added).  Second, the ARB is an "appellate body" that must decide cases "on the basis of *all* relevant matter contained in the *entire* record before it," again suggesting that the ARB has an independent obligation to examine and weigh the record evidence.  29 C.F.R. §8.1(d) (emphasis added). Third, the ARB has authority to "modify or set aside findings of fact only when it determines that those findings are not supported by a preponderance of the evidence," a standard substantially identical to that which applies to this Court's review under Section 39 and which similarly contemplates a plenary review and reweighing of record evidence.  29 C.F.R.    § 8.9(b).  Consequently, in this Court's modified *de novo* review "tinged with deference," such deference is owed to the ARB's application of the law to the facts.

### III. DISCUSSION

#### A. Debarment Under the Service Contract Act

Pursuant to the SCA, contracts to provide services to the United States must include provisions that obligate the service provider to pay its employees a minimum wage and provide them with certain minimum fringe benefits. 41 U.S.C. §351.  Breach of such contractual provisions constitutes a violation of the Act and subjects the contractor to liability for the amount of the unpaid compensation or benefits. 41 U.S.C. §352.  "Unless the Secretary [of Labor] otherwise recommends because of unusual circumstances," the SCA imposes the sanction of a three-year debarment on federal contractors found by the Secretary to have violated the SCA.  41 U.S.C. §354(a).  It is the contractor's burden to prove that unusual circumstances warrant relief from debarment. 29 C.F.R. §4.188(b)(1); *Summit Investigative Service, Inc. v. Herman*, 34 F.Supp.2d 16, 20 (D.D.C. 1998). "[D]ebarment of contractors who violated the SCA should be the norm, not the exception, and only the most compelling of justifications should relieve a violating contractor from that sanction."  *Vigilantes, Inc. v. Administrator of Wage and Hour Div., U.S. Dept. of Labor*, 968 F.2d 1412, 1418 (1st Cir. 1992).

Although the SCA does not define the term "unusual circumstances," its legislative history suggests that the authority to relieve a contractor from debarment was "intended to be used in situations where the violation was a minor one, or an inadvertent one, or one in which disbarment . . . would have been wholly disproportionate to the offense." 29 C.F.R. §4.188 (quoting House Committee on Education and Labor, Special Subcommittee on Labor, Hearings on H.R. 6244 and H.R. 6245, 92 Cong., 1st Sess. 3 (1971)). Consistent with this view, the DOL has promulgated regulations that establish a three-part test to determine the existence of unusual circumstances in a particular case, depending upon the absence of aggravating factors and the presence of mitigating factors. 29 C.F.R. § 4.188(b)(3)(i)-(ii).

First, as a threshold matter, the alleged violation of the Act must be free from aggravating factors such as willful or deliberate conduct, culpable neglect, a history of similar violations, or serious violations in the instant case. 29 C.F.R. § 4.188(b)(3)(i). Second, the regulations note that "[a] good compliance history, cooperation in the investigation, repayment of monies due, and sufficient assurances of future requirements are generally perquisites to relief [from disbarment]." 29 C.F.R. § 4.188(b)(3)(ii). Third, where the foregoing prerequisites are present and aggravating factors absent, a variety of mitigating factors should be considered, including (i) whether the contractor has previously been investigated for violations of the SCA, (ii) whether the contractor has committed record keeping violations which impeded the investigation, (iii) whether liability depended upon resolution of a bona fide legal issue of doubtful certainty, (iv) the extent of the contractor's efforts to ensure compliance with the SCA, (v) the nature, extent and seriousness of any past or present violations, including the impact of violations on unpaid employees, and whether the sums due were promptly paid. *Id.*

Both the Department of Labor's Board of Service Contract Appeals (predecessor to the ARB) and federal courts have construed the regulations to foreclose consideration of the second and third prongs if aggravating factors under the first prong are present. *See In re Kleen Rite Corp.*, 1992 WL 752885 (L.B.S.C.A. Oct. 13, 1992); *see also*, *Summit Investigative Service*, 34 F.Supp.2d at 20; *A to Z Maint. Corp. v. Dole*, 710 F.Supp. 853, 857-859 (D.D.C. 1989).

**B. ISI's Violations of the Act**

A federal contractor who underpays employees violates the terms of his federal contract and, consequently, the Act. 41 U.S.C.A. § 352(a). "A contractor has an affirmative obligation to ensure that its pay practices are in compliance with the Act." 29 C.F.R. §4.188(b)(4) (citing administrative decisions). Although a finding of "unusual circumstances" warrants relief from

the sanction of debarment, such a finding is not relevant to the question of whether the violations occurred in the first instance.

Both the ALJ and the ARB found that ISI had violated the Act by underpaying its employees.  (*See* ALJ Decision, ARIV00383, "[ISI was] found to be in violation of the Act an astounding number of times.");[12] ARB Decision, ARIV00750, "the record contains ample evidence that [ISI] violated the Act.")  During the course of the Administrative Hearing, four DOL investigators testified that ISI's failure to pay proper wages and fringe benefits led to at least 57 DOL enforcement actions. (*See, e.g.*, Hearing Tr. 128-132 (Weeks); 188-199 (LaCroix); 272-276 (Quinn)  333-341 (Martin)).

ISI takes issue with the ALJ's statement that ISI "admitted" violations of the Act.[13] However, upon my own review of the administrative record I find that ISI repeatedly acknowledged that it had underpaid its employees, effectively conceding violations of the Act. ISI argued against culpability by maintaining the underpayments were minor, inadvertent, quickly rectified, or the result of the GSA's late payments.  For example, counsel for ISI stated in his opening argument before the ALJ that "there were a couple of situations in January of 2002 in which other underpayments arose."[14]  (Hearing Tr. 23:10-12.)  Also at the hearing, an investigator in the DOL's Wage and Hour Division authenticated a chart summarizing the DOL's SCA-compliance actions against ISI since May 2001, which showed a total of 1,943 ISI employees had been underpaid by a total of $630,081.07. (Hearing Tr. 131:1-25; *see also* ARI01820-23.)  The chart was admitted into evidence without objection, although Mr. Karawia offered innocent explanations—some of them compelling—about the causes of the underpayments or the alacrity with which they were remedied.  (*Id.* at 132:1.)

For example, on direct examination Mr. Karawia testified about several of the "big ticket items," including $121,000 in unpaid benefits to a third-party benefit administrator for employee

---

[12] The ALJ's use of the passive voice—"was found"—suggests that it improperly relied the sheer number of DOL enforcement actions to conclude that ISI violated the Act, instead of reaching its own independent conclusion as it was required to do.

[13] In its Decision, the ARB found error in the ALJ's finding that ISI had admitted violations of the Act because it found "no such admission" in the record.  (ARB Decision, ARIV00750.)

[14] ISI makes a similar admission in its Memorandum of Law in support of the instant motion: "there were minor occasions where ISI erred in the amount of payment."  (Pl's. Mem. at 6.)  Although the amount of such underpayments was generally less than those that arose around the time the GSA Contract was cancelled, the record does not support characterizing them as "minor."

sick pay.  (Hearing Tr. 578:6-21.)  Mr. Karawia testified that the DOL notified ISI of the unpaid benefits on November 19, 2002 and ISI paid them on December 2, 2002, demonstrating the underpayments were quickly rectified but essentially conceding that the payments required by both contract and statute were not initially paid. (*Id*.)  As another example, Mr. Karawia testified that a compliance action from 1999 was the result of an "isolated incident" in which ISI issued to employees a total of $29,705 in checks inadvertently written on a closed account.  (Hearing Tr. 596: 8-19.)  ISI's post-hearing reply brief also contains implicit—if not express—admissions that it violated the Act.  (*See* e.g. ARIV00371 "Our situation of late payments was not a matter of convenience but of necessity.  We have demonstrated, the instances of failure to pay were either as a result of legitimate legal differing interpretations …[or ISI having] exhausted all avenues of attempting to obtain funds elsewhere.")  In short, ISI's argument that the underpayments were caused by the GSA's late payments or were promptly rectified is relevant to ISI's *culpability*, but they belies the SCA violations for which there is clear and independent evidentiary support in the record.  As a consequence the ARB's finding that ISI violated the Act is amply supported by a preponderance of the evidence in the record before me.

The ARB found fault with the ALJ's conclusion that ISI had violated the Act by failing to fulfill its obligations under the May 2001 Consent Order because "the SCA's debarment sanction does not apply to those who violate consent decrees."  (ARB Decision, ARIV00750.)  The ARB is correct:  that ISI violated the SCA subsequent to signing the Consent Order is relevant to the degree of the company's culpability, but violations of the Consent Order are not independent violations of the Act.[15]  Nevertheless, because ISI's violations of the Act are clearly supported by a preponderance of the record evidence and I owe deference to the ARB which reached the same conclusion, the ALJ's error was harmless and correction thereof would not afford ISI the relief it seeks.

---

[15] At least one violation of the Consent Order found by the ALJ was an independent violation of the SCA. The ALJ found that "Mr. Karawia request[ed] and receiv[ed] a refund of money paid to a third-party benefits administrator under the GSA contract," which was allegedly paid twice as a result of an ISI accounting error.  (ALJ Decision, ARIV00379.)  The ALJ found that "Mr. Karawia testified that he did not know this was in violation if the Act," but violated the Consent Order because he did not seek legal advice before requesting the reimbursement. (*Id*.) However, Mr. Karawia's request for reimbursements itself was a violation of the Act, as both the DOL and his labor and employment counsel later informed him.  (*See* Hearing Tr. 560:10-22.)

**C. Aggravating Factors**

The ARB's conclusion that that ISI's conduct amounted to culpable neglect is also amply supported by the record evidence.  Consequently, ISI failed to meet its threshold burden of establishing that its violations of the Act were free of aggravating factors.  29 C.F.R. § 4.188(b)(3)(i).  As the term is used in the DOL's regulations, culpability "require[s] more than simple negligence or a mere failure to ascertain whether one's practices coincide with the law's demands," *Dantran*, 171 F.3d at 68, but does not require specific intent. *J&J Merrick's Enters., Inc.,* BSCA No. 94, Slip Op. at 5 (Oct. 27, 1994).

ISI claims its conduct was not willful, deliberate, or culpable.  Although the ALJ credited Mr. Karawia's testimony that the violations of the Act "were not purposeful" and "promptly rectified" after notice was received from the DOL, he found ISI never took adequate steps to ensure future compliance and "continued violating the Act until GSA finally cancelled the contract."  (ALJ Decision, ARIV00384)  The ALJ thus concluded that the number of compliance actions initiated against ISI—thirty six of which post-dated the 2001 Consent Decree— alone "indicated extreme irresponsibility that amounting to culpable neglect."[16]  *Id.*  The ARB similarly found that the "record plainly demonstrates that [ISI] repeatedly violated the Act after [the DOL] . . . had provided specific guidance on how to comply with the Act," and that ISI's "numerous and repeated underpayments" constituted "not only culpable neglect, but willful, intentional, and deliberate conduct as well."   (ARB Decision, ARIV00751.)

In support of its argument that both administrative tribunals erred in finding that ISI acted with culpable neglect, ISI places heavy reliance on *Elaine's Cleaning Services, Inc. v. U.S. Dept. of Labor,* No. C-3-92-332, 1995 WL 1612534, at *4-6 (S.D. Ohio Sept. 29, 1995), *aff'd*, 106 F.3d 726 (6th Cir. 1997) ("*Elaine's*").  There, the district court reversed an administrative debarment decision because the contractor's violations were *de minimis*, inadvertent or at most negligent, and wholly disproportionate to the offense.  *Id* at *3.  However, *Elaine's* is readily distinguishable.  In contrast to ISI's numerous SCA violations, which resulted in at least 57 DOL compliance actions, in *Elaine's* only three SCA violations were alleged and they totaled $22,348 in temporarily underpayments.  Moreover, unlike ISI, Elaine's Cleaning Services was inexperienced with federal contracting and reliance on erroneous advice of an experienced

---

[16] It merits note that DOL compliance actions were not opened for each employee complaint or SCA violation.  DOL investigator Daniel Weeks testified that "at the end of the contract period we received so many complaints . . . that anything that came in that wasn't tied to one of these largest [sic] systemic issues . . . we rolled into this [one] compliance action." (Hearing Tr. 101:11-20.)

bookkeeper led to one of its violations of the Act. [17]   *Id.* at *4.  Furthermore, unlike the contactor in *Elaine's*, ISI received specific notice of adequate compliance measures through the Consent Order and its prior dealings with the DOL.

ISI's numerous violations of the SCA after receiving specific notice of the Act's requirements constitute culpable neglect to ascertain whether practices are in violation of the Act, an aggravating factor that precludes relief from debarment.  29 C.F.R. §4.188(b)(3)(i); *See Johnson v. U.S. Dept. of Labor*, 205 Fed. Appx. 312, 316, 2006 WL 2373390, *4 (6th Cir. 2006) (affirming ARB decision that cited "an on-point administrative precedent that 'held that commission of SCA violations after specific notice that a particular practice is in violation constitutes ... culpable neglect'"); *A to Z Maint. Corp. v. Dole*, 710 F.Supp. 853, 857-859 (D.D.C. 1989) (affirming administrative decision that "unfamiliarity with the requirements of the SCA may only constitute 'unusual circumstances' once").

ISI's history of similar violations is another aggravating factor that forecloses relief from debarment.  In the administrative proceedings, ISI consistently objected to introduction of evidence concerning alleged violations of the SCA that predated the Consent Order because ISI signed it without admitting violations of the Act. (*See, e.g.,* Hearing Tr. 129:7-12.)  ISI did agree, however, that the facts set forth in the Consent Order—including that the DOL had opened forty-two investigation files and ISI agreed to pay its employees $157,789 in unpaid compensation — would constitute findings. (Consent Order, at 4-6.)  Such findings are relevant to whether ISI had a history of similar violations, even if the earlier underpayments would have been excused on the basis of "unusual circumstances."  *See A to Z Maint. Corp.*, 710 F.Supp. at 857-859.

In sum, based upon my independent review of the record, ISI's numerous and repeated violations of the SCA, particularly after being put on notice as to the statute's requirement, constitute culpable neglect, an aggravating factor that precludes relief from debarment.  ISI's history of similar violations supports this conclusion.  Consequently, the ARB Decision is supported by a preponderance of the evidence and should be affirmed.   Although the presence of aggravating factors has been held to foreclose further inquiry into whether "unusual circumstances" warrant relief from disbarment, *see Summit Investigative Service*, 34 F.Supp.2d at 20, the merits of ISI's other arguments are addressed below.

---

[17] The final violation of the Act by the contractor in *Elaine's*—a delay in increasing its employees' rate of pay caused by the government's late increase in its payment schedule—is addressed *infra*.

### D.  GSA's Late Payments

As it did in the administrative proceedings below, ISI argues that late payments under the GSA Contract impacted its ability to pay employees and thus constitute "unusual circumstances" that warrant relief from debarment.  Specifically, Karawia testified that during certain "crunch periods" in 2002 the GSA owed ISI as much as $3.5 million under the GSA Contract and that Karawia exhausted his financial resources—both business and personal—to meet his payroll obligations. (Hearing Tr. 537:11-22; 540:10-12.)  However, the amount owed to ISI under the GSA Contract in a given month was consistently far less than the amount that was late.  For example, during the "crunch period" of July 2002, the GSA owed slightly more than $2 million on the contract but only $120,000 was more than thirty days late.  (ARII00216.)  In any event, this argument falls short for several reasons.

First, even if ISI were able to establish that the GSA's late payments caused ISI to violate the Act, this would not excuse ISI's failure to timely pay its employees the full amounts they were owed.  In *Kleen-Rite Corporation,* the Board of Service Contract Appeals rejected the argument ISI asserts here:  "The purpose of the SCA is to protect the rightful wages of service employees. There is no provision in the [SCA] or the regulations which permits an employer to wait until being reimbursed by another party before fulfilling its obligations to its employees." *In The Matter Of: Kleen-Rite Corporation,* BSCA No. 92-09, 1992 WL 752885 (L.B.S.C.A.) (Oct. 13, 1992).  ISI again relies on *Elaine's* which found that debarment is "wholly disproportionate for a contractor's offense when the *sole*, competent producing cause of that offense was the default of the government." *Elaine's*, 1995 WL 1612534, at *5 (emphasis added).  Even if *Elaine's* does stand for the proposition that the government's late payments may constitute "unusual circumstances" in some cases, this is not such a case.

ISI's failure to establish by a preponderance of the evidence that the GSA's late payments were *a* cause of the underpayments to its employees, let alone the *sole* cause is the second shortcoming of its late-payment argument.  Although Karawia testified that he exhausted his business and personal resources, nowhere does he explain how the general "cash crunch" caused by the late payments prevented ISI from making fringe benefit payments required by the Act even as it continued to pay employees' base salaries.  Furthermore, Mr. Karawia's testimony does not explain the fifteen compliance actions concluded between January 1, 2002 and May 1,

2002 when the GSA's payments were current and had been for at least four months previous.[18] (ARI01818-19; ARII00215-16.)

Third, Karawia's testimony and ISI's argument that the company promptly corrected underpayments upon receipt of notice may mitigate ISI's culpability, but it undermines ISI's argument that they were unable to pay their employees because the GSA was late in paying them.  For example, ISI contends that the months surrounding the October 2002 cancellation of the GSA Contract was a "crunch period" during which ISI was short on cash.  (Hearing Tr. 535:8-16.)  However, during that period ISI resolved an underpayment that the DOL calculated to exceed $120,000 in just eight days. (Hearing Tr. 577:16-20; 578:1-21.)  Prompt resolution of underpayment issues may indicate ISI's good faith but it counters the argument of a any causal link between the GSA's late payments and ISI's underpayments to its employees.

### E. Bad Faith Cancellation / Racial Animus

ISI also argues that negative media attention in New York and Robert Soden's racial animus resulted in a bad faith cancellation of the GSA Contract, itself an "unusual circumstance."  Although Soden's alleged comments are reprehensible ISI does not establish by a preponderance of the evidence that his racial animus or the GSA's bad faith led to cancellation of the contract or that, even if it did, bad faith cancellation of the contract would warrant relief from debarment.[19]

Just as ISI has not established that the GSA's late payments caused the violations of the Act that led to its debarment, neither has ISI established that cancellation of the GSA Contract played a direct causal role in the SCA violations.  Mr. Karawia testified that cancellation of the GSA Contract set off a "fire drill" and caused employees to be unsure of the company's continued viability and to lodge numerous payroll complaints with the DOL, but many of ISI's SCA violations predate cancellation of the GSA Contract and some relate to wholly separate federal contracts.  A preponderance of the evidence does not support a direct causal link between cancellation of the contract and the SCA violations that led the DOL to seek debarment, even if some of the underpayments may be attributable to confusion caused by the cancellation which

---

[18] In fairness to ISI, I note that the fifteen compliance actions concluded during this period totaled less than $10,000 in underpayments to employees, and Karawia's testimony about late-payments focused on "big ticket items."  But these compliance actions are simply examples of the alleged SCA violations that cannot be explained away by the GSA's late payments.

[19] The question of whether the GSA Contract was cancelled in bad faith is the subject of a separate action in the Court of Federal Claims.  (Hearing Tr. 471:17-21.)

Mr. Karawia testified came as a "shock." Accordingly, cancellation of the contract, even if based on improper motives, is insufficient to constitute unusual circumstances.

Moreover, upon independent review, the preponderance of the record evidence does not support a conclusion that the contract was cancelled in bad faith. Furthermore, although Robert Soden's alleged conduct is both deplorable and disquieting, ISI fails to show that Soden was responsible for cancellation of the GSA Contract. First, the GSA Contract expressly provided that either party could cancel it on thirty days notice. (*See* Email from Konrad Trope, dated Oct. 8, 2002, ARII00102 (noting contract "clause that gives either side the right to terminate upon 30 days notice.") Second, evidence offered by ISI establishes that a GSA contracting officer in Texas was responsible for reviewing and deciding upon the novation request, and nothing in the record establishes that Mr. Soden had any communication with this official. (Hearing Tr. 442:7-9; Letter from Shelia Brannan, dated Sept. 19, 2002, ARII0088). Third, the GSA cancelled the contract after it rejected ISI's proposed novation. Federal law generally prohibits assignment of federal contracts, 41 U.S.C. §15, and the United States need only agree to a novation agreement when it is in the government's interest. *See* 48 C.F.R. §42.1204. ISI acknowledges that it sought a novation because its New York State business license was in jeopardy.[20] (Hearing Tr. 20:2-11; 452:21-25; *see also*, Letter from Roger Pinnau, dated Jul. 19, 2002, ARII00030-31.) ISI's licensing troubles stemmed from the State of New York's lawsuit that alleged ISI had fraudulently charged for guard services that did not meet contract requirements and to settle that action ISI agreed to pay restitution and cease operations in New York. The state's allegations and the unsettled status of ISI's license to provide security services in New York were ample reason for the federal government to conclude that novation of the GSA Contract was not in its best interest and to exercise its right to cancel the contract.

In short, although isolated pieces of evidence attribute reprehensible comments to a federal agent and suggest that the New York State investigation may have been commenced as a result of post-9/11 anti-Muslim racial animus, examination of the record as a whole does not support the conclusion that the *federal* government acted in bad faith. "It is well settled in the case law that government officials are presumed to act conscientiously and in good faith in the discharge of their duties," *Libertatia Associates, Inc. v. U.S.*, 46 Fed. Cl. 702, 706 (2000) (citing

---

[20] Although in correspondence with the GSA after the contract was cancelled ISI's general counsel took the position that ISI could still perform on its federal contract if it lost its New York State license, ARII00100, at the hearing Mr. Karawia testified that loss of the New York State license would mean that ISI could not maintain the GSA Contract. (Hearing Tr. 416:6-8).

cases), and the record evidence supports the conclusion that the GSA cancelled the contract for legitimate reasons related to questions about ISI's license and its request for a novation, even though under the contract itself the GSA needed no reason at all.  Consequently, ISI fails to establish by a preponderance of the evidence either a causal link between Soden's reprehensible conduct and the contract cancellation or that the federal government otherwise acted in bad faith.

### F. De Facto Debarment/Double Jeopardy

ISI also argues that it has been "de facto debarred" since the GSA Contract was cancelled in October 2002 because it has since been denied federal contracts on the basis of a finding of non-responsibility by the GSA which in turn was based on the circumstances of the cancellation of the GSA Contract and ISI's legal troubles in New York.  In February 2003 the same GSA contracting officer in Texas who cancelled ISI's contract rejected ISI's bid for a new contract, because ISI did not meet the requirements of Federal Acquisition Regulation ("FAR") 9.103. That regulation requires a contracting officer to make an "affirmative determination" of a contractor's responsibility, including that the contractor has a satisfactory performance record and record of integrity and business ethics.  48 C.F.R. §9.103.  Later, ISI lost a contract to provide security services to the Federal Aviation Administration ("FAA") after the FAA received unfavorable information about ISI's performance and legal problems in New York, presumably from the GSA's finding of non-responsibility.  (ARII00627-28.)  As a result, ISI argues that it has been de facto debarred from federal contracting since the GSA Contract was cancelled.[21]

Courts have found merit in de facto debarment arguments on due process grounds.  That is, without the required notice and opportunity to be heard adverse agency action which effectively precludes a contractor from obtaining government work violates due process.[22]  *See, e.g.*, *Old Dominion Dairy Prods. v. Sect'y. of Defense*, 631 F.2d 953 (D.D.C. 1980).  ISI thus

---

[21] ISI contends that I must consider "the real world significance" of an additional three-year period of formal debarment, including the fact that debarment may bankrupt ISI. (Pls. Mem. at 23.)  But the statute is unmistakably clear:  a company's three-year debarment does not commence until the company's name is published in the Comptroller General's list of SCA violators.  41 U.S.C. § 354(a). A contractor is not entitled to a "credit" for the period during which it contests the debarment, whether administratively or otherwise and the ARB has held that adverse effects of debarment should not be considered as a mitigating circumstance.  *Integrated Res. Mgmt., Inc. of Or.,* ARB No. 99-119, ALJ No. 1997-SCA-014, slip op at 7 (ARB June 27, 2002).

[22] Such challenge derives from due process rights that attach to governmental deprivation of one's interest in his own reputation: "Where a person's good name, reputation, honor, or integrity is at stake because of what the Government is doing to him, notice and an opportunity to be heard are essential."  *Old Dominion*, 631 F.2d at 963 (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)).

might have challenged the GSA's finding of non-responsibility, coupled with the FAA's reliance thereon, on procedural due process grounds.  But *this* debarment proceeding has nothing to do with that responsibility determination: for one thing this action concerns violations of the SCA that predate that finding, for another the GSA is not a party.

Thus, to assert a de facto debarment argument here ISI must rely on a double jeopardy theory that is not supported under the facts here.  That is, ISI must contend that the GSA's finding of non-responsibility constitutes a punitive sanction such that debarment under the SCA would constitute "punishment" for the same "crime."  ISI relies on *U.S. v. Halper*, 490 U.S. 435 (1989), in which the Supreme Court held that a civil sanction that cannot be fairly characterized as remedial may constitute punishment for purposes of the Double Jeopardy Clause if a defendant has already been punished criminally for the same offense.  However, the holding in *Halper* was abrogated by *Hudson v. U.S.*, 522 U.S. 93 (1997), which held that the double jeopardy protects only against the imposition of multiple <u>criminal</u> punishments for the same offense. Even if ISI were ultimately able to prevail in arguing that the GSA's finding of non-responsibility was punitive instead of remedial (which would be difficult, given ISI's contracting record in New York), ISI's double jeopardy argument fails as a matter of law because that determination was at a civil administrative sanction. *Hudson* 522 U.S. at 103.  ISI's de facto debarment/double jeopardy lacks legal support and thus must be rejected.

Like the ALJ, I am sensitive to ISI's argument that as a practical matter it has been unable to obtain new government contracts since the GSA cancelled its contract in October 2002. However, not only is this debarment action the incorrect forum for ISI to challenge the basis for either the GSA's cancellation or its subsequent non-responsibility determination, the statute that is at issue here is unambiguous.  Under the SCA the three-year debarment period commences when the contractor's name is published in the list of firms that have been "*found* to have violated" the Act. 41 U.S.C. §354(a) (emphasis added).  Congress has made clear that debarment begins upon an administrative finding of a violation of the Act.  Consequently, just as ISI was not subject to formal debarment for the duration of the administrative adjudication period, neither is it entitled to a "credit" against the debarment sanction for that period.  Although at first blush the five year period between the filing of the DOL's complaint and ISI's full exhaustion of its administrative remedies seems excessive, a review of the administrative record shows that ISI requested extensions of time at each step of the process and thus is partly responsible for the extended timeline.  Finally, I note that ISI has not been prejudiced by its election to seek judicial

review of the ARB's decision because the debarment took effect upon denial of ISI's motion for a preliminary injunction in July 2008, shortly after this case was filed last June.

### G. Mr. Karawia is a Responsible Party

The SCA's debarment sanctions apply to "responsible parties" who exercise "control, supervision, or management over the performance of the contract," 29 C.F.R. § 4.187(e), and both the ALJ and the ARB properly concluded that Mr. Karawia was a responsible party. ISI argues that with 6,000 employees and several executives responsible for payroll, Mr. Karawia cannot be deemed a responsible party.  (Pl.'s Mem. at 29.)   However, Mr. Karawia testified that he negotiated governmental contracts and collective bargaining agreements, signed payroll and non-payroll checks, and supervised the work of executives responsible for payroll and SCA compliance.  (*See, e.g.,* Hearing Tr. 634:23-25; 635:1-5; 637:15-19; 638:1-7). Such admissions are clearly sufficient to establish that Mr. Karawia is a responsible party and thus the ARB Decision debarring Mr. Karawia from federal contracting must be upheld well.

### H. Jurisdictional Defect Based on Improper Service of Process

Finally, ISI contends that the ALJ never had jurisdiction over International Protective Services, the corporate entity, because the complaint named International Services, Incorporated, the name under which International Protective Services does business.  However, both International Services, Incorporated and Mr. Karawia answered the administrative complaint, filed motions, and defended against debarment in a full-blown administrative trial.  *See Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 62 (2d Cir. 1999) (holding that jurisdictional defects are forfeited by participating in proceedings).  Consequently, both the ALJ and the ARB properly concluded that International Protective Services forfeited any jurisdictional arguments by appearing in the administrative proceedings.

### CONCLUSION

ISI does not meet its burden to establish that "unusual circumstances" warrant relief from debarment under the SCA.  Although the record reflects that ISI has established some of the prerequisites to relief, such as cooperation in the investigations and repayment of monies due, ISI has failed to establish the absence of aggravating factors:  ISI's numerous violations of the Act after receiving specific notice about how to comply with it constitutes culpable neglect. Consequently, after considering the parties' arguments and reviewing the record before me *de novo*, but with deference for the fact finding below, I conclude that the ARB Decision must be affirmed.  Accordingly, ISI's motion for summary judgment is DENIED and the DOL's motion

for summary judgment is GRANTED. The Clerk of Court is instructed to close this case and any open motions and remove it from my docket.

**IT IS SO ORDERED.**
**New York, New York**
**May** _6_ **, 2009**

_____
U.S.D.J.